# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

MONSANTO COMPANY and
MONSANTO TECHNOLOGY LLC,

Plaintiffs,

vs.

E.I. DUPONT DE NEMOURS AND
COMPANY and PIONEER HI-BRED
INTERNATIONAL, INC.,

Defendants.

Case No. 4:09-cv-00686 (ERW)

**DEFENDANTS' AMENDED
ANSWER AND
COUNTERCLAIMS**

**DEMAND FOR JURY TRIAL**

**FILED UNDER SEAL**

## ANSWER AND COUNTERCLAIMS

E.I. du Pont de Nemours and Company ("DuPont") and Pioneer Hi-Bred International, Inc. ("Pioneer") (collectively "Defendants") as and for their Answer to the Complaint (the "Complaint") filed by Monsanto Company ("Monsanto Co.") and Monsanto Technology LLC ("Monsanto LLC"), by their attorneys, state and allege as follows:

1.      Defendants admit that Monsanto Company and Monsanto Technology LLC (collectively "Monsanto") are corporations organized and existing under the laws of the State of Delaware.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 1 and deny them on that basis.

2.      DuPont admits that it is a Delaware corporation with its principal place of business in Wilmington, Delaware.  Pioneer admits that it is an Iowa corporation with its

principal place of business in Johnston, Iowa.  Defendants otherwise deny the allegations of paragraph 2.

3.      Paragraph 3 states a legal conclusion for which no response is required; Defendants otherwise deny the allegations of paragraph 3.

4.      Paragraph 4 states a legal conclusion for which no response is required; Defendants otherwise deny the allegations of paragraph 4.

5.      Defendants admit that Monsanto is an agricultural company.  Defendants deny the remaining allegations of paragraph 5.

6.      Defendants deny the allegations of paragraph 6.

7.      Defendants admit that Monsanto has licensed the "40-3-2" Event broadly, including to Pioneer, admit that United States Trademark Registration Nos. 1889104 and 2101872 correspond to "Roundup Ready®"; Defendants further admit that U.S. Reissue Patent No. RE39,247E (the "'247 Reissue Patent") reissued on August 22, 2006 to Barry, *et al.* and lists Monsanto Technology LLC as assignee, and that U.S. Patent No. 5,633,435 issued on May 27, 1997; Defendants admit that a copy of the '247 Reissue Patent is attached to Monsanto's Complaint as Exhibit A; and Defendants otherwise deny the remaining allegations of paragraph 7.

8.      Defendants admit that Monsanto has licensed the NK603 Event broadly, including to Pioneer; Defendants otherwise deny the remaining allegations of paragraph 8.

9.      Defendants admit that effective April 1, 2002, Monsanto and Pioneer entered into the Amended and Restated Roundup Ready® Soybean License Agreement

(referred to hereinafter as the "Soybean License Agreement").   Defendants refer the Court to the Soybean License Agreement for the specific terms contained therein, and otherwise deny the remaining allegations of paragraph 9.

10.      Defendants admit that effective April 1, 2002, Monsanto and Pioneer entered into a Roundup Ready® Corn License Agreement (referred to hereinafter as the "Corn License Agreement").   Defendants refer the Court to the Corn License Agreement for the specific terms contained therein, and otherwise deny the remaining allegations of paragraph 10.

11.      Defendants admit that past research activities have included development of glyphosate-tolerant genetic traits for a variety of agriculturally-relevant crops, and that in 2006, statements were made concerning development of a glyphosate-tolerant genetic trait called Optimum® GAT®.   Defendants refer the Court to the precise text of those statements, but deny that paragraph 11 provides a complete and/or accurate representation of the content of those statements.   Defendants admit that they have not made commercial sales of seeds containing Optimum® GAT®, and deny the remaining allegations of paragraph 11.

12.      Defendants admit that they have continued their research and development toward seeds that contain their proprietary Optimum® GAT®, and have made statements regarding same and refer the Court to the precise text of those statements, but deny that paragraph 12 provides a complete and/or accurate representation of the content of those statements.

13.      To the extent that the allegations of paragraph 13 are intended to relate to a commercial product, Defendants deny the allegations of paragraph 13; and to the extent that the allegations relate to something else, the allegations are too vague to admit or deny and are therefore denied on that basis.

14.      Defendants deny the allegations of paragraph 14.

15.      Defendants admit that U.S. Patent Application No. 12/129,947 was published on January 8, 2009 as U.S. Patent Pub. No. US 2009/0011938, and admit that the Complaint refers to this application as the "'938 Application."  Defendants further admit that the '938 Application lists DuPont and Pioneer as assignees of the application. Defendants deny the remaining allegations of paragraph 15.

16.      Defendants refer the Court to the Soybean License Agreement for the specific terms contained therein and otherwise deny the allegations of paragraph 16.

17.      Defendants refer the Court to the Soybean License Agreement for the specific term contained therein and otherwise deny the allegations of paragraph 17.

18.      Defendants refer the Court to the Soybean License Agreement for the specific term contained therein and otherwise deny the allegations of paragraph 18.

19.      Defendants refer the Court to the Soybean License Agreement for the specific term contained therein and otherwise deny the allegations of paragraph 19.

20.      Defendants refer the Court to the Soybean License Agreement for the specific term contained therein and otherwise deny the allegations of paragraph 20.

21.      Defendants refer the Court to the Soybean License Agreement for the specific term contained therein and otherwise deny the allegations of paragraph 21.

22.     Defendants refer the Court to the Soybean License Agreement for the specific term contained therein and otherwise deny the allegations of paragraph 22.

23.     Defendants deny the allegations of paragraph 23.

24.     Defendants refer the Court to the Soybean License Agreement for the specific term contained therein and otherwise deny the allegations of paragraph 24.

25.     Defendants refer the Court to the Soybean License Agreement for the specific term contained therein and otherwise deny the allegations of paragraph 25.

26.     Defendants deny the allegations of paragraph 26.

27.     Defendants refer the Court to the Soybean License Agreement for the specific term contained therein and otherwise deny the allegations of paragraph 27.

28.     Defendants deny the allegations of paragraph 28.

29.     Defendants admit the Optimum® GAT® is capable of expressing proteins in plants such as to provide tolerance to the administration of a glyphosate herbicide. Defendants deny the remaining allegations of paragraph 29.

30.     Defendants refer the Court to the '938 Application for the specific disclosures contained therein and otherwise deny the allegations of paragraph 30.

31.     Defendants refer the Court to the Corn License Agreement for the specific term contained therein and otherwise deny the allegations of paragraph 31.

32.     Defendants refer the Court to the Corn License Agreement for the specific term contained therein and otherwise deny the allegations of paragraph 32.

33.     Defendants refer the Court to the Corn License Agreement for the specific term contained therein and otherwise deny the allegations of paragraph 33.

34.      Defendants refer the Court to the Corn License Agreement for the specific term contained therein and otherwise deny the allegations of paragraph 34.

35.      Defendants refer the Court to the Corn License Agreement for the specific term contained therein and otherwise deny the allegations of paragraph 35.

36.      Defendants refer the Court to the Corn License Agreement for the specific term contained therein and otherwise deny the allegations of paragraph 36.

37.      Defendants refer the Court to the Corn License Agreement for the specific term contained therein and otherwise deny the allegations of paragraph 37.

38.      Defendants deny the allegations of paragraph 38.

39.      Defendants refer the Court to the Corn License Agreement for the specific term contained therein and otherwise deny the allegations of paragraph 39.

40.      Defendants refer the Court to the Corn License Agreement for the specific term contained therein and otherwise deny the allegations of paragraph 40.

41.      Defendants deny the allegations of paragraph 41.

42.      Defendants refer the Court to the Corn License Agreement for the specific term contained therein and otherwise deny the allegations of paragraph 42.

43.      Defendants deny the allegations of paragraph 43.

44.      Defendants admit the Optimum® GAT® is capable of expressing proteins in plants such as to provide tolerance to the administration of a glyphosate herbicide. Defendants deny the remaining allegations of paragraph 44.

45.      Defendants admit that they have continued their research and development toward seeds that contain their proprietary Optimum® GAT®, and have made statements

6

regarding same and refer the Court to the precise text of those statements, but deny that paragraph 45 provides a complete and/or accurate representation of the content of those statements.

46.      Defendants admit that they have continued their research and development toward seeds that contain their proprietary Optimum® GAT®, and have made statements regarding same and refer the Court to the precise text of those statements, but deny that paragraph 46 provides a complete and/or accurate representation of the content of those statements.

47.      Defendants deny the allegations of paragraph 47.

48.      Defendants deny the allegations of paragraph 48.

49.      Defendants admit that on February 6, 2009, GreenLeaf Genetics issued an E-Update relating to Optimum® GAT®, which speaks for itself.  Defendants admit that GreenLeaf Genetics is a joint venture.  Defendants deny the remaining allegations of paragraph 49.

50.      Defendants admit that they have continued their research and development toward seeds that contain their proprietary Optimum® GAT®, and have made statements regarding same and refer the Court to the precise text of those statements, but deny that paragraph 50 provides a complete and/or accurate representation of the content of those statements.

51.      Defendants admit that they have continued their research and development toward seeds that contain their proprietary Optimum® GAT®, and have made statements regarding same and refer the Court to the precise text of those statements, but deny that

paragraph 51 provides a complete and/or accurate representation of the content of those statements.

52.      Defendants admit that on March 2, 2006, DuPont issued a press release, which speaks for itself, and otherwise deny the allegations of paragraph 52.

53.      Defendants admit that on November 28, 2006, DuPont issued a press release, which speaks for itself, and otherwise deny the allegations of paragraph 53.

54.      Defendants admit that they have continued their research and development toward seeds that contain their proprietary Optimum® GAT®, and have made statements regarding same and refer the Court to the precise text of those statements, but deny that paragraph 54 provides a complete and/or accurate representation of the content of those statements.

55.      Defendants admit that on July 2, 2007, DuPont issued a press release, which speaks for itself, and otherwise deny the allegations of paragraph 55.

56.      Defendants admit that on October 17, 2006, DuPont issued a press release, which speaks for itself, and otherwise deny the allegations of paragraph 56.

57.      Defendants deny the allegations of paragraph 57.

58.      Defendants admit that Pat Arthur made statements in April 2009 regarding Optimum® GAT®, but deny that paragraph 58 provides a complete and/or accurate representation of the content of those statements.

59.      Defendants deny the allegations of paragraph 59.

60.      Defendants deny the allegations of paragraph 60.

## CLAIMS FOR RELIEF
### Count I - Patent Infringement

61.     Defendants repeat and reassert their responses to and denials of the allegations contained in paragraphs 1-60 of the Complaint.

62.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 62 and deny them on that basis.

63.     Defendants deny the allegations of paragraph 63.

64.     Defendants deny the allegations of paragraph 64.

65.     Defendants deny the allegations of paragraph 65.

66.     Defendants deny the allegations of paragraph 66.

67.     The statement of paragraph 67 is neither an averment nor an allegation to which a response is required, and Defendants otherwise deny this allegation.

### Count II - Inducement To Infringe

68.     Defendants repeat and reassert their responses to and denials of the allegations contained in paragraphs 1-67 of the Complaint.

69.     Defendants have moved to dismiss this claim so there is no need to respond at this time, except that Defendants deny the allegations of 69-75.

70.     See response to paragraph 69.

71.     See response to paragraph 69.

72.     See response to paragraph 69.

73.     See response to paragraph 69.

74.     See response to paragraph 69.

75.     See response to paragraph 69.

9

## Count III - Breach of Contract - Soybean License Agreement

76.      Defendants repeat and reassert their responses to and denials of the allegations contained in paragraphs 1-75 of the Complaint.

77.      Paragraph 77 calls for a legal conclusion, and contains neither an averment nor an allegation to which a response is required; Defendants otherwise deny paragraph 77.

78.      Defendants deny the allegation of paragraph 78, and state that Monsanto has breached the Soybean License Agreement as described more specifically in Defendants' counterclaim for breach of contract.

79.      Defendants deny the allegations of paragraph 79.

80.      Defendants deny the allegations of paragraph 80.

81.      Defendants deny the allegations of paragraph 81.

82.      The statement of paragraph 82 is neither an averment nor an allegation to which a response is required, and Defendants otherwise deny this allegation.

## Count IV - Breach of Contract Soybean License Agreement

83.      Defendants repeat and reassert their responses to and denials of the allegations contained in paragraphs 1-82 of the Complaint.

84.      Defendants refer the Court to the Soybean License Agreement for the specific term contained therein and otherwise deny the allegations of paragraph 84.

85.      Defendants deny the allegations of paragraph 85.

86.      Defendants deny the allegations of paragraph 86.

87.      Defendants deny the allegations of paragraph 87.

88.       The statement of paragraph 88 is neither an averment nor an allegation to which a response is required, and Defendants otherwise deny this allegation.

### Count V - Breach of Contract - Soybean License Agreement (Patent Application)

89.       Defendants repeat and reassert their responses to and denials of the allegations contained in paragraphs 1-88 of the Complaint.

90.       Defendants deny the allegations of paragraph 90.

91.       Defendants deny the allegations of paragraph 91.

92.       Defendants deny the allegations of paragraph 92.

93.       Defendants deny the allegations of paragraph 93.

94.       The statement of paragraph 94 is neither an averment nor an allegation to which a response is required, and Defendants otherwise deny this allegation.

### Count VI - Breach of Contract - Soybean License Agreement

95.       Defendants repeat and reassert their responses to and denials of the allegations contained in paragraphs 1-94 of the Complaint.

96.       Defendants refer the Court to the Soybean License Agreement and the Roundup Ready® Trademark License Agreement ("Soybean Trademark License Agreement") for the specific term contained therein and otherwise deny the allegations of paragraph 96.

97.       Defendants refer the Court to the Soybean License Agreement for the specific term contained therein and otherwise deny the allegations of paragraph 97.

11

98.      Defendants refer the Court to the Soybean Trademark License Agreement for the specific term contained therein and otherwise deny the allegations in paragraph 98.

99.      Defendants refer the Court to the Soybean Trademark License Agreement for the specific term contained therein and otherwise deny the allegations in paragraph 99.

100.     Defendants deny the allegations of paragraph 100.

101.     Defendants deny the allegations of paragraph 101.

102.     Defendants refer the Court to the Soybean Trademark License Agreement for the specific term contained therein and otherwise deny the allegations in paragraph 102.

103.     The statement of paragraph 103 is neither an averment nor an allegation to which a response is required, and Defendants otherwise deny this allegation.

### Count VII - Unjust Enrichment

104.     Defendants repeat and reassert their responses to and denials of the allegations contained in paragraphs 1-103 of the Complaint.

105.     Defendants deny the allegations of paragraph 105.

106.     Defendants deny the allegations of paragraph 106.

107.     Defendants deny the allegations of paragraph 107.

108.     Defendants deny the allegations of paragraph 108.

109.     The statement of paragraph 109 is neither an averment nor an allegation to which a response is required, and Defendants otherwise deny this allegation.

12

## Count VIII - Breach of Contract - Corn License Agreement

110.      Defendants repeat and reassert their responses to and denials of the allegations contained in paragraphs 1-109 of the Complaint.

111.      Paragraph 111 calls for a legal conclusion, and contains neither an averment nor an allegation to which a response is required; Defendants otherwise deny paragraph 111.

112.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 112 and deny them on that basis.

113.      Defendants deny the allegations of paragraph 113.

114.      Defendants deny the allegations of paragraph 114.

115.      Defendants deny the allegations of paragraph 115.

116.      The statement of paragraph 116 of the Complaint is neither an averment nor an allegation to which a response is required, and Defendants otherwise deny this allegation.

## Count IX - Breach of Contract - Corn License Agreement

117.      Defendants repeat and reassert their responses to and denials of the allegations contained in paragraphs 1-116 of the Complaint.

118.      Defendants refer the Court to the Corn License Agreement for the specific term contained therein and otherwise deny the allegations of paragraph 118.

119.      Defendants deny the allegations of paragraph 119.

120.      Defendants deny the allegations of paragraph 120.

121.      Defendants deny the allegations of paragraph 121.

122.     The statement of paragraph 122 is neither an averment nor an allegation to which a response is required, and Defendants otherwise deny this allegation.

## Permanent Injunction Relief Is Requested

123.     Defendants repeat and reassert their responses to and denials of the allegations contained in paragraphs 1-122 of the Complaint.

124.     Defendants deny the allegations of paragraph 124.

125.     Defendants deny the allegations of paragraph 125.

126.     Defendants deny the allegations of paragraph 126.

127.     Defendants deny the allegations of paragraph 127.

128.     Defendants deny the allegations of paragraph 128.

129.     Defendants deny the allegations of paragraph 129.

## Prayer For Relief

130.     Defendants deny that Monsanto is entitled to the relief requested in its Prayer for Relief, or to any other relief.

131.     Defendants deny that Monsanto is entitled to a jury trial on any of its claims.

## **ADDITIONAL DEFENSES**

Defendants assert the following Additional Defenses, without assuming the burden of proof when that burden would otherwise be on Monsanto.

### **FIRST ADDITIONAL DEFENSE – LACK OF SUBJECT MATTER JURISDICTION**

The Complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(1) because this Court does not have subject matter jurisdiction over the causes of action pleaded herein.

The Soybean License Agreement and the Corn License Agreement both contain ████████████████████████████████████████████████████████████

### **SECOND ADDITIONAL DEFENSE – LICENSE**

The Complaint should be dismissed in whole or in part based on the fact that the accused conduct is licensed.

### THIRD ADDITIONAL DEFENSE – FAILURE TO STATE A CLAIM

The allegations of the Complaint fail to state a claim upon which relief can be granted and should be dismissed under Federal Rule of Civil Procedure 12(b)(6).

### FOURTH ADDITIONAL DEFENSE – PATENT MISUSE

U.S. Reissue Patent No. RE39,247E is not enforceable, in whole or in part, due to the wrongful and improper conduct by Monsanto which constitutes patent misuse.

### FIFTH ADDITIONAL DEFENSE – NON-INFRINGEMENT

Defendants have not infringed and are not infringing any claim of U.S. Reissue Patent No. RE39,247E, or Pioneer has intervening rights over the claims of that patent.

Defendants have not induced or encouraged third-parties to infringe any claim of U.S. Reissue Patent No. RE39,247E.

### SIXTH ADDITIONAL DEFENSE – INVALIDITY

The claims of U.S. Reissue Patent No. RE39,247E are invalid because they fail to satisfy the conditions for patentability, including, *inter alia*, those conditions specified in 35 U.S.C. §§ 101, *et seq.* and/or non-statutorily and judicially invoked doctrines of invalidity.

### SEVENTH ADDITIONAL DEFENSE – UNENFORCEABILITY

U.S. Reissue Patent No. RE39,247E is unenforceable due to Monsanto's inequitable and wrongful conduct in procuring the patent and/or related patents, and because Monsanto has unclean hands because it knew or should have known when it commenced this case that said patent was not infringed, is invalid and/or unenforceable by reason of fraud or inequitable conduct.

### EIGHTH ADDITIONAL DEFENSE – EQUITABLE ESTOPPEL

Each and every one of Monsanto's breach of contract causes of action contained in the Complaint is barred by reason of acts, omissions, representations, and acts to conceal material facts and courses of conduct by Monsanto, made with knowledge, actual or constructive, of those facts, by which Defendants were led to rely to their detriment, thereby barring, under the doctrine of equitable estoppel, any such causes of action.

### NINTH ADDITIONAL DEFENSE – REFORMATION

Defendants allege that if there presently exists or ever existed, any or all of the alleged restrictions, claims or obligations which Monsanto seeks to enforce by way of the Complaint, said restrictions or obligations require reformation.

### TENTH ADDITIONAL DEFENSE – CLAIM OR ISSUE PRECLUSION

Plaintiffs' claims are barred, in whole or in part, by the doctrine of claim or issue preclusion.

### ELEVENTH ADDITIONAL DEFENSE – ANTITRUST

Plaintiffs' claims are barred, in whole or in part, by Section 2 of the Sherman Act (15 U.S.C. § 2), Section 1 of the Sherman Act (15 U.S.C. § 1), and Section 3 of the Clayton Act (15 U.S.C. § 14) for the reasons set forth in the below antitrust counterclaims.

## COUNTERCLAIMS

Counterclaim Plaintiffs E.I. du Pont de Nemours and Company ("DuPont") and Pioneer Hi-Bred International, Inc. ("Pioneer"), by and through their undersigned attorneys, demand a jury trial and allege, on knowledge as to themselves and on information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

1.       This case involves a scheme by Monsanto to monopolize agricultural biotech traits in corn and soybeans, and emerging combinations of such traits.  These traits produce desirable agronomic characteristics, such as tolerance to herbicides or resistance to insects ("input traits"), or confer valuable end-use qualities such as improved nutritional value ("output traits").   The scheme began with Monsanto's procurement, by fraud and inequitable conduct before the Patent Office, of patent protection for a corn and soybean trait that provides one means of conferring tolerance to the herbicide glyphosate.  Glyphosate is, by far, the herbicide most widely used by farmers, covering over 90% of the acres devoted to growing soybeans.  Monsanto markets its glyphosate herbicide as Roundup® and its glyphosate-tolerant corn and soybean seeds as Roundup Ready®. Monsanto has asserted its fraudulently obtained Roundup Ready® patents to obtain monopolies in virtually every commercially important agricultural biotech trait in corn and soybeans, including glyphosate-tolerant traits in soybeans and corn and insect-resistant traits in corn.

2.       DuPont and Pioneer bring this action to arrest a new anticompetitive campaign by Monsanto designed to force ISCs to switch from Roundup Ready® to

18

Roundup Ready® 2 Yield prior to the patents that Monsanto asserts to cover Roundup Ready®, thereby allowing it to create a bridge between two patent monopolies, to impede generic entry, and to extend its monopoly power into developing markets involving combinations ("stacks") of input traits that confer multiple or more effective forms of herbicide tolerance or insect resistance or stacks of input and output traits that confer valuable end-use qualities.   Monsanto has implemented its strategy to extend its monopoly power into emerging markets for stacked traits by either directly denying competitors the ability to stack their traits with Monsanto's unlawfully acquired monopoly traits or achieving the same result indirectly, by foreclosing competitors from access to the market by denying such stacking rights to independent seed companies, and foreclosing stacks containing generic Roundup Ready®.   Monsanto has abused its unlawfully-acquired monopoly power to block competition, thwart innovation and extract from farmers unjustified price increases of over 100 percent in recent years.

3.      The unlawful scheme described herein has five key related components, each by itself anticompetitive and each contributing to the exclusionary effects of the whole.

4.      *First*, Monsanto seeks to stifle an emerging competitive threat to its monopoly in glyphosate tolerance arising from Pioneer's Optimum® GAT® trait in soybeans.  By blocking that threat, Monsanto also seeks unlawfully to extend its existing glyphosate trait monopoly into stacked traits, like OGAT, which improve performance of

19

glyphosate tolerant crops and confer tolerance to multiple herbicides.[1]   Pioneer's OGAT/RR product produces a better soybean seed for farmers than Roundup Ready® alone, increasing crop yields and offering tolerance to additional herbicides to address weeds that have become resistant to glyphosate.  Monsanto is developing, but has not yet introduced to the market, a product like OGAT/RR that addresses glyphosate-resistant weeds.  To accomplish its anticompetitive objective, Monsanto has falsely asserted rights to block competition under an invalid and unenforceable patent and under related patent license provisions which Monsanto alleges restrict Pioneer from competing.  And then, in a press release accompanying its lawsuit, and in multiple communications to the industry, Monsanto misrepresented its patent position in a clear attempt to undermine seed company and farmer confidence in Pioneer's OGAT/RR soybean product in advance of its anticipated commercialization in 2011.

5.      Monsanto's anticompetitive motivation for this exclusionary conduct is evident.  The stacked, better yielding, OGAT/RR product is a direct threat to Monsanto's attempt to extend its glyphosate-tolerant trait monopoly into the distant future by moving independent seed companies ("ISCs") and farmers from the original Roundup Ready® soybeans to the next generation – Roundup Ready® 2 Yield.  The latter allegedly contains DNA that likely encodes for the same enzyme found in Roundup Ready®, but will be sold under patents that do not expire until long after expiration of the fraudulently obtained patents that Monsanto asserts covers Roundup Ready®.  Monsanto already has announced plans to charge 40% more for Roundup Ready® 2 Yield soybeans than the Roundup

---

[1]      "OGAT" hereinafter will be used to refer to Pioneer's Optimum® GAT® multi-herbicide-tolerant traits, and "OGAT/RR" will be used to refer to Pioneer's soybean product containing both Optimum® GAT® and Roundup Ready®.

Ready® soybeans now on the market. Because Pioneer's stacked product offers farmers a high yielding, multi-herbicide-tolerant alternative to Roundup Ready® 2 Yield, it threatens Monsanto's scheme to extend its monopoly power – and the monopoly profits it has so long enjoyed – through the next decade.

6.      *Second*, Monsanto has systematically prevented ISCs from developing and selling seeds that contain both Monsanto traits and traits developed by Monsanto's competitors.  ISCs play a critical role in the development, marketing and distribution of new seed traits to farmers.  They license germplasm and traits to incorporate into their own seeds, and they sell those seeds to farmers through their own distribution networks. Developers of competitive traits, such as Pioneer, must have access to ISCs in order to successfully bring a new trait to market.  Access to ISCs is therefore necessary to create financial incentives for trait developers to undertake the significant financial investment and risk involved in the development of new seed traits.  Monsanto has engaged in multiple tactics specifically designed to cut off competitive access to ISCs by competitors such as Pioneer and thereby dampen incentives for investment in the development of competing traits.

7.      One means employed by Monsanto in this monopolizing scheme has been to include provisions in its ISC license agreements making it virtually impossible for any of Monsanto's competitors to acquire an ISC, while Monsanto itself has acquired more than 25 ISCs over the past five years.  Another means has been to impose anti-stacking provisions in ISC licenses that prevent ISCs from combining any non-Monsanto traits with Monsanto traits in the seeds that the ISCs produce.  These stacking restrictions have

21

become more stringent over time and specifically target traits that Pioneer is developing, including herbicide-tolerant traits and output traits, including a soybean trait for improved nutritional value. These restrictions target output traits in order to foreclose Monsanto's competitors from introducing such traits in advance of Monsanto's own efforts.

8.     *Third*, Monsanto has entered into anticompetitive agreements with other trait developers which give Monsanto unilateral veto power over the ability of licensees of non-Monsanto traits to sublicense non-Monsanto technology to ISCs. For example, Pioneer jointly developed with Dow Agrosciences LLC ("Dow") insect-resistant traits (Herculex®) that are superior to any insect-resistant traits developed by Monsanto. The development agreement between Pioneer and Dow gave Dow the right to license Herculex®, and gave Pioneer a non-exclusive license to use Herculex® in the seed it produces. Recognizing the competitive threat that the Herculex® traits posed, Monsanto entered into a contractual relationship with Dow in an effort to obtain access to these traits while limiting their use by ISCs. While the terms of Monsanto's agreements with Dow are not public, on information and belief, Monsanto secured the right to prohibit Dow from, or to penalize Dow for, permitting Pioneer to sub-license Herculex®. Dow therefore denied each of Pioneer's requests for the right to sub-license, foreclosing Pioneer (even as a co-developer of Herculex®), from sublicensing Herculex® to ISCs. By denying Pioneer the ability to sub-license Herculex® to ISCs, Monsanto was able to secure a dominant position, allowing it to obtain the rights necessary to offer a stacked corn product called SmartStax™, with Herculex® serving as the centerpiece. Because it cannot sub-license Herculex® to ISCs, Pioneer cannot license to ISCs the full suite of

22

traits that they require to offer a competing product, impeding not only competition to Monsanto's SmartStax™ but important innovative activity.

9.      *Fourth*, Monsanto has used its dominance in the out-licensing of germplasm to prevent ISCs from working with Monsanto's competitors to develop competing seed traits.   Germplasm is the base genetic material which determines the agronomic characteristics of a plant.   Most ISCs no longer have independent trait development or breeding programs for developing germplasm; they license traits and germplasm in combination from companies such as Monsanto.   Since in or about 2004, on information and belief, Monsanto has imposed increasingly severe restrictions on ISC use of germplasm licensed from Monsanto, including limitations on which germplasm ISCs' traits could be combined with, and even outright prohibitions against introducing non-Monsanto traits into the germplasm. These restrictions have effectively prevented ISCs from incorporating competing traits into their own, proprietary breeding programs, and have accelerated the decline in the ability of ISCs to compete with Monsanto.

10.      *Fifth*, Monsanto is using license restrictions to foreclose generic competitors in herbicide-tolerant traits.   Monsanto is forcing ISCs to switch to the Roundup Ready® 2 Yield trait before the expiration of the patents that Monsanto asserts to cover the Roundup Ready® trait.  On information and belief, ISCs have been told that, if they do not complete their switch to Roundup Ready® 2 Yield within three years, they will lose their licenses to Roundup Ready®.  By switching ISCs to the Roundup Ready® 2 Yield trait, Monsanto seeks to remove the Roundup Ready® trait from the market prior to the time when competitors – including ISCs and Pioneer – will be able to market a

generic product, thereby creating a bridge between its Roundup Ready® patent monopoly and its Roundup Ready® 2 Yield patent monopoly of longer duration.

11.      Competition in corn and soybean traits and seeds is at a critical crossroads, with farmers demanding, and advances in biotechnology making possible, the development of competing seed "systems," offering stacked trait "packages" engineered to meet specialized farmer needs and to produce desirable end-use characteristics, such as more nutritional soybeans.  Monsanto seeks not only to unlawfully preserve its existing trait monopolies, but also to impede the entry of generics and to extend its monopoly power through exclusionary conduct into emerging markets for stacked traits and output traits.  DuPont and Pioneer assert these counterclaims to remove the unlawful barriers to competition Monsanto has erected and to restore competition in agricultural biotechnology.

**JURISDICTION AND VENUE**

12.      This Court has subject matter jurisdiction under 28 U.S.C. § 1337 (commerce and antitrust regulation) and 28 U.S.C. §§ 1331 (federal question), 1338(a), 2201 and 2202 (declaratory judgment) as this action arises under Section 2 of the Sherman Act (15 U.S.C. § 2), Section 1 of the Sherman Act (15 U.S.C. § 1), Section 3 of the Clayton Act (15 U.S.C. § 14), Section 4 of the Clayton Act (15 U.S.C. § 15), Section 16 of the Clayton Act (15 U.S.C. §  26), and 28 U.S.C. § 2201 (declaratory judgment). This Court has supplemental jurisdiction over Counts 11 and 12 under 28 U.S.C. § 1367, because they seek, *inter alia*, relief with respect to a breach of contract stemming from the same contract that Monsanto asserts against Counterclaim Plaintiffs.

24

13.     The Court has personal jurisdiction over Monsanto because Monsanto filed the Complaint in this Court, and under Section 12 of the Clayton Act (15 U.S.C. § 22).  Monsanto Company and Monsanto Technology LLC are both inhabitants of and may be found in this district.  Both companies have their principal places of business in this district.

14.     Venue is proper because Monsanto Company and Monsanto Technology LLC reside within this judicial district as provided in 28 U.S.C. § 1391(b) and (c) and as provided in Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§ 15, 22, and 26).

15.     An actual and justiciable controversy exists between Counterclaim Plaintiffs and Monsanto with respect to the non-infringement, invalidity and unenforceability of the U.S. Reissue Patent Number RE39,247E and with respect to the rights of the parties under the Amended and Restated Roundup Ready® Soybean License Agreement ("Soybean License Agreement") and the Roundup Ready® Corn License Agreement ("Corn License Agreement").

## PARTIES

16.     Counterclaim Plaintiff E. I. du Pont de Nemours and Company is a Delaware corporation with its principal place of business in Wilmington, Delaware. DuPont is a global science company, offering a wide range of products and services for agriculture, nutrition, electronics, communications, safety and protection, home and construction, transportation, and apparel.

17.     Counterclaim Plaintiff Pioneer Hi-Bred International, Inc. is an Iowa corporation with its principal place of business in Johnston, Iowa.  Pioneer is a leading developer and supplier of advanced plant genetics to farmers worldwide.

18.     Counterclaim Defendant Monsanto Company is a Delaware corporation with its principal place of business in St. Louis, Missouri.

19.     Counterclaim Defendant Monsanto Technology LLC (an affiliate of Monsanto Company) is a Delaware limited liability company with its principal place of business in St. Louis, Missouri.

20.     Counterclaim Defendants Monsanto Company and Monsanto Technology LLC (together, "Monsanto") are engaged in interstate commerce and in activities substantially affecting interstate commerce.  Monsanto is the leading supplier of agricultural products, including biotechnology traits and seeds, with sales to customers throughout the United States.

## RELEVANT MARKETS AND MONSANTO'S MONOPOLY POWER

### A.    Relevant Product Markets

21.     The product markets at issue in this case involve corn and soybean traits, which can be divided into two broad categories: input traits and output traits.  Input traits affect crop yield and the growing of crops, including resistance to insects and tolerance to weed-killing herbicides. Output traits affect the crop itself; for example, they produce a soybean with superior nutritional value or corn better-suited for producing ethanol.

1.      **Herbicide-Tolerant Traits In Soybeans**

22.     Herbicide-tolerant traits in soybeans are a line of commerce or relevant product market within the meaning of the antitrust laws.

23.     Herbicide-tolerant traits in soybeans represent a unique product line that is used on the vast majority of acres planted with soy seed.  There are no substitutes for herbicide-tolerant soybean traits for these customers.  Herbicide-tolerant traits are used on approximately 95% of the soybean acres planted in the United States.  Almost 100 percent of those acres are planted with Monsanto's herbicide-tolerant trait Roundup Ready® which confers tolerance to the herbicide glyphosate.

24.     A small, but significant, non-transitory increase in licensing fees above the competitive level for glyphosate-tolerant traits in soybeans would not cause seed companies or other customers to switch a significant enough quantity of purchases to another product so as to make the price increase unprofitable for a firm with monopoly power.

25.     Monsanto is the dominant supplier of herbicide-tolerant soybean traits in the United States with a market share of approximately 99.7%.  Monsanto has virtually a complete monopoly in the relevant market, including the power to control prices and exclude competition.

26.     Pioneer seeks to enter the market for herbicide-tolerant soybean traits with its introduction of OGAT/RR soybeans and, ultimately, a stack of a generic version of Roundup Ready® and OGAT.  As a result of years of widespread use of glyphosate in U.S. agriculture, there is a growing problem of glyphosate-resistant weeds. However, the

27

development of herbicide resistance in weeds can be controlled by combining herbicide-tolerant traits that confer tolerance to multiple herbicides. Pioneer's OGAT/RR product can provide tolerance not only to glyphosate, but also to five classes of ALS herbicides, including sulfonylurea ("SU") and imidazolinone ("IM") herbicides. Fields planted with crops containing OGAT can be sprayed with glyphosate, SU and IM herbicides, allowing farmers to control weeds that have become resistant to glyphosate. Monsanto is developing its own stacked trait product that will confer herbicide tolerance to multiple herbicides, combining glyphosate tolerance with dicamba tolerance. Pioneer is also a manufacturer of its own proprietary soybean seed progeny from the 40-3-2 line and thus a potential source of generic competition upon the invalidation or expiration of the rights that Monsanto asserts over Roundup Ready®. Pioneer is therefore a significant potential competitor in the market for herbicide-tolerant soybean traits.

**2.       Herbicide-Tolerant Traits In Corn**

27.       Herbicide-tolerant traits in corn are a line of commerce or relevant product market within the meaning of the antitrust laws.

28.       Herbicide-tolerant traits in corn provide a unique product to seed companies and to farmers. There are no substitutes for herbicide-tolerant corn traits for these customers.

29.       A small, but significant, non-transitory increase in licensing fees above competitive levels for herbicide-tolerant traits in corn would not cause seed companies or other customers to switch a significant enough quantity of purchases to another product so as to make the price increase unprofitable for a firm with monopoly power.

30.     Monsanto is the dominant supplier of herbicide-tolerant corn traits in the United States with a market share of approximately 80.8%.   Monsanto possesses monopoly power in the relevant market, including the power to control prices and exclude competition.

31.     Pioneer seeks to enter the market for herbicide-tolerant traits in corn with the introduction of OGAT.

32.     Pioneer is therefore a significant potential competitor in the relevant market.

**3.      Stacked Herbicide-Tolerant And Insect-Resistant Traits In Corn**

33.     Stacked herbicide-tolerant and insect-resistant traits for corn are a line of commerce or relevant product market within the meaning of the antitrust laws.

34.     The stacking of traits involves breeding two or more individual traits in a single seed.

35.     Seeds that contain stacks of traits of different types such as the combination of herbicide-tolerant traits with traits conferring resistance to either corn root worm or the European corn borer have substantial benefits for farmers.  In addition to its trait for glyphosate tolerance in corn, Monsanto has market power in the markets for corn rootworm resistance, with approximately 74.9% market share, and for European corn borer resistance, with approximately 65.2% market share.

36.     Stacked herbicide-tolerant and insect-resistant traits in corn are a unique product for seed companies and for farmers.  There are no good substitutes for these stacked traits for these customers.

29

37.     A small, but significant, non-transitory increase in licensing fees above competitive levels for corn seed containing stacked herbicide-tolerant and insect-resistant traits would not cause seed companies or other customers to switch a significant enough quantity of purchases to another product so as to make the price increase unprofitable for a firm with monopoly power.

38.     Monsanto is the dominant supplier of existing products containing stacked herbicide-tolerant and insect-resistant traits in corn in the United States, with a market share of approximately 74.2%.  Monsanto possesses monopoly power in the relevant market, including the power to control prices and exclude competition.

39.     Pioneer seeks to enter the relevant market for stacked herbicide-tolerant and insect-resistant traits in corn with its introduction of OGAT corn, which it can stack with Herculex® or other insect- resistant traits.

40.     Pioneer is therefore a significant potential competitor in the relevant market.

**4.      Stacked Traits In Corn That Confer Insect Resistance Through Multiple Modes Of Action And Herbicide Tolerance To Multiple Herbicides.**

41.     Stacked traits in corn that confer insect resistance through multiple modes of action and herbicide tolerance to multiple herbicides are a line of commerce or relevant product market within the meaning of the antitrust laws.

42.     Stacked traits in corn for insect resistance that work through multiple modes of action and for herbicide tolerance to multiple herbicides is an emerging market. One such offering is Monsanto's SmartStax™ product which Monsanto intends to

commercialize in 2010.   On information and belief, stacked traits in corn for insect resistance through multiple modes of action and for herbicide tolerance to multiple herbicides provide a unique product to farmers such that a small, but significant, non-transitory increase in licensing fees above competitive levels would not cause seed companies or other customers to switch a significant enough quantity of purchases to another product so as to make the price increase unprofitable for a firm with monopoly power.

43.     Pioneer seeks to offer a competitive alternative to SmartStax™, but has been prevented from offering a competitive product to be sold through ISCs as a result of Monsanto's anticompetitive conduct.   While Pioneer can include the Herculex® traits in seeds that it produces, it is unable to sub-license Herculex® to ISCs, foreclosing Pioneer from selling any competitive alternative to a substantial segment of the relevant market.

44.     There is a dangerous probability that Monsanto's anticompetitive scheme to use its monopoly power in herbicide tolerant traits to restrict and stifle competition in the emerging relevant markets for stacked in corn traits will result in Monsanto achieving the same degree of dominance – and cause similar anticompetitive effects – in the market for stacked traits that confer insect resistance through multiple modes of action and herbicide tolerance through multiple herbicides.

**5.      Stacked Input And Output Traits In Soybeans**

45.     Stacked input and output traits in soybeans are a relevant line of commerce or relevant product market within the meaning of the antitrust laws.

31

46.     While input traits have been widely adopted by U.S. farmers, the markets for output traits are still developing. Soybean output traits that are currently available or under development include low linolenic, high oleic, and Omega-3 enriched soybeans. Monsanto and Pioneer have both commercialized soybeans with low linolenic traits, which produce soybeans with reduced transfats. Pioneer is about to commercialize soybeans containing a high oleic trait which reduces transfats even further; Monsanto is still developing its high oleic trait.

47.     Output traits are commercially viable only if they can be combined with input traits that have already been adopted on a widespread basis. Because most farmers require herbicide tolerance, they would not choose, for example, a soybean seed containing a high oleic trait without a herbicide-tolerant trait.

48.     On information and belief, stacked input and output traits in soybeans provide a unique product to farmers such that a small, but significant, non-transitory increase in licensing fees above competitive levels for stacked input and output traits in soybeans would not cause seed companies or other customers to switch a significant enough quantity of purchases to another product so as to make the price increase unprofitable for a firm with monopoly power.

49.     Pioneer and Monsanto are both developing soybean output traits that must be stacked with a glyphosate-tolerant trait in order to be commercially successful. Monsanto and Pioneer are therefore potential competitors in the relevant market.

50.     There is a dangerous probability that Monsanto's anticompetitive scheme to use its monopoly power in herbicide tolerance traits to restrict and stifle competition in

the emerging relevant markets for stacked traits will result in Monsanto achieving the same degree of dominance – and cause similar anticompetitive effects – in the market for stacked input and output traits in soybeans.

**B.   The Relevant Geographic Market Is the United States.**

51.      For the foregoing markets, the relevant geographic market is the United States.  Before genetically modified soybeans and corn can be commercialized in the United States, they must receive regulatory approvals from U.S. governmental agencies. The U.S. Department of Agriculture regulates the use of biotechnology traits in crops planted in the United States.  The U.S. Environmental Protection Agency regulates the use of both plant incorporated protectants and chemical insecticides in the United States. The U.S. Food and Drug Administration also has a role to the extent the crop may be used in food.  The process of gaining regulatory approval to sell a seed with a new trait in the United States is long and costly.  In response to an increase in the price of traits sold in the United States, U.S. farmers or licensees could not turn to suppliers of traits approved abroad that have not already been approved for use in the United States.  Other factors, such as the U.S. distribution system and other demand characteristics, support a U.S. geographic market.

**C.   There Are Significant Barriers To Entry In Each Of The Relevant Markets.**

52.      There are significant barriers to entry in the development of new transgenic traits, including the costly and time-consuming process for developing new traits and obtaining the necessary regulatory approvals to commercialize a new trait.

53.      Monsanto's restrictive licensing agreements with seed companies and developers create additional barriers to entry. The decision to fund research and development projects depends, in substantial part, on the expected return on such investment. Because competing trait developers such as Pioneer are foreclosed from licensing their new traits to ISCs and farmers as a result of Monsanto's exclusionary licensing practices, and thus are foreclosed from participating in a substantial share of the market, those competitors will curtail, or substantially reduce, their investment in the development of new traits. The effect of such foreclosure will be to protect the monopoly power of Monsanto in both existing and emerging relevant markets to the substantial detriment of competition and consumers.

**D.  Monsanto Has Used Its Monopoly Power to Impose Significant Price Increases on Farmers.**

54.      During the 2002 to 2006 period alone, on information and belief, the price of the Roundup Ready® trait in soybeans increased 118%, and during the 2004 to 2008 period, the price of the Roundup Ready® trait in corn seed prices increased 100%. Monsanto has announced that, in the first half of fiscal year 2009, its average global prices in corn seed and traits increased 23%. Monsanto's profitability has also grown. In an August 2008 presentation, Monsanto's Chairman, President, and Chief Executive Officer, Hugh Grant, forecasted that Monsanto's corn seed and traits gross profits for 2008 would be up by 25% and its soybean seeds and traits gross profits would be up by 15%.

# FACTUAL BACKGROUND

## A.     Biotechnology Crop Traits

55.     Biotechnology has made it possible to introduce beneficial characteristics into plant crops by transferring and stably incorporating specific non-native genetic material into the chromosomes of plant cells. A plant cell that survives such a genetic transformation carries the non-native gene of interest, which causes a desirable trait or characteristic in plant crops. A transformed cell can generate a mature plant which in turn will generate seeds. Crops grown from these seeds normally will have the desirable characteristic or trait.

56.     Genetic transformation has been used to make corn and soybean crops tolerant to non-selective herbicides, including glyphosate. Glyphosate is a commonly used chemical herbicide. Glyphosate-tolerant soybean and corn traits have been created by the insertion of genes isolated from soil micro-organisms into the genomes of soybean and corn cells. Soybeans and corn that are glyphosate-tolerant can survive an otherwise lethal effect of a herbicide. As a result of this biotechnology, farmers that plant glyphosate-tolerant soybeans and corn may apply glyphosate over an entire field, after the soybean or corn crops have emerged, with little or no damage to the crops themselves. The dominant glyphosate-tolerant trait in soybeans and corn is Monsanto's Roundup Ready[®] trait.

57.     Biotechnology is also used to make corn resistant to damage from insects such as the European corn borer ("ECB") and the corn rootworm ("CRW"). ECB-resistant corn traits and the CRW-resistant corn traits have both been created by the

insertion of genes isolated from the soil micro-organism *Bacillus thuringensis* into the corn cell's genome.

58.     Crop protection traits, including herbicide tolerance and insect resistance, are valuable to farmers because they reduce production costs and increase yield.

59.     Biotechnology has transformed agriculture.  From 1996 to 2006, the total worldwide acreage of crops produced from genetically-modified seed grew from 4 million acres to more than 250 million acres.

60.     More than 90% of soybean and 80% of corn seeds in the United States contain at least one biotech transgenic trait.

61.     Monsanto's claimed patents for the Roundup Ready® are about to expire, potentially allowing, for the first time, generic competition in the herbicide-tolerant soybean trait market.

62.     Biotech development in corn and soybeans has shifted from a focus on individual traits to stacked traits.  For example, as more weeds show evidence of becoming resistant to glyphosate, there has been an increasing focus on combining herbicide-tolerant traits that confer tolerance to multiple herbicides in attacking weeds. In addition, there is an increasing focus on combining multiple insect-resistant traits in corn, as well as combining input traits providing herbicide tolerance or insect resistance with output traits, such as traits providing improved nutritional value in soybeans or increased starch content in corn.

63.     Only a few firms continue to invest significantly in the development of commercially important traits for corn and soybeans; they include Monsanto, Pioneer,

36

Syngenta Seeds, Inc. ("Syngenta"), Dow AgroSciences ("Dow"), Bayer CropScience ("Bayer") and BASF Plant Science ("BASF").  There are also only a few firms that invest significantly in the development of germplasm, the base genetic material for plants.  In soybeans, the principal developers of germplasm are Midwest Oilseeds/Harry Stine, Dairyland, and Pioneer.  In corn, the primary germplasm developers are Holden's Foundation Seeds (a subsidiary of Monsanto), Pioneer, Syngenta and Mycogen (a Dow subsidiary).

**B.   Monsanto's Strategy Is To Extend And Protect Its Monopoly Power In The Relevant Markets For Soybean And Corn Herbicide-Tolerant Traits To Other Relevant And Emerging Markets.**

64.    In 2010, Monsanto will commercialize Roundup Ready® 2 Yield soybeans, which it is marketing as having an improved yield over the original version of Roundup Ready® soybeans.  Some of the patents Monsanto claims to protect Roundup Ready® 2 Yield soybeans will not expire until years after the purported expiration of the last patent Monsanto claims to protect Roundup Ready® soybeans.  Roundup Ready® 2 Yield soybeans express the same enzyme that confers glyphosate tolerance in Roundup Ready® soybeans and therefore, according to Monsanto, both are covered by the same patent directed at the enzyme.

65.    Incorporation of the gene conferring glyphosate tolerance in Roundup Ready® 2 Yield soybeans was accomplished using different promoters than were used in Roundup Ready® soybeans.  Promoters are DNA regions that facilitate transcription of a gene.  In effect, they serve as genetic "on switches."  Monsanto claims different promoter patents protect Roundup Ready® 2 Yield and Roundup Ready® soybeans.

37

66.     It is not the presence or absence of these promoters that result in any differences between Roundup Ready® and Roundup Ready® 2 Yield soybeans in glyphosate tolerance and crop yield.   Rather, on information and belief, any such differences result from the different points on the soybean genome at which the gene conferring glyphosate tolerance was incorporated, which is beyond Monsanto's control, or from the Monsanto's requirement that farmers use  Monsanto's Acceleron™ seed treatment.

67.     Nevertheless, Monsanto presents its new Roundup Ready® 2 Yield soybeans as an important innovation protected by new patents warranting higher prices.

68.     According to a presentation by Monsanto's Chief Technology Officer, Robert Fraley, Monsanto will charge 40 percent more for Roundup Ready® 2 Yield soybean seeds than for the original Roundup Ready® soybean seeds.

69.     Monsanto has begun an aggressive campaign to switch farmers from Roundup Ready® to Roundup Ready® 2 Yield soybeans.   For example, on information and belief, it has recently entered into new license agreements that require ISCs to convert from Roundup Ready® to Roundup Ready® 2 Yield.

70.     Monsanto is also developing a soybean that will provide tolerance not only to glyphosate, but also to the herbicide dicamba.   Sean Gardner, Monsanto's Global Chemistry Lead explained:   "Combining a second type of herbicide resistance with Roundup Ready® technology would offer farmers multiple tools for weed control through the use of Roundup®, dicamba, or combinations of both herbicides."

71.      Roundup Ready® 2 Yield corn has been on the market for about 7 years. In response to Pioneer's plans to commercialize OGAT corn, Monsanto has focused on bringing stacked products to the market containing insect resistance through multiple modes of action and herbicide tolerance through multiple herbicides and is planning on introducing to the market a product called SmartStax™ in 2010 at or about the time that Pioneer begins to introduce OGAT corn.  SmartStax™ combines multiple insect-resistant traits operating by multiple modes of action and herbicide-tolerant traits to multiple herbicides.

72.      The centerpiece of SmartStax™ is insect-resistant traits co-developed by Pioneer and Dow.   Under the development agreement between Dow and Pioneer, Dow has the right to license Herculex®, and Pioneer has a non-exclusive license to use Herculex® in the seed that it produces.  On information and belief, in order to prevent Pioneer from effectively marketing a competing stacked product, Monsanto has entered into anticompetitive agreements with Dow that prohibit Dow from, or penalize Dow for, permitting Pioneer to sub-license Herculex® to ISCs.  Dow has therefore denied each of Pioneer's requests to sub-license Herculex®, even though Pioneer, not Monsanto, developed the Herculex® traits.   As a result of Pioneer's inability to sub-license Herculex® to ISCs, it is foreclosed from a substantial segment of the market for stacked traits in corn conferring insect resistance through dual modes of action and herbicide tolerance to multiple herbicides.

73.      Monsanto's anticompetitive scheme is not limited to input traits, such as insect resistance or herbicide tolerance, but also includes attempts to stifle competition in

emerging markets for output traits which bestow desirable end-use characteristics on soybeans and corn.

74.      In 2005, Doug Rushing, Monsanto's Director of Technology Development for North America, explained: "We've concentrated on products with input traits such as herbicide tolerance and insect resistance. We'll begin to look harder at output traits as well, traits such as increased protein grains that benefit consumers." In addition, Mr. Rushing explained that, as Monsanto focuses on output traits, "[i]mproving soybean oil will be a big issue. Soybean oil is the number one oil in the United States, but it is high in transfats." Pioneer is ahead of Monsanto in commercializing a high oleic trait, which provides lower transfats than the low linolenic soybeans now on the market.

75.      In order to produce soybean and corn seeds with agronomic traits desired by farmers, competing developers of output traits must be able to combine their output traits with input traits, over which Monsanto exercises monopoly control. Monsanto's monopoly power in input traits thus gives it the ability to use that power to exclude its competitors in output traits and extend its monopoly into the emerging output traits markets.

C.   **Pioneer's Threat To Monsanto's Strategy Of Dominance**

76.      Pioneer, a subsidiary of DuPont, is a leading developer, producer, and marketer of a full line of corn and soybean seeds. Pioneer uses advanced breeding techniques and genetic research to produce high crop yields. Pioneer is a licensee of Monsanto's Roundup Ready® traits in soybeans and corn, as well as other Monsanto

traits.  Using its advanced breeding techniques and technology, Pioneer has been able to overcome the yield drag associated with the Roundup Ready® trait.

77.    Pioneer also competes in the development of traits.  Pioneer is one of only a small number of seed companies that is still making a significant investment in research and development to develop new traits, including traits that have the potential to compete with Monsanto traits.

78.    Pioneer has been developing a competing herbicide tolerance trait, Optimum® GAT®.  The OGAT technology allows for more flexibility in attacking weeds than the Roundup Ready® technology.

79.    The widespread adoption of the Roundup Ready® trait has caused the development of glyphosate-resistant weeds, as well as "weed shift" -- the increased prevalence of weeds that are naturally resistant to glyphosate.  OGAT will help forestall glyphosate resistance.  The OGAT trait not only provides glyphosate tolerance, but also provides tolerance to five classes of ALS herbicides, including sulfonylurea and imidazolinone herbicides, providing control over weeds over which glyphosate is less effective.  The ALS component gives OGAT a second mode of action and thereby helps to manage glyphosate-resistant weeds.  OGAT also provides flexibility by giving farmers a longer period over which to apply the herbicides.

80.    Pioneer plans to begin introducing OGAT corn in 2010, and to launch OGAT/RR soybeans in 2011.  Breeding the OGAT and Roundup Ready® traits in soybeans increases yields 6% or higher above the yields of Pioneer's highest yielding soybean varieties with the Roundup Ready® trait alone.

81.      In addition to developing input traits providing herbicide tolerance and insect resistance, Pioneer is developing output traits for use in soybean and corn. Pioneer's high oleic soybean provides greater stability for extended frying and longer shelf life and reduces the amount of transfats in foods.   In addition to providing nutritional value, Pioneer's high oleic soybeans, because of the oil's high stability, creates opportunities for transportation and industrial applications.   The oil's high stability will allow companies to develop renewable, environmentally sustainable alternatives to petroleum-based products.   In addition, Pioneer is working on the development of output traits to improve protein, starch, oil, fiber and nutritional content. Pioneer's development of certain output traits is more advanced than Monsanto's and thus presents a competitive threat to Monsanto's dominance in soybean and corn traits.

**MONSANTO'S ACQUISITION AND UNLAWFUL
MAINTENANCE OF MONOPOLY POWER**

**A.  Monsanto Obtained The Roundup Ready® Patents By Fraudulent And Inequitable Conduct.**

    **1.      U.S. Patent Number 5,633,435**

82.      Monsanto obtained patents directed to Roundup Ready® as early as 1990. In that same year, Monsanto filed another patent application, Serial Number 07/576,537, purporting to cover certain new genetic material for an enzyme conferring glyphosate tolerance. In 1991 and 1994, Monsanto filed related continuation-in-part patent applications which added information and claims.  In 1991, Monsanto also filed a Patent Cooperation Treaty ("PCT") patent application, seeking to obtain foreign patent coverage for the same alleged inventions as contained in Monsanto's 1990 and 1991 filings with

42

the United States Patent and Trademark Office ("Patent Office").   The PCT patent application was published by the World Intellectual Property Organization and available to the public in early 1992.

83.     On or about September 13, 1994, Monsanto filed application Serial Number 08/306,063 ("the '063 Application") with the Patent Office.   Monsanto described its disclosure as:

> Genes encoding Class II EPSPS enzymes are disclosed. The genes are useful in producing transformed bacteria and plants which are tolerant to glyphosate herbicide. Class II EPSPS genes share little homology with known, Class I EPSPS genes, and do not hybridize to probes from Class I EPSPS's. The Class II EPSPS enzymes are characterized by being more kinetically efficient than Class I EPSPS's in the presence of glyphosate. Plants transformed with Class II EPSPS genes are also disclosed as well as a method for selectively controlling weeds in a planted transgenic crop field.

84.     On May 27, 1997, the '063 Application matured into U.S. Patent Number 5,633,435 ("the '435 Patent").   The '435 Patent, as issued, contained broad claims that purported to cover DNA and genes that encode EPSPS enzymes and their expression, *inter alia*, in soybean and corn plants and seeds.

85.     Monsanto has used the broad claims purporting to cover the EPSPS DNA and genes and their expression in soybean and corn plants and seeds to exclude competitors in the markets for herbicide-tolerant traits in soybeans and corn, and seeks to extend its reach into other markets.  Monsanto obtained this economic power, however, only through fraud and inequitable conduct before the Patent Office.  In prosecuting the '435 Patent, Monsanto withheld information from the Patent Office that was material to patentability, including prior art publications that anticipated, made obvious, or otherwise

43

undermined or destroyed the patentability of the claims of the '435 Patent as issued and

that a reasonable patent examiner would have regarded as important.

86.     Scientists and lawyers at Monsanto knew of those references, had a duty

to disclose them to the Patent Office, but withheld them and their substance and

significance, with the intent to deceive and defraud the Patent Office.

87.     For example, in March 1992, Monsanto's PCT application was published

as WO92/04449 ("'449 PCT application"), which corresponds to the disclosure of an

application filed in 1991 from which the '063 Application descended.  When published,

the '449 PCT application became a prior art reference to all the claims in the '435 Patent

which have the 1994 effective filing date, and anticipated or made those claims obvious.

Monsanto knew of the publication of the '449 PCT application but knowingly and

intentionally withheld the published '449 PCT application and its substance and

significance from the Patent Office during prosecution of the '435 Patent, despite having

a duty to disclose it.  Had the Patent Office known of the prior art status of the '449 PCT

application and its significance to the pending claims, the '435 patent would not have

issued.

88.     Monsanto failed to inform the Patent Office of the '449 PCT application's

publication and its substance and significance.   Even after one examiner in 1999,

examining a related application, rejected all of that application's pending claims in view

of the '449 PCT application, Monsanto still continued to hide it from other examiners.  In

that one instance, Monsanto convinced the Patent Office that the '449 PCT application

could not be prior art as to that particular application only by representing that all its

then-pending claims – unlike those of the '435 Patent – claimed priority to an application filed on August 31, 1990.

89.    Monsanto also fraudulently failed to disclose other material prior art and patents it already owned, which broadly patented glyphosate-tolerant soybean seeds with EPSPS genes that are indistinct from those in the '063 Application.[2]   Those patents were material as prior art and double-patenting references which clearly would have been important to the Patent Office and would have precluded the '435 Patent from being issued.  Monsanto knew of the prior art patents and their relation to the subject matter of the '063 Application, but knowingly and intentionally chose not to disclose them to the Patent Office during the prosecution of the '435 Patent, despite having a duty to do so.

90.    Monsanto had a duty to disclose to the Patent Office any references and information that anticipated, made obvious, or otherwise undermined or destroyed the patentability of the claimed invention in prosecuting the '435 Patent.  Monsanto also had a duty to disclose to the Patent Office any prior art publications that a reasonable patent examiner would have regarded as important to the patentability of the claimed invention in prosecuting the '435 Patent.

91.    Monsanto knew of all the prior art and patents discussed in ¶¶ 85-90 above that anticipated, made obvious, otherwise undermined or destroyed the patentability of the claims of the '435 Patent and that a reasonable patent examiner would have regarded as important to patentability of the claimed invention.  Monsanto knew it had a duty to

---

[2]    Prior to filing the '063 Application which issued as the '435 Patent, Monsanto already owned U.S. Patent Nos. 5,188,642 ("'642 Patent") and 4,940,835 ("'835 Patent"), each entitled "Glyphosate resistant plants," which expired in 2007.

disclose those publications to the Patent Office during prosecution of the '435 Patent. Instead, Monsanto fraudulently, knowingly and willfully chose not to disclose that highly material information to the Patent Office.

92.     If Monsanto had disclosed the material prior art publications it knew about and/or all of its prior issued patents on this technology, the '435 Patent would not have issued, and Monsanto would not have been able to wield it to block competition.

93.     Monsanto also withheld from the Patent Office a reference by Dennis E. McCabe, *et al.*, which undermines the patent application's primary support for a claim to a glyphosate resistant soybean – Example 3 in the specification of the '435 Patent. Example 3 teaches one to follow technology described in a reference by Christou, *et al.*: "Soybean plants are transformed with pMON13640 by the method of microprojectile injection using particle gun technology as described in Christou, et al. (1988)." However, the McCabe reference states the authors were unable to regenerate intact soybean plants using the Christou method, which therefore does not enable one to make a glyphosate-tolerant soybean plant as Monsanto represented in its specification and in prosecuting the '063 Application. The McCabe reference is therefore directly related to the patentability of the invention Monsanto sought to patent.

94.     On information and belief, McCabe was an employee of Monsanto. Monsanto was aware of the McCabe reference, and cited to it in related Monsanto publications, but chose not to disclose it during prosecution of the '435 Patent, despite having a duty to do so. Monsanto failed to disclose the McCabe reference fraudulently,

knowingly and willfully and with the intent to deceive the Patent Office and to obtain economic power over its competitors.

95.     Disclosing the Christou method without disclosing the published problems with that method as reported in the McCabe reference constituted an affirmative misrepresentation to the Patent Office.   Indeed, the McCabe reference indicates that Example 3 of the '435 Patent was never performed as written.   Monsanto made these misrepresentations fraudulently, with the intent to deceive the Patent Office and thereby to obtain economic power over its competitors.

96.     The Patent Office relied on the incomplete disclosure of the Christou method and relied on Monsanto's duty to disclose all other material references in deciding to issue the '435 Patent and confer on Monsanto a patent monopoly.

97.     Monsanto also knowingly and intentionally withheld information from the Patent Office during prosecution of the '063 application that, if disclosed, would have shortened the term of any patent claims that did issue from that application.   Monsanto chose to withhold such information with the intent to deceive the Patent Office and thereby extend the temporal scope of its patent monopoly.

98.     Monsanto's fraud and inequitable conduct in connection with securing the '435 Patent is not limited to the misconduct pled above.   Monsanto has engaged in a lengthy and deliberate campaign, including repeated misrepresentations, omissions, and other wrongful acts, all with the intent and design of securing patents and patent term extensions for the purpose of thwarting competition.

99.     Monsanto wielded the '435 Patent for the purpose of exercising economic power to exclude, weaken, or marginalize its competitors, despite knowing of its infirmity.

100.    From 1998 to 2002, Monsanto filed dozens of lawsuits in which it asserted rights under the '435 Patent against numerous different defendants, including farmers. On information and belief, Monsanto knew, in those actions, that it was seeking to enforce an invalid, non-infringed or unenforceable patent.

### 2.     U.S. Reissue Patent Number RE39,247E

101.    On September 7, 2000, Monsanto asserted a claim for infringement of the '435 Patent against yet another farmer. After the farmer introduced evidence through an expert that the claims of the '435 Patent were invalid and unenforceable, Monsanto recognized the risk to its patent and moved to voluntarily dismiss its cause of action alleging infringement of the '435 Patent. Monsanto knew that if the claims of the '435 Patent were held invalid or unenforceable, the '435 Patent would not protect its market position in Roundup Ready® soybeans and corn.

102.    To remedy this problem and to protect its economic dominance, Monsanto filed an application for a reissue patent ("reissue application"), purportedly seeking to correct errors in the '435 Patent. As required to obtain a reissue patent, Monsanto offered to surrender the '435 Patent upon reissue of the new corrected patent.

103.    On July 18, 2003, in prosecuting the reissue application, Monsanto engaged in misrepresentations and omissions of material facts to mislead the Patent Office, including knowingly submitting a declaration to the Patent Office which

contained false and misleading statements.  The substance of any declaration to the Patent Office is *per se* material and an untruthful oath signed under penalty of perjury constitutes fraud.

104.    Monsanto misleadingly stated that the '435 Patent was wholly or partially inoperative or invalid "by reason of other errors" related to the separate filings dates of different subject matters claimed by the patent. Monsanto also falsely declared in the same document that "[a]ll errors corrected in this reissue application up to the time of filing of this declaration arose without any deceptive intention on the part of the applicant."  Monsanto did not inform the Patent Office that the '435 Patent had improperly claimed more than the patentee had a right to claim.  Monsanto's declaration was knowingly false, incomplete and misleading.

105.    The Patent Office rejected Monsanto's first declaration as insufficient. Given a second chance, Monsanto declared that it sought the reissue patent to correct errors related to the separate filings dates of different subject matters claimed by the patent and to correct the classifications of certain sequences as DNA sequencing rather than amino acid sequences.  Monsanto again failed to inform the Patent Office that it knew claims of the '435 Patent were invalid in view of prior art and that Monsanto had improperly claimed more than it had a right to claim.  Monsanto's second declaration was knowingly false, incomplete and misleading.

106.    Monsanto used these purported errors in the claims of the '435 Patent as a pretext and deceptively withheld the more serious problems with the patentability of its claimed invention, which in fact motivated Monsanto to file the reissue application, with

the purpose of regaining, in the form of a reissue patent, the economic power originally conferred by the '435 Patent.

107.    Monsanto also falsely swore, in the same reissue declaration, that "[a]ll errors corrected in this reissue application up to the time of filing of this declaration arose without any deceptive intention on the part of the applicant." Monsanto knew that if it disclosed the true deficiencies and problems with the '435 Patent, which could not as a matter of law be corrected through a reissue proceeding, it would lose the '435 Patent as invalid and unenforceable.

108.    Monsanto affirmatively denied any fraud or inequitable conduct before the Patent Office during prosecution of the reissue application, and failed to disclose its prior misconduct, despite having a legal duty to be truthful that lasted until the reissue patent issued on August 22, 2006.

109.    Monsanto also violated its duty of candor and committed fraud by not specifically informing the Patent Office that certain broad claims in the '435 Patent from proper consideration were invalid and unenforceable in view of the prior art that Monsanto withheld from prior consideration during the prosecution of the '435 Patent, and, *inter alia*, by not specifically informing the Patent Office that claims were rejected in a related application over the '449 PCT application.

110.    Monsanto also failed to disclose other prior art publications to the Patent Office that were material to the patentability of the reissue claims covering genes for the specific enzyme purportedly found in Roundup Ready® soybeans. Monsanto did not disclose the '642 and '835 Patents it withheld during the prosecution of the application

50

that led to the '435 Patent. This failure to disclose violated both Monsanto's duty to disclose earlier misconduct and its duty to disclose information material to the reissue application.

111.     Monsanto also failed to disclose the earlier issued U.S. Patent Number 5,602,319 ("'319 Patent") which claimed a soybean seed that would inherently anticipate any of the claims of the '435 Patent and the reissue application that could be construed to apply to Roundup Ready® soybeans. A reasonable patent examiner would have found the '319 Patent important in assessing issues of double patenting. On information and belief, Monsanto acquired the '319 Patent in 1997, and owned both the '435 Patent and the '319 Patent while it prosecuted the reissue application. Monsanto knew of the '319 Patent and its relation to the '435 Patent and the reissue application, had a duty to disclose it to the Patent Office, but withheld it with the intent to deceive the Patent Office and unlawfully expand its patent rights.

112.     Monsanto disclosed the McCabe reference in the reissue application, but did not disclose its materiality to the enablement of a glyphosate-tolerant soybean plant. Nor did Monsanto reveal the fraud and affirmative misrepresentations it made regarding the Christou method in the specification of the '435 Patent.

113.     Monsanto also knowingly and intentionally withheld information from the Patent Office during prosecution of the reissue application that, if disclosed, would have shortened the term of any patent claims that did issue from the application. Monsanto chose to withhold such information with the intent to deceive the Patent Office and thereby extend the temporal scope of its patent monopoly.

114.    The '247 Reissue Patent is invalid for double patenting, *inter alia*, disclaiming its term beyond 2010.

115.    Monsanto's fraud and inequitable conduct in connection with prosecuting the reissue application is not limited to the misconduct pled above.   Monsanto has engaged in a lengthy and deliberate campaign, including repeated misrepresentations, omissions, and other wrongful acts, all with the intent and design of securing patents and patent term extensions for the purpose of thwarting competition.

116.    On August 22, 2006, acting in reliance on Monsanto's fraud, misstatements and omissions, the Patent Office issued U.S. Reissue Patent Number RE39,247E ("'247 Reissue Patent"), which had the effect of reviving Monsanto's patent monopoly.

117.    The Patent Office would not have issued the '247 Reissue Patent if it had been informed of Monsanto's misrepresentations, omissions, and other deceptive acts and misconduct during the prosecution of the original '435 Patent.   Nor would the Patent Office have issued the '247 Reissue Patent if Monsanto had disclosed the material publications that Monsanto fraudulently withheld.

118.    The '247 Reissue Patent is invalid and unenforceable due to the fraud and inequitable conduct that occurred during the prosecution of the '435 Patent which was perpetuated during the prosecution of the reissue application.

119.    The '247 Reissue Patent would not have issued if Monsanto had not misrepresented and withheld material information from the Patent Office during the

prosecution of the reissue application. As a result of Monsanto's fraud and inequitable conduct, the '247 Reissue Patent is invalid and unenforceable.

120.     All of Monsanto's anticompetitive misconduct before the Patent Office was undertaken in a manner designed to conceal its wrongdoing.

121.     Monsanto's fraud and inequitable conduct before the Patent Office had the effect of inducing competitors, including DuPont and Pioneer, to enter into license agreements with Monsanto to manufacture, use, or sell Roundup Ready® soybeans.

122.     Monsanto has wielded and continues to wield the '247 Reissue Patent for the purpose of exercising economic power to exclude, weaken, or marginalize its competitors, despite knowing of its infirmity.

**B. Monsanto's Additional Unlawful Exclusionary Conduct**

123.     Having obtained an unlawful patent monopoly on Roundup Ready® through fraud and inequitable conduct on the Patent Office, Monsanto has acted with specific intent to use that power to acquire, preserve and extend its monopoly power in each of the relevant markets in which rivals might threaten to erode Monsanto's monopoly – and to unlawfully extend that monopoly into emerging relevant markets for stacked traits.

**1.     Monsanto Has Unlawfully Sought To Prevent The Introduction Of OGAT/RR Soybeans.**

124.     Pioneer is one of a small number of remaining seed companies that continues to make substantial investments in research and development. As a result of its research and development efforts, Pioneer has developed a competing herbicide tolerance trait, Optimum® GAT®.

53

125.     OGAT uses a different mode of action in achieving glyphosate tolerance than Roundup Ready®.  The OGAT trait is not only capable of providing glyphosate tolerance, it also provides tolerance to five classes of ALS herbicides (including sulfonylurea and imidazolinone herbicides), and provides better protection against weeds that are controlled less effectively with glyphosate.  A combination of OGAT and Roundup Ready® in soybeans increases yields 6% or more above the yields of Pioneer's higher yielding varieties with the Roundup Ready® trait alone.

126.     OGAT/RR soybeans present a direct threat to Monsanto's plan to extend its glyphosate-tolerant soybean monopoly with Roundup Ready® 2 Yield because they will provide a more desirable means to farmers of controlling glyphosate-resistant weeds than Roundup Ready® alone, and directly challenge a purported key Roundup Ready® 2 Yield selling point of producing better yield than Round Ready® 1.

127.     Because Pioneer intends to commercialize OGAT/RR soybeans as an improved yield product, that product, if permitted to enter the marketplace, would compete with Roundup Ready® 2 Yield, would erode Monsanto's planned dominance and would encroach on Monsanto's planned profit margins from Roundup Ready® 2 Yield sales.

128.     In response to the competitive threat posed by OGAT/RR soybeans, Monsanto invoked an invalid and unenforceable patent and purported licensing restrictions based on that patent to block Pioneer from stacking or combining OGAT and Roundup Ready® in soybeans.

129.     Monsanto seeks to restrict Pioneer from combining Monsanto's Roundup Ready® trait with other genetically-modified traits or genes conferring glyphosate tolerance, including the OGAT gene, and from using information that is already in the public domain to make a competing product.

130.     The contract terms that Monsanto has characterized as containing restrictions on Pioneer's right to stack OGAT with Roundup Ready® ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ When the licenses were entered into, Monsanto knew that it had no valid and enforceable patent covering the protein in Roundup Ready® soybeans. █████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████

**2.**     **Monsanto Has Used Threats Against ISCs, Dealers And Farmers To Chill Market Acceptance Of OGAT/RR Soybeans.**

131.     In a press release that accompanied Monsanto's lawsuit, and in various communications to the industry, Monsanto misrepresented its own patent position and has told seed companies and other licensees of seed containing Monsanto traits that Pioneer cannot lawfully commercialize OGAT/RR soybeans.

132.     Monsanto sent a letter to seed dealers stating, *inter alia*, that:

> As you may know, Monsanto filed a federal lawsuit May 4, 2009 to prevent DuPont and its subsidiary, Pioneer Hi-Bred International, from unlawfully using our proprietary Roundup Ready® herbicide-tolerant technology.  I want to take this opportunity to provide you with some additional information,

because I would like you and your customers to know the truth – which is **that DuPont/Pioneer is breaching its contract with Monsanto and infringing Monsanto's patents by misusing Monsanto's Roundup Ready technology**.

(Emphasis added).

133.    Monsanto also sent a letter to all Roundup Ready® licensees stating, *inter alia,* that:

As you may be aware, DuPont's subsidiary, Pioneer Hi-Bred International, Inc. ("Pioneer"), has announced its intention to commercialize soybeans that contain Monsanto's patented Roundup Ready® trait in combination with the DuPont OGAT trait. A Pioneer representative recently announced that in 2011 Pioneer plans to commercially launch Optimum® GAT® soybean varieties combined or "stacked" with the Monsanto's proprietary Roundup Ready® trait. GreenLeaf Genetics LLC, an affiliate of Pioneer, has reported that "Pioneer is providing communication materials to its field sales employees and reps about how Pioneer is combining its proprietary Optimum® GAT® trait with the Roundup Ready® trait" in soybeans.

To avoid possible confusion in light of these recent statements, we want to make Monsanto's position clear. **No company, including DuPont, Pioneer and their GreenLeaf affiliate, is authorized at this time to make, use, or sell soybeans that contain both Monsanto's patented Roundup Ready® trait and Pioneer's Optimum® GAT® trait**.

(emphasis added).

134.    On its website, Monsanto posted the following message:

True innovation is delivered by companies that respect patents and contractual agreements, and deliver new products through their own innovations. And that's why we're working with our peers in the industry – companies like BASF, Bayer CropScience and Dow AgroSciences – to do just that. DuPont's unauthorized use of our technology and patents is simply unacceptable.

DuPont and Pioneer will likely continue to create smokescreen and rhetoric intended to divert a sympathetic ear to why their misuse of

56

our technology is a good thing. **None of that changes the fundamental issue: the unauthorized use of Monsanto's technology is an apparent attempt to remedy unacceptable risk posed by DuPont's product.**

(emphasis in original).

135.     Monsanto sent these letters and disseminated these messages even though it knows or should have known that the '247 Reissue Patent is not valid and enforceable. The purpose of these false and misleading communications to the industry is to block OGAT/RR soybeans from successfully entering the market.

136.     Monsanto's goal is to prevent OGAT/RR soybeans from encroaching on the profitability of its Roundup Ready® 2 Yield soybeans. By employing threatening and misleading communications to licensees and farmers, Monsanto will be able to impede, delay, or prevent successful competition from OGAT/RR soybeans. If Monsanto is allowed to use invalid and unenforceable patent rights to impede the market entry of competing products, investment by trait developers in the development of new traits will likely decline and innovation will be stifled, harming both farmers and consumers.

**3.      Monsanto Has Unlawfully Restricted Competition By Cutting Off Competitor Access To ISCs.**

**a.      ISCs Are Critical To Trait Competition.**

137.     Monsanto's current attempt to enforce an invalid and unenforceable patent, and purportedly related licensing restrictions, is just one facet of Monsanto's comprehensive, anticompetitive scheme to impede Pioneer's traits from successfully penetrating the market. Within the last two years, Monsanto has also entered into license agreements with independent seed companies ("ISCs") that contain restrictive provisions

that are intended to block products with Pioneer's traits, including OGAT/RR soybeans, OGAT corn, and soybean and corn products with Pioneer's output traits, from a significant distribution channel and thereby impede their successful entry into the relevant markets.

138.    ISCs play a critical role in the distribution of agricultural biotech traits. Having access to ISCs, and the ability to develop business relationships with them, is essential for seed trait developers competing with Monsanto.

139.    There are at present approximately 240 ISCs in the United States.  A substantial percentage of the acres planted with soybeans and corn are planted with soybeans and corn sold through ISCs.  The shares of seed sales made through ISCs understate their significance.  Many ISCs concentrate on a limited geographic area and are leading suppliers in the specific areas in which they operate.

140.    The development of biotech traits, and the introduction of those traits into commercially valuable germplasm (seed products), require large research and development investments.  In order for trait developers to have the incentive to make that investment and undertake the risk of failure, they require access to the entire soybean and corn seed market, including ISCs, not just their own seed business.

141.    ISCs play a significant role in developing, marketing and distributing new traits for several reasons.  They license germplasm and traits to incorporate into their own seeds, and they sell those seeds to farmers through their own distribution networks. ISCs have special relationships with the farmers they serve; many farmers consult with ISCs in deciding which seeds to plant.  Further, the rate of adoption of competing traits and seeds

occurs slowly.  Farmers only gradually adopt new seed varieties and will usually switch products only after observing how the seeds will grow in local conditions.  Even if a competing trait developer were able to replicate the ISCs' customer relationships, it would still face the obstacle of convincing customers to change to new traits and seed varieties based on different germplasm.  The incorporation of competing traits into the germplasm already being used by the ISCs would lead to a more rapid rate of adoption of those competing traits.

142.    Trait developers with established seed businesses would find it very difficult and expensive to replicate the current sales that ISCs make to their customers.  Approximately 88 percent of ISCs sell seed directly to local farmers or through independent farmer-dealers, rather than through retail outlets.  ISCs develop long-term relationships with farmers, and these long-term relationships are important because many farmers depend on recommendations from their local seed providers in deciding which seeds to purchase.

143.    On information and belief, Monsanto has imposed stringent restrictions in recently-entered license agreements with ISCs that forbid them from incorporating non-Monsanto traits into their breeding programs and selling seeds with such non-Monsanto traits.  Such restrictions foreclose rival developers of traits, including Pioneer, from a substantial portion of the relevant markets, thereby impeding the introduction of competitive traits and dampening the incentives to invest in the development of such traits.

### b.    Monsanto Has Unlawfully Used "Poison Pill" Provisions To Prevent Competitors From Acquiring ISCs.

144.    Monsanto has used its trait licenses and germplasm licenses with ISCs to prevent ISCs from being acquired by Monsanto competitors.   The licenses contain provisions that operate as "poison pills."

145.    On information and belief, Monsanto's ISC licenses contain "change-in-control" provisions that prevent ISCs from being acquired by any company other than Monsanto.  These provisions permit Monsanto, in its sole discretion, to terminate licenses upon any change in ownership of an ISC.

146.    Upon termination of an ISC's license, on information and belief, the ISC must cease selling seeds containing Monsanto traits and destroy its inventory of seeds containing such technology.  The absence of any inventory renders the seed company valueless to Monsanto's competitors.

147.    On information and belief, Monsanto's licenses also contain "grantback" provisions requiring any ISC that licenses Monsanto technology and subsequently improves that technology to license that technology back to Monsanto for up to twenty years after those licenses expire.  Any company that subsequently acquires the ISC would be subject to the grantback provision.   The grantback provision therefore prevents Monsanto's competitors from acquiring ISCs because the competitor would be placed in the untenable position of giving Monsanto access to the competitor's new proprietary technology for twenty years after the expiration of the ISC's license with Monsanto.

148.    Pioneer has sought to avoid triggering the change-in-control provisions in Monsanto's licenses with ISCs through co-branding relationships with ISCs.   On

60

information and belief, Monsanto has exercised its monopoly power to prevent such competition by imposing a new license agreement, which prohibits ISCs from selling seed co-branded with any Monsanto trait competitor.

149.    Based on the restrictions contained in Monsanto's licenses with ISCs, Monsanto has effectively warned ISCs that if they want to include any non-Monsanto traits in their breeding programs or sell seed with non-Monsanto traits, they will lose their licenses to Monsanto's traits. Because Monsanto traits dominate the marketplace, and the adoption of new traits by farmers is generally a gradual process, the choice between Monsanto and non-Monsanto traits that Monsanto has given ISCs is no choice at all. Monsanto has therefore been able to use its ISC licenses to block competing traits from successfully entering the relevant markets and has stifled innovation.

150.    As a result of these poison pill provisions, over the past five years, Monsanto has acquired approximately twenty-five ISCs without any competitive bidding. Through these acquisitions, Monsanto has been able to restrict the distribution channel through which competing trait developers can sell seed containing non-Monsanto traits.

        **c.**    **Monsanto Is Unlawfully Using Stacking Restrictions In Its ISC Licenses To Prevent The Development Of Competing Stacked Products.**

151.    As Monsanto's commercialization of Roundup Ready® 2 Yield soybeans nears, Monsanto has stepped up its efforts to lock ISCs into Monsanto traits, to prevent them from incorporating non-Monsanto traits into their breeding programs, and from selling seed with non-Monsanto traits. Many of the new restrictions are directly targeted at new traits developed by Pioneer.

61

152.    In the latter part of 2008, Monsanto, on information and belief, issued a new ISC license agreement for Monsanto's Roundup Ready® 2 Yield soybean trait, which contains addenda amending existing corn and soybean trait licenses (the "New License Agreement").

153.    The New License Agreement and the addenda thereto, on information and belief, contain more expansive anti-stacking provisions than prior ISC licenses.  In addition to general stacking restrictions, the New License Agreement prohibits the stacking of Monsanto's Roundup Ready® trait with any alternative glyphosate-tolerant trait developed by Monsanto's competitors.

154.    To date, the majority of the genetic modification to corn and soybean seeds has been in the form of "input" traits, which are traits that alter the process of growing the plant (*i.e.*, yield, herbicide tolerance, insect resistance), but do not affect the attributes of the final product grown from the seed.  Pioneer and other trait developers are now developing "output traits," which are traits that improve the quality of food grown from seeds.  For example, Pioneer has developed a high oleic trait in soybeans, which increases the stability of soybean oil when used in frying and food processing, resulting in foods with only negligible transfats.  The high oleic soybean oil trait will be commercialized by Pioneer in or about 2009.  Monsanto is still developing a high oleic soybean oil trait.

155.    Output traits are commercially viable only if they can be combined with input traits that have already been adopted.  On information and belief, Monsanto's New

License Agreement prohibits the stacking of Monsanto's input traits with output traits developed by Monsanto's competitors.

156.     Monsanto's restrictions on ISCs' ability to stack non-Monsanto traits with Monsanto traits have foreclosed a substantial part of the relevant markets to competing trait developers, including Pioneer.

### 4.     Monsanto Has Unlawfully Restricted Competitors From Developing Alternative Stacked Trait Corn Products.

157.     Biotechnology in corn is shifting from individual traits to "stacked" traits, combining herbicide tolerance and insect resistance into a single seed.  The next phase of development is the stacking of multiple traits that would confer resistance to the same insect by two different mechanisms or confer tolerance to multiple herbicides.  This approach to insect resistance is known as "dual modes of action" and its goal is to reduce the development of resistance in target pests. This approach to herbicide tolerance has as its goal addressing weeds that have become resistant to glyphosate.

158.     There are herbicide-tolerant traits that provide competitive alternatives to the Roundup Ready® trait in corn.

159.     Syngenta offers the herbicide-tolerant corn trait GA21.  This trait is the original Roundup Ready® corn trait that Monsanto used in Roundup Ready® corn. Monsanto later lost the rights to GA21, and Syngenta acquired those rights from Bayer Cropscience in 2004. Monsanto attempted to block Syngenta from selling GA21 by asserting patents Syngenta was able to show were invalid or not infringed.  After it lost its rights to the GA21 technology, Monsanto required seed companies to which it had licensed GA21 to switch to NK603, another glyphosate tolerant trait owned by Monsanto.

63

160.     Pioneer is preparing to commercialize the OGAT trait in corn in 2010, which will maximize yield and expand weed control options.

161.     The success of OGAT in corn will depend, in large part, on the ability of Pioneer to include the OGAT trait in stacked product offerings that compete with Monsanto's stacked product offerings.

162.     To prevent competition from the introduction of the OGAT corn trait, Monsanto has used its monopoly power in the relevant markets to restrict Pioneer's ability to stack that trait with the Herculex® insect-resistant traits that Pioneer co-developed with Dow.

163.     Herculex® is a family of insect-resistant traits that provides farmers protection against a broad spectrum of insects.  The Herculex® traits were co-developed by Pioneer and Dow's subsidiary Mycogen in order to compete against Monsanto's YieldGard® insect-resistant traits.  Herculex® traits are recognized for their effectiveness against a broad spectrum of insects and as superior to Monsanto's insect-resistant traits.

164.     Under the development agreement between Pioneer and Dow, Dow has the right to license Herculex®, and Pioneer has a non-exclusive license to use Herculex® in its own corn seeds or those co-branded with its seed distributors.  The development agreement does not permit Pioneer to sub-license Herculex® to ISCs or others.

165.     In connection with a litigation settlement, Monsanto and Dow entered into a contractual relationship whereby they are cross-licensing each other's biotechnology with the goal of launching a bundle of corn seed traits to be marketed under the name SmartStax™.  The SmartStax™ product will combine, among other traits, Dow's

64

Herculex® insect-resistant traits and Monsanto's Roundup Ready® herbicide-tolerant trait. The SmartStax™ product is to enter the market in or about 2010.

166.     Monsanto has recognized the competitive advantage that it received from obtaining licensing rights to Herculex®. In a September 14, 2007 presentation, Monsanto stated that the "First-Ever Eight-Gene Stack Leapfrogs Competitive Products."

167.     Under its agreement with Dow, Monsanto is to serve as the exclusive representative of both companies in out-licensing SmartStax™ to ISCs.

168.     The terms of Monsanto's agreements with Dow are not public; however, on information and belief, those agreements prohibit Dow from, or penalize Dow for, permitting Pioneer to sub-license Herculex® to ISCs.

169.     Pioneer has sought from Dow the right to sub-license Herculex® to ISCs, but Dow has denied those requests.

170.     Monsanto's efforts to obtain *de facto* control over the out-licensing of Herculex® traits is a direct response to the competition in herbicide-tolerant traits that Monsanto is facing. To impede Pioneer's entry into the market for stacked traits in corn that confer insect resistance through multiple modes of action and herbicide tolerance to multiple herbicides, Monsanto used its market power in herbicide tolerance corn traits to enter into an anticompetitive agreement with Dow that would restrain competition in the relevant market. Without the ability to sub-license Herculex® to ISCs, Pioneer will not be able to provide them the full suite of corn traits that their customers require, giving ISCs no choice but to offer SmartStax™, and therefore foreclosing Pioneer's corn stacked products from a substantial segment of the relevant market.

5.       **Monsanto Is Attempting To Use Its Dominance In Germplasm To Restrict Competition In The Relevant Markets For Traits.**

171.       Germplasm is the base genetic material which determines the agronomic characteristics of a plant. In addition to having a dominant position in seed traits, Monsanto has a dominant position in out-licensed germplasm. On information and belief, Monsanto has control of over 60% of the soy and corn germplasm that is out-licensed.

172.       Monsanto is using its dominant market position in germplasm out-licensing to reinforce its monopoly in traits by imposing restrictive licensing terms on the germplasm needed by ISCs for their breeding programs.

173.       Initially, most germplasm developers were independent of trait developers. However, over time, most trait developers have obtained access to germplasm by acquiring seed companies with breeding programs. There are at present only a few developers of germplasm. In corn, the primary germplasm developers include Pioneer, Holden's Foundation Seeds ("Holden's"), which is a subsidiary of Monsanto, Syngenta, and Mycogen ("Dow"). In addition, GreenLeaf Genetics, a joint venture between Pioneer and Syngenta, recently began out-licensing Syngenta's and Pioneer's proprietary germplasm to ISCs. In soybeans, the principal developers of germplasm are Midwest Oilseeds/Harry Stine, Dairyland, and Pioneer, with Midwest Oilseeds/Harry Stine being the largest of these developers.

174.       Access to germplasm is critical for trait developers because it takes generations of breeding to create inbred or foundation lines containing the most desirable, high-yielding characteristics.

66

175.     Most ISCs do not have independent trait development or breeding programs for developing germplasm. Instead, most ISCs license traits from trait developers and germplasm from licensors such as Holden's.

176.     When it acquired Holden's, Monsanto was subject to a U.S. Department of Justice Consent Decree.  On information and belief, since in or about 2004, after expiration of the Consent Decree, Holden's has included more restrictive provisions in its license agreements, including prohibiting its licensees from introducing non-Monsanto traits into Holden's germplasm, effectively preventing ISCs from creating inbred lines or "stacks" comprised of Holden's germplasm, a Monsanto trait, and a non-Monsanto trait. These restrictions apply equally to non-patented germplasm.

177.     The purpose and effect of these license provisions is to limit the ability of ISCs to incorporate competing traits into their breeding programs and, as a result, to eliminate ISCs as a potential means by which trait developers can commercialize competing traits.

178.     Monsanto is also attempting to leverage its monopoly power in germplasm to move ISCs from Roundup Ready® germplasm to Roundup Ready® 2 Yield germplasm, before the patents purportedly covering Roundup Ready® expire.  Monsanto is doing so by forcing ISCs licensed to use germplasm with the Roundup Ready® trait to switch to germplasm with the Roundup Ready® 2 Yield trait, the purpose of which is to create a bridge from one false patent-protected monopoly over glyphosate-tolerant traits and seeds, which is on the verge of expiring, to a second false patent-protected monopoly of longer duration.

6.       **Monsanto Is Attempting To Use Its Dominance In Herbicide-Tolerant Traits in Soybeans To Move The Industry From Expiring and Unenforceable Patent Protections To Patent Protections Of Longer Duration.**

179.      As Monsanto's patent-supported monopoly over herbicide-tolerant traits nears expiration, Monsanto is preparing to commercialize a new herbicide-tolerant trait product.

180.      Monsanto intends to bring Roundup Ready® 2 Yield soybean seeds to market in 2010.  The Roundup Ready® 2 Yield trait is covered by additional patents that expire in 2020.  Both Roundup Ready® traits confer glyphosate tolerance by the same mechanism – the same EPSPS enzyme – but the Roundup Ready® 2 Yield trait has longer patent protection because Monsanto used a different promoter to activate transcription of the EPSPS gene.

181.      The Roundup Ready® 2 Yield trait is not the innovation Monsanto claims it is.  Though Monsanto asserts Roundup Ready® 2 Yield soybean seeds will have improved yield and has announced plans to charge 40% more for them, any improvement in yield is not caused by the presence of the different promoter, but instead likely results from the fact that the gene conferring glyphosate tolerance was inserted at a different point on the soybean genome or application of Monsanto's seed treatment Acceleron™, which on information and belief Monsanto is requiring growers  to purchase and use with Roundup Ready® 2 Yield soybean seeds.

182.      On information and belief, Monsanto is using the New License Agreement to shift customers to the Roundup Ready® 2 Yield trait.   Monsanto is forcing ISCs to destroy their Roundup Ready® trait seed lines and switch to the Roundup Ready® 2 Yield

trait before the expiration of the patents covering the Roundup Ready® trait. On information and belief, Monsanto has informed ISCs that, if they do not complete their switch to Roundup Ready® 2 Yield within three years, they will lose their licenses to Roundup Ready®.

183.    By forcing ISCs to make this switch prior to the expiration of the fraudulently and inequitably obtained patents covering Roundup Ready®, Monsanto seeks to remove Roundup Ready® from the market prior to the time when competitors will be able to produce a generic product. Doing so will ensure that ISCs are, as a matter of economic reality, unable to sell seeds with a competing generic Roundup Ready® trait when it comes off patent, whether by judicial action or by expiration.

184.    Without ISCs as a distribution channel for generic competitors, competing trait suppliers, such as Pioneer, will be unable, due to other substantial barriers to entry, to bring generic versions of Roundup Ready® or stacked products, including generic versions of Roundup Ready®, to market. Monsanto's conduct has the effect of substantially foreclosing the entry of generic versions of Roundup Ready® stand-alone and stacked products, after the term of the alleged patent monopoly expires.

185.    By switching ISCs to the Roundup Ready® 2 Yield trait, Monsanto seeks to remove the Roundup Ready® trait from the market prior to the time when competitors – including ISCs – will be able to market generic products, thereby creating a bridge between two purported patent monopolies and foreclosing generic entry.

## ANTITRUST INJURY

186.     Pioneer is an actual or potential competitor in each of the relevant markets (see ¶¶ 21-50) affected by Monsanto's exclusionary conduct.  DuPont and Pioneer have suffered, or are likely to suffer, injury as a direct result of Monsanto's conduct that has excluded, harmed, or threatened to exclude or harm competition in each such market.

187.     Monsanto's unlawful conduct has injured and will continue to injure competition, unless and until it is enjoined by this Court. The same conduct has proximately caused injury to DuPont and Pioneer and will continue to cause injury to DuPont and Pioneer unless and until it is enjoined by this Court.

## CLAIMS FOR RELIEF

### COUNT ONE
**(Willful Acquisition And Maintenance Of A Monopoly In The Relevant Market For Herbicide-Tolerant Soybean Traits In Violation Of Sherman Act, Section 2)**

188.     Counterclaim Plaintiffs reallege and incorporate herein by reference the allegations set forth in Paragraphs 1 to 187 herein.

189.     Herbicide-tolerant traits in soybeans are a line of commerce or relevant product market within the meaning of the antitrust laws.

190.     The relevant geographic market is the United States.

191.     Monsanto possesses monopoly power in the relevant market, and has maintained a market share of 99.7%.  Substantial barriers to entry and expansion exist in the relevant market.

192.     Monsanto has the power to control market prices and exclude competition in the relevant market.

70

193.     Monsanto has engaged in conduct and a pattern of conduct with anticompetitive effects to unlawfully maintain and enhance its monopoly in the relevant market and to keep prices at artificially high levels, suppress competition, stifle innovation, and eliminate consumer choice through exclusionary behavior designed to keep Pioneer from entering the relevant market and competing successfully.  It has done so with the intent to monopolize the relevant market.

194.     Monsanto's wrongful acts have caused and are likely to continue to cause injury to competition in the relevant market and have caused and are likely to cause seed companies, farmers, and consumers to pay higher prices than they would otherwise pay in a competitive market.

195.     There is no legitimate business justification for Monsanto's conduct.

196.     DuPont and Pioneer have suffered, and will likely continue to suffer, antitrust injury.  Monsanto's wrongful conduct is material, and will impede, hamper, delay, or destroy the ability of Pioneer and others to compete in the relevant market, has improperly induced Pioneer to pay royalties to Monsanto pursuant to its Soybean License Agreement, and has caused, and continues to cause, DuPont and Pioneer damages in an amount to be proven at trial.

**COUNT TWO**
**(Willful Acquisition And Maintenance Of A Monopoly In The Relevant Market For Herbicide-Tolerant Corn Traits In Violation Of Sherman Act, Section 2)**

197.     Counterclaim Plaintiffs reallege and incorporate herein by reference the allegations set forth in Paragraphs 1 to 196 herein.

71

198.      Herbicide-tolerant traits in corn are a line of commerce or relevant product market within the meaning of the antitrust laws.

199.      The relevant geographic market is the United States.

200.      Monsanto possesses monopoly power in the relevant market, and has maintained a market share of approximately 80.8%.  Substantial barriers to entry and expansion exist in the relevant market.

201.      Monsanto has the power to control market prices and exclude competition in the relevant market.

202.      Monsanto has engaged in conduct and a pattern of conduct with anticompetitive effects to unlawfully maintain and enhance its monopoly in the relevant market and to keep prices at artificially high levels, suppress competition, stifle innovation, and eliminate consumer choice through exclusionary behavior designed to keep Pioneer from entering the relevant market and competing successfully.  It has done so with the intent to monopolize the relevant market.

203.      Monsanto's wrongful acts have caused and are likely to continue to cause injury to competition in the relevant market and have caused seed companies, farmers, and consumers to pay higher prices than they would otherwise pay in a competitive market.

204.      There is no legitimate business justification for Monsanto's conduct.

205.      DuPont and Pioneer have suffered, and will continue to suffer, antitrust injury.  Monsanto's wrongful conduct is material, and will impede, hamper and delay Pioneer's and others' ability to expand in the relevant market, has improperly induced

Pioneer to pay royalties to Monsanto pursuant to its Corn License Agreement, and has caused, and continues to cause, DuPont and Pioneer damages in an amount to be proven at trial.

## COUNT THREE
### (Monopolization Of Relevant Market For Stacked Herbicide-Tolerant And Insect-Resistant Traits In Corn In Violation Of Sherman Act, Section 2)

206.     Counterclaim Plaintiffs reallege and incorporate by reference the allegations set forth in Paragraphs 1 to 205 herein.

207.     Stacked herbicide-tolerant and insect-resistant traits in corn are a line of commerce or relevant product market within the meaning of the antitrust laws.

208.     The relevant geographic market is the United States.

209.     Monsanto possesses monopoly power in the relevant market, and has maintained a market share of approximately 74.2%.  Substantial barriers to entry and expansion exist in the relevant market.

210.     Monsanto has the power to control prices and exclude competition in the relevant market.

211.     Monsanto has engaged in conduct and a pattern of conduct with anticompetitive effects to unlawfully maintain and enhance its monopoly in the relevant market and to keep prices at artificially high levels, suppress competition, stifle innovation, and eliminate consumer choice through exclusionary behavior designed to keep Pioneer from entering the relevant market and competing successfully. It has done so with the intent to monopolize the relevant market.

212.      Monsanto's wrongful acts have caused and are likely to cause injury to the competition in the relevant market and have caused seed companies, farmers, and consumers to pay higher prices than they would otherwise pay in a competitive market.

213.      There is no legitimate business justification for Monsanto's conduct.

214.      DuPont and Pioneer have suffered, and will continue to suffer, antitrust injury. Monsanto's wrongful conduct is material, and will impede, hamper, delay, or destroy the ability of Pioneer and others to compete in the relevant market and has caused, and continues to cause, DuPont and Pioneer damages in an amount to be proven at trial.

### COUNT FOUR
**(Attempted Monopolization Of The Relevant Market For Stacked Traits In Corn Conferring Insect Resistance Through Multiple Modes Of Action And Herbicide Tolerance To Multiple Herbicides In Violation Of Sherman Act, Section 2)**

215.      Counterclaim Plaintiffs reallege and incorporate by reference the allegations set forth in Paragraphs 1 to 214 herein.

216.      Stacked traits in corn conferring insect resistance through multiple modes of action and herbicide tolerance to multiple herbicides are a line of commerce or relevant product market within the meaning of the antitrust laws.

217.      The relevant geographic market is the United States.

218.      Stacked traits in corn conferring insect resistance through multiple modes of action and herbicide tolerance to multiple herbicides are an emerging product market. Substantial barriers to entry and expansion exist in the relevant market.

219      Monsanto has engaged in conduct and a pattern of conduct with anticompetitive effects with the purpose of obtaining a monopoly in the relevant market,

to raise prices to artificially high levels, suppress competition, stifle innovation, and eliminate consumer choice through exclusionary behavior designed to keep Pioneer from entering the relevant market and competing successfully.

220.     Monsanto has pursued its exclusionary conduct with the specific intent to monopolize the relevant market.

221.     There is a dangerous probability that Monsanto will acquire monopoly power in the relevant market by using its false patent-based monopoly in herbicide tolerance together with other anticompetitive conduct alleged herein to obtain monopoly power in the relevant market.

222.     Monsanto's wrongful acts have caused and are likely to cause injury to competition in the relevant market and cause seed companies, farmers and consumers to continue to pay higher prices than they would otherwise pay in a competitive market.

223.     There is no legitimate business justification for Monsanto's conduct.

224.     DuPont and Pioneer have suffered, and will continue to suffer, antitrust injury.  Monsanto's wrongful conduct is material, and will impede, hamper, delay, or destroy the ability of Pioneer and others to compete in the relevant market and has caused, and continues to cause, DuPont and Pioneer damages in an amount to be proven at trial.

## COUNT FIVE
### (Attempted Monopolization Of The Relevant Market For Stacked Input And Output Traits In Soybeans In Violation Of Sherman Act, Section 2)

225.     Counterclaim Plaintiffs reallege and incorporate by reference the allegations set forth in Paragraphs 1 to 224 herein.

226.     Stacked input and output traits in soybeans are a line of commerce or relevant product market within the meaning of the antitrust laws.

227.     The relevant geographic market is the United States.

228.     Monsanto has engaged in conduct and a pattern of conduct with anticompetitive effects with the purpose of obtaining a monopoly in the relevant market, to keep prices at artificially high levels, suppress competition, stifle innovation, and eliminate consumer choice through exclusionary behavior designed to keep Pioneer from entering the relevant market and competing successfully.

229.     Monsanto has pursued its exclusionary conduct with the specific intent to monopolize the relevant market.

230.     There is a dangerous probability that Monsanto will acquire monopoly power in the relevant market by using its false patent-based monopoly in herbicide tolerance together with other anticompetitive conduct alleged herein to obtain monopoly power in the relevant market.

231.     Monsanto's wrongful acts have caused and are likely to cause injury to competition in the relevant market and cause seed companies, farmers and consumers to continue to pay higher prices than they would otherwise pay in a competitive market.

232.     There is no legitimate business justification for Monsanto's conduct.

233.     DuPont and Pioneer have suffered, and will continue to suffer, antitrust injury.  Monsanto's wrongful conduct is material, and will impede, hamper, delay, or destroy the ability of Pioneer and others to compete in the relevant market and has

caused, and continues to cause, DuPont and Pioneer damages in an amount to be proven at trial.

## COUNT SIX
### (Exclusive Dealing Agreements Relating To ISC License Agreements In Violation of Clayton Act, Section 3 And Sherman Act, Section 1)

234.    Counterclaim Plaintiffs reallege and incorporate herein by reference the allegations set forth in Paragraphs 1 to 233 herein.

235.    Monsanto has licensed traits to and entered into restrictive licensing agreements with ISCs on the condition that ISCs not deal in the traits of rival trait developers.  Because of Monsanto's monopoly or market power in the relevant markets, ISCs had no choice but to enter into these agreements.

236.    Monsanto has monopoly or market power in the relevant markets. Substantial barriers to entry and expansion exist in the relevant markets.

237.    DuPont and Pioneer have suffered, and will continue to suffer, antitrust injury.  Monsanto's wrongful conduct is material, and will impede, hamper, delay or destroy the ability of Pioneer and others to compete in the relevant markets, and has caused, and continues to cause, DuPont and Pioneer damages in an amount to be proven at trial.

238.    Monsanto's restrictive ISC licensing agreements have significantly limited the opportunities for competing trait developers, including DuPont and Pioneer, to enter and compete effectively in the relevant markets in the United States, and caused a substantial lessening of competition in the relevant markets, has foreclosed Pioneer from a substantial share of the relevant market, unreasonably restrained trade, and affected

interstate commerce in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14 and

Section 1 of the Sherman Act, 15 U.S.C. § 1.

## COUNT SEVEN
### (Agreement In Restraint Of Trade Relating To Dow Co-Licensing Agreements In Violation of Sherman Act, Section 1)

239.    Counterclaim Plaintiffs reallege and incorporate herein by reference the

allegations set forth in Paragraphs 1 to 238 herein.

240.    Monsanto has entered into agreements with Dow Agroscience LLC and,

on information and belief, Dow is either prohibited or penalized if it agrees to permit

Pioneer to sub-license Herculex®, based on one or more agreements into which Monsanto

required Dow to enter.  Dow has refused to allow Pioneer to sub-license Herculex®  to

ISCs.

241.    Monsanto has monopoly or market power in the relevant markets for

stacked traits conferring insect resistance through multiple modes of action and herbicide

tolerance to multiple herbicides.  Substantial barriers to entry and expansion exist in the

relevant markets.

242.    Monsanto's  agreement with Dow has caused, and will cause, a substantial

lessening of competition in the market for stacked traits in corn conferring insect

resistance through multiple modes of action and herbicide tolerance to multiple

herbicides, unreasonably restraining trade in the relevant market and affecting interstate

commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

243.    DuPont and Pioneer have suffered, and will continue to suffer, antitrust

injury.  Monsanto's wrongful conduct is material, and will impede, hamper and delay

Pioneer's and others' ability to enter the relevant markets for stacked traits conferring herbicide tolerance and insect resistance through multiple modes of action and has caused, and continues to cause, DuPont and Pioneer damages in an amount to be proven at trial.

## COUNT EIGHT
### (Declaratory Judgment Regarding Non-Infringement)

244.     Counterclaim Plaintiffs reallege and incorporate herein by reference the allegations set forth in paragraphs 1 to 243 herein.

245.     Monsanto alleges that Counterclaim Plaintiffs infringe the '247 Reissue Patent, and Counterclaim Plaintiffs deny those allegations.

246.     Accordingly, there is an actual, justiciable controversy within the meaning of 28 U.S.C. §§ 2201 and 2202 between Counterclaim Plaintiffs and Monsanto regarding the Counterclaim Plaintiffs' alleged infringement of the '247 Reissue Patent.

247.     Counterclaim Plaintiffs are entitled to a declaratory judgment that Counterclaim Plaintiffs do not infringe and have not infringed the '247 Reissue Patent, either directly or indirectly, or because Pioneer has intervening rights over the claims of the '247 Reissue Patent.

## COUNT NINE
### (Declaratory Judgment of Invalidity)

248.     Counterclaim Plaintiffs reallege and incorporate herein by reference the allegations set forth in paragraphs 1 to 247 herein.

249.     Monsanto alleges that Counterclaim Plaintiffs infringe the '247 Reissue Patent, and Counterclaim Plaintiffs deny that allegation.

250.     Accordingly, there is an actual and justiciable controversy within the meaning of 28 U.S.C. §§ 2201 and 2202 between Counterclaim Plaintiffs and Monsanto regarding the invalidity of the '247 Reissue Patent.

251.     Counterclaim Plaintiffs are entitled to a declaratory judgment that the '247 Reissue Patent is invalid for failure to satisfy one or more of the requirements for patentability specified in 35 U.S.C. §§ 101, *et seq.*, and/or non-statutorily and judicially invoked doctrines of invalidity.

### COUNT TEN
### (Declaratory Judgment of Unenforceability)

252.     Counterclaim Plaintiffs reallege and incorporate herein by reference the allegations set forth in paragraphs 1 to 251 herein.

253.     There is an actual and justiciable controversy within the meaning of 28 U.S.C. §§ 2201 and 2202 between Counterclaim Plaintiffs and Monsanto with respect to the unenforceability of the '247 Reissue Patent.

254.     The '247 Reissue Patent is unenforceable because Monsanto knowingly and willfully misrepresented or omitted material information important to the patentability of the pending claims, with intent to deceive the Patent Office, during the prosecution of the U.S. Patent No. 5,633,435, and/or during the reissuing procedure for the '247 Reissue Patent.

255.     Upon information and belief, the '247 Reissue Patent is unenforceable for, *inter alia*, inequitable conduct by the people involved in the prosecution of the patents, inventors or their agents before the Patent Office.

## COUNT ELEVEN
### (Declaratory Judgment Regarding the Soybean and Corn License Agreements)

256.     Counterclaim Plaintiffs reallege and incorporate herein by reference the allegations set forth in paragraphs 1 to 255 herein.

257.     Pioneer is a leading developer and supplier of advanced plant genetics to farmers worldwide, increasing productivity and developing sustainable agricultural systems for people around the globe.

258.     A primary mission of Pioneer is to increase corn and soybean yield and yield stability and to optimize attributes of corn and soybean crops such as its maturity, standability, disease and pest resistance, stress tolerance, herbicide resistance, oil and meal quality and emergence.  To maximize these qualities, Pioneer employs technologies such as gene transfer, molecular markers and automation, which introduces new and improved traits to soybeans and corn.

259.     This action involves the Soybean License Agreement and the Corn License Agreement entered into by and between Pioneer and Monsanto on April 1, 2002.

260.     Pioneer's OGAT trait does not infringe either ████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
There is no prohibition in the Soybean License Agreement to Pioneer's activities ██████████
████████████████████████████

261.     Pioneer's OGAT trait does not infringe either the ███████████████████
████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████  There is

no prohibition in the Corn License Agreement to Pioneer's activities ████████

█████████████████████

262.     Should this Court interpret any provision of the Soybean and Corn License

Agreements to restrict or preclude any conduct by Pioneer with regard to ████████

████████████████████████████  then Pioneer respectfully requests that the

Court reform the Soybean License Agreement and/or the Corn License Agreement

accordingly to allow such activity in accordance with the intent and contemplated scope

of the Agreements permitting such activity.

263.     Monsanto alleges that Counterclaim Plaintiffs have severally breached the

Soybean and Corn License Agreements, and Counterclaim Plaintiffs deny each and every

one of these allegations.

264.     Accordingly, there is an actual, justiciable controversy within the meaning

of 28 U.S.C. §§ 2201 and 2202 between Counterclaim Plaintiffs and Monsanto

concerning their rights, duties and obligations under the Soybean and Corn License

Agreements.

265.     Counterclaim Plaintiffs are entitled to a declaratory judgment that they

have not breached either the Soybean or Corn License Agreements.

## COUNT TWELVE
### (Breach of the Soybean License Agreements)

266.     Counterclaim Plaintiffs reallege and incorporate herein by reference the

allegations set forth in paragraphs 1 to 265 herein.

267.     Monsanto agreed under the Soybean License Agreement ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████

268.     Monsanto and Pioneer also entered a letter agreement ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████

269.     In the ████████████ Letter, Monsanto acknowledged that ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████

270.     ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████

271.     On October 31, 2008, Monsanto refused Pioneer's request in violation ██

████████████ of the Soybean License Agreement, thereby preventing Pioneer ████

███████████████

272.     Monsanto materially breached the Soybean License Agreement by ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████

273.     As a direct and proximate result of Monsanto's material breach of the Soybean License Agreement Pioneer has been damaged, ████████████████████ ████████████████████████████████████████████████ ████████████████████████

274.     Pioneer has complied with its obligations under the Soybean License Agreement.

## DEMAND FOR JURY TRIAL

275.     Pursuant to Fed. R. Civ. P. 38(b), Counterclaim-Plaintiffs demand a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, COUNTERCLAIM PLAINTIFFS PRAY THAT THIS COURT:

A.     Dismiss Monsanto's Complaint with prejudice, and denial of each and every prayer for relief contained therein;

B.     Adjudge that Monsanto take nothing by way of its Complaint.

C.     Adjudge and decree that Counterclaim Defendants have acted unlawfully to acquire and maintain a monopoly in herbicide-tolerant soybean traits,

herbicide-tolerant corn traits, and stacked herbicide-tolerant and insect-resistant traits in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

D.    Adjudge and decree that Counterclaim Defendants have acted unlawfully to attempt to maintain a monopoly in the relevant markets for stacked traits in corn conferring insect resistance through multiple modes of action and herbicide tolerance to multiple herbicides, and stacked input and output traits in soybeans in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

E.    Adjudge and decree that Counterclaim Defendants (a) entered into unlawful exclusive dealing agreements that have substantially lessened competition in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14, and (b) entered into unlawful agreements in unreasonable restraint of interstate commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

F.    Award Counterclaim Plaintiffs treble damages in an amount to be proven a trial, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a), including, without limitation, the royalties that Pioneer has paid Monsanto pursuant to its Roundup Ready® corn and soybean licenses and its lost profits.

G.    Grant injunctive relief prohibiting Counterclaim Defendants and all persons, firms, and corporations acting on their behalf and under their

85

direction or control from continuing violations of Section 2 of the Sherman Act, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

H.    Grant injunctive relief prohibiting Counterclaim Defendants and all persons, firms, and corporations acting on their behalf and under their direction or control from continuing violations of Section 3 of the Clayton Act and Section 1 of the Sherman Act, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

I.    Award Counterclaim Plaintiffs such other relief as is necessary to or appropriate to restore and maintain competitive conditions in the markets affected by Defendants' unlawful conduct.

J.    Award Counterclaim Plaintiffs attorneys' fees and the costs of this action under Section 4 of the Clayton Act, 15 U.S.C. § 15.

K.    Declare that Counterclaim Plaintiffs have not infringed, are not infringing, nor will infringe any claim of U.S. Reissue Patent No. RE39,247E, and/or have intervening rights over that patent.

L.    Declare that each of the claims of the U.S. Reissue Patent No. RE39,247E is invalid.

M.    Declare that each of the claims of the U.S. Reissue Patent No. RE39,247E is unenforceable.

N.    Declare that this is an exceptional case, pursuant to 35 U.S.C. § 285, and award Counterclaim Plaintiffs their reasonable attorneys' fees.

O.  Award Counterclaim Plaintiffs all available equitable remedies, including, but not limited to, equitable intervening rights over the U.S. Reissue Patent No. RE39,247E.

P.  Declare that Counterclaim Plaintiffs have not breached the Soybean License Agreement.

Q.  Declare that Counterclaim Plaintiffs have not breached the Corn License Agreement.

R.  Enter a Judgment that Counterclaim Defendants have materially breached the Soybean License Agreement by ███████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████

S.  Award damages to Pioneer resulting from Counterclaim Defendants' breach ████████████ of the Soybean License Agreement.

T.  Enter an Order for specific performance that Counterclaim Defendants comply with the Soybean License Agreement, █████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ █████████████████

87

U.    Award Counterclaim Plaintiffs all costs, interest (including pre-judgment

and post-judgment interest) as to which it is legally entitled; and

V.    Grant such other and further relief as the Court deems just and proper.

Dated:  July 10, 2009

Respectfully submitted,

**LEWIS, RICE & FINGERSH, L.C.**

By:    /s/ C. David Goerisch           
      Andrew Rothschild, #4214
      C. David Goerisch, #77207
500 N. Broadway, Suite 2000
St. Louis, Missouri  63102
(314) 444-7600
(314) 241-6056 (facsimile)
arothschild@lewisrice.com
dgoerisch@lewisrice.com

*Of Counsel:*

Leora Ben-Ami, *pro hac vice motion to be filed*
Thomas F. Fleming, *pro hac vice motion to be filed*
Christopher T. Jagoe, *pro hac vice motion to be filed*
**KAYE SCHOLER LLP**
425 Park Avenue
New York, New York  10022
(212) 836-8000
(212) 836-8689 (facsimile)
lbenami@kayescholer.com
tfleming@kayescholer.com
cjagoe@kayescholer.com

Donald L. Flexner, *pro hac vice motion to be filed*
**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue, 7th Fl.
New York, New York 10022
(212) 446-2300
(212) 446-2350 (facsimile)
dflexner@bsfllp.com

James P. Denvir, *pro hac vice motion to be filed*
Amy J. Mauser, *pro hac vice motion to be filed*
**BOIES, SCHILLER & FLEXNER LLP**
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015
202-237-2727
202-237-6131 (facsimile)
jdenvir@bsfllp.com
amauser@bsfllp.com

***Counsel for Defendants E.I. du Pont de Nemours and Company and Pioneer Hi-Bred International, Inc.***

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of July, 2009, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants, and also sent the foregoing document to each of the following individuals via electronic mail:

**VIA ECF AND EMAIL**
Joseph P. Conran
Omri E. Praiss
Greg G. Gutzler
Tamara M. Spicer
Steven M. Berezney
HUSCH BLACKWELL SANDERS LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
joe.conran@huschblackwell.com
omri.praiss@huschblackwell.com
greg.gutzler@huschblackwell.com
tamara.spicer@huschblackwell.com
steve.berezney@huschblackwell.com

**VIA EMAIL**
Susan K. Knoll
Steven G. Spears
MCDERMOTT WILL & EMERY
1000 Louisiana Street, Suite 3900
Houston, TX 77002
sknoll@mwe.com
spears@mwe.com

**VIA EMAIL**
Kurt G. Calia
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
kcalia@cov.com

/s/ C. David Goerisch