UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


MONSANTO COMPANY, et al.,          )
                                   )
                 Plaintiffs,       )
                                   )
     vs.                           ) No. 4:09-CV-00686(ERW)
                                   )
E.I. DUPONT DE NEMOURS & COMPANY,  )
et al.,                            )
                                   )
                 Defendants.       )



MOTION HEARING

BEFORE THE HONORABLE E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

September 2, 2009


APPEARANCES:

FOR PLAINTIFF:        DAN K. WEBB
                      WINSTON & STRAWN, LLP
                      35 W. Wacker Drive
                      Chicago, IL  60601
                      (312) 558-5600

                      JOHN J. ROSENTHAL
                      WINSTON & STRAWN, LLP
                      1700 K Street, NW
                      Washington, DC  20006
                      (314) 539-2200

                      JOSEPH P. CONRAN
                      GREG G. GUTZLER
                      HUSCH, BLACKWELL, SANDERS, LLP
                      190 Carondelet Plaza, Suite 600
                      St. Louis, MO  63105
                      (314) 480-1500

                      STEVEN G. SPEARS
                      MCDERMOTT & WILL
                      1000 Louisiana Street, Suite 3900

```
                           Houston, TX  77002-5005
                           (713) 653-1700


FOR DEFENDANTS:            JAMES P. DENVIR, III
                           AMY J. MAUSER
                           BOIES, SCHILLER & FLEXNER, LLP
                           5301 Wisconsin Avenue, Suite 800
                           Washington, DC  20015
                           (202) 237-2727

                           LEORA BEN-AMI
                           THOMAS F. FLEMING
                           KAYE SCHOLER, LLP
                           425 Park Avenue
                           New York, NY  10022
                           (212) 836-7203

                           C. DAVID GOERISCH
                           LEWIS, RICE & FINGERSH
                           500 N. Broadway, Suite 2000
                           St. Louis, MO  63102-2147
                           (314) 444-7600

COURTROOM CLERK:           MARY GRACE BECKER

REPORTED BY:               DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
                           Official Court Reporter
                           United States District Court
                           111 South Tenth Street, Third Floor
                           St. Louis, MO  63102
                           (314) 244-7449
```

1          (PROCEEDINGS BEGAN AT 9:00 AM.)

2          THE COURT:  Good morning.

3          COUNSEL OF RECORD:  Good morning, Your Honor.

4          THE COURT:  Once more onto the breach we go.

5          *Monsanto Company and others versus E.I. DuPont and*

6   *others*; 4:09-CV-00686(ERW).

7          The matter comes before the Court today on

8   Plaintiffs', Monsanto Company and Monsanto Technology, LLC's,

9   Motion to Stay Discovery and for Separate Trial of Defendants'

10  Antitrust Counterclaims, Document No. 35.

11         In their motion, Plaintiffs ask that the Court stay

12  discovery on the antitrust counterclaims filed by Defendants

13  until resolution of Plaintiffs' patent and contract claims.

14  Additionally, Plaintiffs ask that the antitrust counterclaims

15  be tried separately.

16         Plaintiffs state that it is common practice for

17  Courts to sever antitrust claims and patent claims to simplify

18  issues and reduce the risk of jury confusion.  Plaintiffs note

19  that patent claims are less complex and require less discovery

20  and will be ready for trial earlier.  Plaintiffs state that

21  the antitrust counterclaims depend upon issues at the core of

22  the patent claims and resolving the patent claims first will

23  moot or simplify the antitrust counterclaims.

24         Defendants respond that granting this motion would

25  substantially delay the resolution of this case and assert

1   that Plaintiffs' current actions to extend its monopoly power

2   require an expedited briefing and trial schedule on these

3   counterclaims.  Defendants state that many of their antitrust

4   counterclaims are not dependent on Plaintiffs' patent claims

5   and assert that the law does not support a stay where patent

6   claims would not be dispositive of all of the antitrust

7   claims.

8           Plaintiffs reply that the vast majority of

9   Defendants' antitrust counterclaims would be mooted by the

10  resolution of their contract and patent claims and state that

11  Courts frequently stay discovery even where resolution of the

12  patent claims will not dispose of all antitrust counterclaims.

13          Plaintiffs ready?

14          MR. CONRAN:  Good morning, Your Honor.

15          THE COURT:  Good morning.  Plaintiffs ready?

16          MR. CONRAN:  We're ready.

17          THE COURT:  Defendants ready?

18          MR. DENVIR:  We are, Your Honor.

19          THE COURT:  Good morning.  Whenever you're ready.

20          MR. CONRAN:  I'd like to introduce to the Court

21  Dan Webb, a good friend, who is going to be handling the

22  motion on this issue.  All right?

23          THE COURT:  All right.  Good morning, Mr. Webb.

24          MR. WEBB:  Good morning, Your Honor.  Thank you for

25  allowing me to appear and argue this motion.

1            Let me maybe start with a general observation or

2    point that this issue that we're arguing today on behalf of

3    Monsanto of staying an antitrust counterclaim that gets filed

4    following a patent case being filed is an issue that's been

5    frequently handled by Courts in recent years, and it's because

6    this pattern repeats itself.  When a patent case gets filed by

7    a patent holder, it's quite common and frequent that, as a

8    strategy, there's an antitrust counterclaim that gets filed by

9    the -- by the defendant for a variety of reasons.  And so

10   Courts have addressed this issue a lot over the years.

11           When you look at the most recent cases, these cases

12   and now in recent years come out and directly say that it has

13   become a standard practice or a common practice for Federal

14   Courts to stay antitrust counterclaims pending resolution of

15   -- of the patent claims.  The Federal Courts have moved in

16   this direction in recent years, Your Honor, because it just

17   makes good common sense to do so for three reasons.  If you

18   read those -- There's a lot of -- I think there's about 25

19   cases the parties cite between the two briefs on this issue,

20   but when you break down those cases, what I see in the cases,

21   Your Honor, there's essentially three reasons that in one form

22   or another get referred to in the cases as being the reason

23   why the Court has decided to stay discovery and to separate

24   the trials.

25           Probably the most important reason, the one that

1  seems to get referred to the most is that resolution of the

2  patent claims first may moot some number of the antitrust

3  counterclaims or at least simplify and to streamline the

4  antitrust counterclaims.  That's basically a judicial

5  efficiency argument that the cases focus on, but there's two

6  other reasons that get often mentioned and discussed in the

7  cases that are really related to that.

8        The second is that the fact is it's quite common that

9  those antitrust counterclaims are so much more complex,

10  involve so much more discovery; that from the standpoint of --

11  of judicial economy, that Courts focus on that and decide that

12  it's better to let these patent cases get tried first because

13  what happens in the real world is that that almost always

14  narrows down the antitrust counterclaim and, quite frankly,

15  frequently it goes away.  And, therefore, as the Supreme Court

16  has recently said in the *Trombley* case, the cost of discovery

17  and the time consumption with discovery, if it can be

18  reasonably avoided, then that's something the Court should

19  focus on which is why I think these cases in recent years have

20  focused more on that second issue, along with the first issue.

21        The third issue that gets focused on in the cases and

22  why they grant the motion is jury confusion.  What the Courts

23  analyze and say is that if you just crunch the patent case and

24  throw on top of it, glob on top of it all of these antitrust

25  issues, it's inevitable that you're going to create a great

1    deal of jury confusion and -- and cloud the focus of the

2    patent case.

3           And so those three reasons I want to talk about here

4    today with Your Honor because all three of those reasons that

5    are present in the case are present in the circumstance before

6    Your Honor with this case.  And by the way, as far as how

7    common it is, the cases say it's become the common practice, I

8    actually counted it up.  So I looked at the briefs.

9           On the issue of whether there should be a separate

10   trial, the parties have cited 23 cases between the two briefs.

11   Now I did the best I could to look at those 23 cases.  It

12   looks to me like 18 of those cases -- Twenty-three of those

13   cases said they wanted a separation of trials.  On that issue,

14   18 of those cases granted the separate trial issue.  And so I

15   think that supports at least what the Courts are observing in

16   their opinions that it's become the common practice in these

17   motions.

18          As far as staying discovery, the parties appear to me

19   to cite 19 cases between their two briefs, and 11 of those

20   cases stayed discovery.  And so I do think it has become the

21   common practice, and all three reasons are present here.  Let

22   me go through them one at a time, if I might, for Your Honor,

23   the basic issue of whether or not the resolution of the patent

24   case first could have a significant effect on mooting out the

25   antitrust counterclaims or simplify the issues in that case.

1    Your Honor in your preliminary comments touched upon

2    the first issue that is presented there; is that the Courts

3    have addressed how much mootness might be -- result from

4    trying the patent issues first.  And the Plaintiffs, for

5    example, say it needs to all be moot when all the dust is

6    settled.  And, Your Honor, there is no case that I could find

7    that actually says that.

8    The standard seems to me, as I read the cases, that

9    the basic standard is the Court's focus on whether there's a

10   reasonable likelihood that some of the antitrust issues are

11   going to get mooted out or it's going to get simplified in a

12   significant way.  One of the cases I'm just going to read a

13   quote from because it kind of said it better than what I'm

14   saying.  In the *Dentsply* case which is the District of

15   Delaware by Judge Robson, the Court pointed out the argument

16   that, "All of the antitrust issues must be resolved in the

17   first trial."  That's the patent trial.  That misapprehends

18   the goal of bifurcation because separate trials may be

19   warranted so long as some of the issues in the second trial

20   would be simplified.  All of the issues in a second trial may

21   not be implicated in the first trial.  I think, as I read the

22   cases, that's the standard that seems to have emerged; that

23   you would need to conclude that you see that some of the

24   issues in that antitrust counterclaim are going to be

25   simplified or actually going to be moot because of what is

1    going to happen in the patent case.

2            Now if you look at the Complaint here, Your Honor,

3    I -- I put a chart together that I'm going to hand up to

4    Your Honor because there are eight different forms of

5    anticompetitive conduct that get discussed in this Complaint,

6    the antitrust counterclaim Complaint.  So what I've done,

7    Your Honor, is I have prepared a chart.  If I could, could I

8    ask leave to hand this to Your Honor?

9            THE COURT:  Sure.

10           MR. WEBB:  Thank you.  What I'm trying to address is

11   the mootness question.  What is it that could very likely end

12   up being moot if you try the patent case first?

13           And so the first column, I've got the eight

14   categories of anti -- or forms of anticompetitive conduct that

15   appears to me the Plaintiff is alleging in the antitrust

16   counterclaim.

17           The second column addresses how I at least think or

18   we think that it -- the allegations in the -- in the antitrust

19   case may very well be resolved because of what happens in the

20   first trial, in the patent trial.

21           And the third column, I've tried to pinpoint from the

22   briefs whether I think the parties have any great dispute

23   about this.  And so let me quickly walk through this, but the

24   bottom line is that six -- six out of the eight antitrust

25   forms of anticompetitive conduct are going to be significantly

1   impacted and I believe mooted by what happens one way or the

2   other in the patent case.  And six out of eight is obviously a

3   lot more than some.  It's a large majority, and I respectfully

4   suggest that in and of itself would lead to granting our

5   motion.

6           The issue -- I'll quickly go through them.  The issue

7   about patent fraud, I don't think there's any question that

8   that issue is going to get resolved in the -- in the -- in the

9   patent case and is going to end up being moot one way or the

10  other.  That issue is not going to get relitigated in the --

11  in the underlying antitrust case.  But -- And the Federal

12  Circuit, by the way, has made clear that once these issues get

13  resolved in the patent case, they do become, if you will, law

14  of the case or collateral estoppel.  We're not going to be

15  relitigating the issues that get resolved in the patent case

16  in the antitrust case which is what brings the judicial

17  economy or judicial efficiency.  So patent fraud is going to

18  be mooted.

19          Sham litigation is clearly going to be mooted one way

20  or the other by -- by what happens in the patent trial.

21          False statements, the false statement so-called

22  antitrust misconduct, that we misrepresented our patent

23  position to seed companies, that's going to get resolved in

24  the patent case because it turns out one way or the other

25  that's going to have a significant mootness effect on the

1    false statements formed of antitrust anticompetitive conduct.

2            No. 4:  The "poison pill" provision basically is a

3    provision that allows Monsanto, if there's a change of

4    ownership by its licensee, they can terminate the license

5    because Monsanto has a right to know who owns its License

6    Agreements.  There's no question that that "poison pill"

7    provision is what under the law is called a field-of-use

8    restriction which, in effect, gets resolved once you know the

9    scope of the patent, and that's going to get litigated by

10   Your Honor in the patent trial.  And so the field-of-use

11   restriction is also going to end up being mooted or

12   significantly affected.

13           Now I don't -- I don't think the Defendants agree

14   with me on that point, so I point that out in the third

15   column, although I don't see any real argument in their brief

16   as to why.

17           The stacking restrictions, No. 5, there's no dispute

18   on this.  That's another field-of-use restriction on whether

19   or not our License Agreement, which -- which restricts

20   stacking of Monsanto's Roundup® Ready trait with any other

21   alternative glyphosate-tolerant trait, that also is a

22   field-of-use restriction that's going to get resolved once the

23   scope of the patent gets resolved in the patent trial.

24           No. 6, the Dow-Monsanto Agreement, both sides agree

25   that issue will still -- will not get mooted out by the patent

1  trial because that's an agreement actually between -- that

2  Monsanto had with Dow.  And there's all kinds of issues about

3  standing there, but I'm not going there today.  I'm just --

4  That point is we agree that that issue will still be there in

5  the antitrust case.

6          And the Germplasm License Provisions, this is another

7  field-of-use issue which is going to get resolved with the

8  determination of the scope of Monsanto's patent rights, and

9  it's going to get resolved in the patent case.

10         The switching strategy, we agree the switching

11 strategy, that Defendants allege a form of anticompetitive

12 conduct, will not get resolved in the patent case.  But you've

13 got six out of eight of these antitrust forms of misconduct

14 that are going to be mooted or substantially affected or

15 streamlined.  And, therefore, I think the first factor that

16 the Courts really focus on, which is judicial economy, is

17 clearly present and supports the motion that we filed here.

18         The second -- The second issue -- I'm sorry,

19 Your Honor.

20         THE COURT:  Yeah.  I just wanted to inject here for a

21 moment.

22         MR. WEBB:  Yes.

23         THE COURT:  Of course, the Defendants take a large

24 part of their brief to discuss No. 8, and it's their view that

25 what this is all about is delaying the disposition of their

1    antitrust claims to permit the -- what they claim unlawful

2    activity of Monsanto to continue, and I'm sure I'll be hearing

3    a lot more about that in a moment.  But do you want to touch

4    upon that now or wait for rebuttal until you hear what they

5    have to say?

6            MR. WEBB:  No.  I'll touch -- If you want, I'll touch

7    on it now --

8            THE COURT:  All right.

9            MR. WEBB:  -- and then I'll address it more in detail

10   in rebuttal.

11           THE COURT:  All right.

12           MR. WEBB:  But let me just make this basic point.

13   That's a -- That's a prejudice argument.  They've raised an

14   issue that they will be prejudiced if they don't get this

15   antitrust case to trial sooner rather than later, and the

16   stay, when they -- whether the stay will somehow hurt the

17   marketplace.  And that prejudice argument, if you look at the

18   cases, the prejudice argument is not valid if the Plaintiff --

19   if in this case the Defendant has sat on their rights.  These

20   Licensing Agreements that have these restrictions in it and

21   the issues that they're raising, they've been part -- they've

22   been part of the License Agreement for the seed companies

23   going back to 1996 and 1997, and they've been -- So the idea

24   that the Plaintiff is going to be prejudiced by, let's say, a

25   year delay in getting the antitrust case to trial I

1   respectfully suggest is not a valid reason.  Plaintiffs or

2   Defendants raise this -- The counterclaim plaintiff always

3   raises this, saying, "Oh, we have to get to trial sooner on

4   our underlying -- on our underlying antitrust claim because of

5   the market."  But most of the time, the Courts don't grant it

6   for that reason, for the reason I just -- The Plaintiff here

7   has sat on these Licensing Agreements for the seed companies

8   and its own Licensing Agreement for years and has never

9   brought an antitrust claim until all of a sudden the patent

10  claim gets brought.  And I'll address it more later, but I

11  think under the case law, they are not suffering any prejudice

12  because of their own conduct.

13          THE COURT:  I think the record needs to say -- You

14  said "Plaintiffs sat on it."  You mean Defendants sat on it.

15          MR. WEBB:  I did.  I should have -- Thank you.

16  They're the Defendants who have filed the counterclaim on the

17  antitrust counterclaim.  Thank you, Your Honor.

18          So they've sat on their rights, and I don't think

19  there's any prejudice.

20          Now the second reason that the cases grant the stay

21  and the separate trial is a focus, I think, primarily on

22  discovery which is that if -- if it turns out that the

23  antitrust claims truly are much more complex than the patent

24  claims, and there's some likelihood that they may get

25  streamlined, mooted out or just go away because the patent

1   case gets resolved first, then you got this issue of a huge

2   amount of cost and time consumption in discovery that can be

3   saved which is, obviously, something the Courts are heavily

4   focused on today with the heavy increase in discovery costs.

5        THE COURT:  Let me interrupt you again.

6        It is -- Even with the multi-national companies,

7   certainly, the thought of costs, I think, is -- to me is less

8   significant than if you have an enormous company on one side

9   and a very small company on the other side that could

10  effectively be put out of business with these kinds of costs.

11  But how -- how really is the cost of discovery saved if you

12  have to do it twice?

13       It seems to me that it's -- it's -- that argument

14  sort of pales when you look at the overall picture because a

15  lot of these same witnesses are going to be deposed repeatedly

16  if -- if the Motion to Stay is granted, I think.

17       MR. WEBB:  Well, Your Honor, respectfully I don't

18  think that's what's going to happen.  Let me just address that

19  because if you look at what has happened historically, that

20  once the patent case gets tried, those issues that actually

21  get mooted out in the patent case, the parties are not allowed

22  to relitigate those issues in the antitrust case.  And so the

23  antitrust discovery will not go through the same discovery.

24  It will not be repeated twice because of the mootness issue.

25  Once -- Once the patent issues become the law of the case and

1    they're resolved and then you -- after the dust settles, you

2    figure out what's actually left in the antitrust case -- For

3    example, if the only discovery that got taken in the antitrust

4    case were on the -- let's say on Dow, on the Dow contract or

5    on the switching strategy, if that's all that was left, that

6    amount of discovery would be so small compared to the amount

7    of discovery that would take place if we just litigated all of

8    the antitrust issues in the patent case and took discovery.

9          And just to have a visual, something I can show

10   Your Honor on that, let me hand up another chart that relates

11   to Your Honor's question.

12         The -- What I've tried to do on this chart is to kind

13   of look at the briefs and the Complaint and in effect show the

14   Court that if you -- if you don't take discovery of the

15   antitrust case and the patent case, the discovery in the

16   patent case will essentially address the issues in that

17   left-hand column which are very focused.  They're narrow and

18   they're the issues that will -- that get litigated in a patent

19   case or in a breach of contract case involving with the patent

20   the validity of the patent, the enforceability and

21   infringement.  Those are pretty narrow, straightforward issues

22   that will get discovered and will get addressed.

23         In the right-hand column are the issues that are

24   presented by this massive antitrust case.  And it is massive,

25   Your Honor.  For example, just under the issue of Market

1   Definition and Market Power as I've set forth in the

2   right-hand column, the fact is that we -- we don't have one or

3   two alleged relevant markets.  There are five proposed

4   relevant trait product markets.  When I've tried antitrust

5   cases with one or two markets, it becomes massive.  I don't

6   even know with five -- five different trait markets, and the

7   issue about what is the -- the definition of what is in those

8   markets to the testimony of experts and economists, the

9   existence of whether or not there's market power within each

10  of those five relevant markets, Your Honor, that issue in and

11  of itself will be an enormous amount of discovery which if it

12  doesn't -- if it gets delayed until you see when the dust

13  settles, that issue could very well be reduced down to a much

14  smaller number of markets that we're dealing with.

15          The alleged anticompetitive conduct, which I just

16  went through with Your Honor to some extent, there's eight

17  different forms of it.  A lot of those forms of

18  anticompetitive conduct I think are going to be mooted out by

19  the resolution of the patent case.  And -- And so that, again,

20  we don't know what's going to happen in the patent case, and

21  when the Courts tend to rule on these motions, they're trying

22  to look a little bit into a crystal ball and take a reasonable

23  approach, but I think that the eight -- eight different forms

24  of anticompetitive conduct in which I think six of the eight

25  are going to be mooted out and we're not going to take

1    discovery on those six forms of anticompetitive conduct after

2    the patent case is resolved.

3            Also, antitrust injury or anticompetitive effect is

4    also a major issue that gets addressed by experts and is a big

5    issue dealing with five different relevant markets.  And then,

6    of course, there's antitrust damages.  And so what I have in

7    the right-hand column is discovery which I believe very likely

8    is going to be substantially reduced.  And so I think there's

9    going to be -- I don't think it's going to happen twice, and I

10   don't think we're going to litigate the issues twice, and I

11   think there's going to be an enormous amount of judicial

12   efficiency and an enormous cost savings.  And, yes, Your Honor

13   is correct.  I accept you got two major companies here, and I

14   don't minimize Your Honor's point, but I would say the Supreme

15   Court in the recent *Trombley* case at least pointed out that

16   it's important that whether it's a big company or a little

17   company, if discovery in some way can -- there's an obvious

18   potential cost savings, Courts ought to at least look at that

19   issue, and I would just respectfully say that when you read

20   these cases over, Courts do seem to look at that issue.

21           Now the ---

22           THE COURT:  One point.  I may not have allowed enough

23   time for argument, and so I don't want to ---

24           MR. WEBB:  Yes.

25           THE COURT:  We have another big case coming at

1    10:00, --

2              MR. WEBB:  Yes.

3              THE COURT:  -- so just proceed accordingly.

4              MR. WEBB:  I'm moving right along.  Thank you.

5              THE COURT:  All right.

6              MR. WEBB:  I did not realize -- I'm moving.

7              THE COURT:  All right.

8              MR. WEBB:  Let me go to the third reason, Your Honor.

9          The third reason is that trying the patent contract

10   case together with the antitrust counterclaims is likely to

11   create significant jury confusion.  This is an issue that the

12   Courts really focus on in these Motions to Stay or for

13   separate trials.  And it's done so because you can just

14   imagine, Your Honor, if you took the simple issues I put on

15   this side of the chart, the patent case, and just threw on top

16   of it this massive amount of evidence, the potential for jury

17   confusion, to get lost and lose the focus on the patent and

18   breach of contract.  I will quote from that same case very

19   quickly in *Dentsply* where Judge Robson said, "The Court would

20   be left numb -- The Jury -- The Jury would be left numb and

21   bewildered if asked to consider the patent and antitrust

22   issues together which would include intricate, factual and

23   economic analysis regarding relevant market, actual and

24   potential shares of that market, barriers of entry,

25   et cetera."

1        And so, Your Honor, that issue, I don't think there's

2   any question that if you took all of these antitrust issues

3   and just lobbed them on top here, that that is a major issue

4   that I think supports our motion.

5        Therefore, Your Honor, I would just conclude by

6   making this one observation.  In a case a few years ago,

7   DuPont happened to be on the other side of the fence than they

8   are today.  In that case, they, in a case called *Akznoa v.*

9   *DuPont*, DuPont ended up having, in effect, had a patent claim

10  for infringement and then they picked up the inevitable

11  antitrust counterclaim.  And they went forward on that case in

12  front of a District Court Judge in Delaware, and they raised

13  the -- every issue I just raised before Your Honor.  And they

14  argued that they should get a stay of discovery and they

15  should get a separation of trials, and they got it.  The Court

16  granted it on the very issues I've raised because of --

17  because most, but not all, of the antitrust claims potentially

18  were mooted because there was going to be jury confusion

19  likely and because of burdensome discovery.  And so somewhat

20  ironically, at least DuPont in another case has found that the

21  principles I've set forth here seem to be particularly

22  relevant.

23       Thank you, Your Honor.

24       THE COURT:  Thank you, Mr. Webb.  Thank you.

25       MR. DENVIR:  Thank you, Your Honor.

1          THE COURT:  Good morning.

2          MR. DENVIR:  Your Honor, I, too, have some

3    demonstratives to hand up, --

4          THE COURT:  All right, good.

5          MR. DENVIR:  -- if it's okay with you.

6          THE COURT:  Thank you.

7          MR. DENVIR:  Your Honor, Jim Denvir for Defendants.

8    Good morning.

9          THE COURT:  Good morning.

10         MR. DENVIR:  A couple of points I'd like to respond

11   to right away, Your Honor.  We acknowledge that the cases go

12   both ways, and I think if we were to count the cases, we'd

13   probably come up with a slightly different breakdown.

14         But what I think -- what I think happens in these

15   cases is that Courts do try to use their common sense and

16   reach the most efficient outcome given the facts before them.

17   And we would suggest, Your Honor, that in this case all of

18   the -- all of the factors that were just discussed weigh not

19   in favor of stay and bifurcation but in favor of going forward

20   to a single trial of all of these issues.  And I think,

21   Your Honor, that's effectively what the cases say.

22         Now counsel for Monsanto, Your Honor, specifically

23   mentioned the *Dentsply* case as one that's worth looking at,

24   and I think he read a quote to you from the case.  I would

25   like to read you a couple of other quotes from that case.  The

1    cite is 1996 Westlaw 756766.  That's a District of Delaware

2    case, 1996.  The Court did order separate trials in that case.

3    However -- And this is a quote.  It stated that, quote,

4    "There's a possibility that all aspects of the antitrust

5    claims, including the two nonsham allegations, could be

6    resolved by a first trial on patent infringement."

7            So, Your Honor, I would suggest that even the

8    *Dentsply* case involved a situation in which all of the

9    antitrust claims could be mooted by a determination in favor

10   of the plaintiffs in that case.  That Court also observed,

11   quote, "A stay of discovery on antitrust issues would most

12   likely devolve into a series of time-consuming and expensive

13   discovery disputes as to whether particular discovery is

14   directed at the patent or antitrust claims.  Efficiency

15   dictates that discovery on all claims, including the antitrust

16   counterclaims, continue apace."

17           Now, Your Honor, we're going to start, I think, with

18   three reasons of our own why this case should -- should go

19   forward.

20           First is that -- And this is sort of coming at it

21   from the other end.  We believe, Your Honor, that there's --

22   there's actually no very good reason that the Court has to

23   decide now whether to bifurcate the trial of this case.  We've

24   got a long way ahead of us, including possible Motions for

25   Summary Judgment, and a lot of things can happen between now

1    and the final pretrial conference.  But what I would

2    respectfully suggest to Your Honor is that it is extremely

3    important that the Court at least leave its options open with

4    respect to whether there is a single trial or a bifurcated

5    trial, so the antitrust and patent claims, and that's for the

6    reason that we've already discussed in our papers, Your Honor;

7    that antitrust plaintiffs -- There's a -- There's a standard

8    in antitrust law that antitrust plaintiffs should be given the

9    opportunity to have the jury consider their evidence as an

10   integrated whole and not segmented or considered piecemeal.

11   So in order to preserve that option by Your Honor, we have to

12   allow discovery on all -- on all issues because if the Court

13   decides to stay discovery, then that option is off the table.

14        The second reason, Your Honor, that we think this

15   case needs to go forward on all claims is the -- is the

16   judicial economy and efficiency argument that was just raised

17   before Your Honor.

18        And third, Your Honor, if -- if this case is stayed,

19   there will be very real prejudice, and I'd like to address all

20   of those points.

21        The first numbered page, Your Honor, in that set of

22   demonstratives that I handed up, which I think is probably --

23   it's the page after the Table of Contents, this is sort of our

24   own competing chart.  I think we're going to have -- we're

25   having a war of charts in this case.

1        The categories here are the categories that the

2   Plaintiffs are using in this case.  They come from Pages 7 and

3   8 of their reply brief.  They're exactly the same categories;

4   (1) Patent Fraud, (2) Sham Litigation.  The Paragraphs of

5   Amended Counterclaims that are cited there are also the

6   paragraphs that are listed in Defendants' reply brief.

7        So we've looked at this in a slightly different way,

8   Your Honor.  And let's start where -- where there's no

9   disagreement, and that is with respect to this patent fraud

10  issue.

11       Neither side contends otherwise.  It is a fact,

12  Your Honor, that discovery as to that claim, which is sort of

13  the flip side of the inequitable conduct affirmative defense,

14  is going to go forward because the facts underlying both the

15  affirmative defense and the affirmative antitrust counterclaim

16  are the same.  They involve issues surrounding Monsanto's

17  conduct before the Patent Office.  They involve material which

18  we allege was withheld.  They involve issues concerning the

19  materiality of that information.  They involve issues

20  concerning Monsanto's intent in withholding that information.

21  And discovery as to all of those issues will take place,

22  Your Honor, regardless of -- Well, they're going to take place

23  because they have to take place.  It's our -- Inequitable

24  conduct is our affirmative defense, and the facts underlying

25  that affirmative defense are the same as the facts underlying

1    our affirmative *Walker Process* claim.

2          These factual allegations, Your Honor, which account

3    for 49 of the 104 of the allegations of anticompetitive

4    conduct in the case, are, in fact, the most factually complex,

5    discovery-intensive disputed facts in this litigation.

6    Everything else will pale in comparison to the complexity and

7    the difficulty of that discovery, and that's going to take

8    place no matter what.

9          Now we enter, again using Monsanto's categories,

10   categories of Anticompetitive Conduct as to which there is no

11   dispute that discovery will eventually be necessary at some

12   point.  So, again, we have patent fraud which we just

13   discussed; the sham litigation which we just discussed; the

14   Dow-Monsanto agreement.  That's an additional 14 out of the

15   104 allegations of fact and the switching strategy which is

16   another 7 out of the 104.  So that's 70 out of the 104

17   allegations, Your Honor, as to which discovery is going to

18   take place no matter what happens.  It's just a question of

19   when.

20         Now you'll note in the middle column opposite

21   "Switching Strategy" that we put in parentheses "excluding

22   Paragraphs 137 to 143," and we've noted that because Monsanto

23   doesn't count those paragraphs anywhere.  What those

24   paragraphs involve, Your Honor, ---

25         THE COURT:  Just a second.  Where are you now?

1      MR. DENVIR:  I'm sorry.  "Eventual Discovery

2  Necessary - Undisputed."

3      THE COURT:  All right.

4      MR. DENVIR:  And if you look down to "Switching

5  Strategy," the paragraphs of the counterclaims that have been

6  identified by Monsanto, 179 through 185, do not include, nor

7  does any other category in Monsanto's chart, include

8  Paragraphs 137 to 143.  And I just wanted to tell you what --

9  Those paragraphs are the paragraphs that allege that the

10 independent seed companies are a critical, essential,

11 necessary distribution channel for developers of traits.  That

12 is a key -- Those are key sets of allegations, Your Honor, in

13 antitrust terms, and Monsanto concedes that those have to go

14 forward as well.  So we're really talking about 77 out of the

15 104 paragraphs of the counterclaims that allege

16 anticompetitive conduct as to which discovery will be

17 necessary at some point.

18      Now when you talk about efficiency, Your Honor,

19 "efficiency" means potentially avoiding unnecessary discovery.

20 It does not mean delaying discovery that's going to happen no

21 matter what, and that's essentially what Monsanto is arguing

22 for here today.

23      We then have the final category, Your Honor,

24 "Discovery Necessary," but it's our position that Monsanto

25 disputes that, and that includes the remainder of those -- of

1    those categories of anticompetitive conduct.

2        Now the reason we disagree with Monsanto's position,

3    Your Honor, that discovery will not be necessary with respect

4    to those claims is that they are all part of our allegations

5    of the switching strategy.  If you look at the next page,

6    Your Honor, we tried to demonstrate this graphically.

7        When Monsanto refers to the "ISC switching strategy,"

8    they suggest, I think, Your Honor, that these are some

9    isolated, disconnected sort of allegations that we just threw

10   in the Complaint.  As a matter of fact, Your Honor, the

11   Complaint says that we bring this action -- that's in the

12   yellow box on top -- "DuPont and Pioneer bring this action to

13   arrest a new anticompetitive scheme by Monsanto designed to

14   force ISCs to switch from Roundup Ready® 1 to Roundup Ready® 2

15   Yield prior to the expiration of the patents."  So it's not

16   some isolated, off-to-the-side set of allegations.  This is

17   the centerpiece of our case.

18       It is then alleged, Your Honor, in Paragraph 3 of the

19   counterclaims, "The unlawful scheme described herein" --

20   that's the switching scheme -- "has five key related

21   components each by itself anticompetitive and each

22   contributing to the exclusionary effects of the whole."

23       And what are those five?  They're the five categories

24   of anticompetitive conduct that Monsanto says, "Well, these

25   are field-of-use restrictions," so the Court need not -- If we

1   went on -- if we went on the patents then, the Court will

2   never need to consider these issues, but we disagree with

3   that.  We think, Your Honor, the discovery will be necessary

4   as to those parts of an overall -- overarching scheme,

5   regardless of the outcome on the patent issues.

6          Now we address that on the next page of this -- these

7   demonstratives, Your Honor.

8          We respectfully submit, Your Honor, that the

9   switching strategy cannot be viewed in isolation from its

10  various components, and those components are the five

11  categories as to which Monsanto claims discovery will not be

12  necessary.

13         It has long been held that even if individual

14  elements of an alleged anticompetitive scheme are legal, taken

15  outside of the context of monopoly power and taken outside of

16  the context of the synergistic effects of that scheme, that if

17  there are effects taken as a whole that are exclusionary

18  within the meaning of Section 2 of the Sherman Act, then they

19  violate Section 2, taken as a whole, even if individually,

20  each of those -- each of those acts viewed in isolation might

21  be legal.

22         Our Complaint -- Our counterclaims, Your Honor,

23  allege that you can't view these -- these acts in isolation

24  here.  The Complaint alleges that they are all part of a

25  scheme; that they're interrelated and that they operate

1    synergistically.  So we would submit, Your Honor, that no

2    matter what the outcome on the patent case is, on the patent

3    case we're going to have to take discovery on these five

4    remaining categories as well which means virtually a hundred

5    percent.

6            I want to make one comment.  We've heard today and in

7    the briefing that's been done in this case the term "field of

8    use" as sort of a callusment (ph); if it's -- if it's a -- if

9    it's a field of use, then it's somehow blessed and no longer

10   subject to antitrust scrutiny.  Well, it's not quite that

11   simple.  Number one, we will dispute whether these are

12   actually field-of-use restrictions or not.  But, second, even

13   if they are, the Federal Circuit in *B. Braun*, B-R-A-U-N,

14   *Medical v. Abbott Labs*, which is at 124 F3d 1419 at 1426,

15   Federal Circuit case, stated that field-of-use restrictions

16   are generally upheld.  It then went on to note, however, that

17   quote, "Any anticompetitive effects they may have are analyzed

18   under the rule of reason," closed quote.

19           So we will -- we will argue during the course of this

20   case, Your Honor, that these are -- number one, these are not

21   field-of-use restrictions and, number two, even if they are,

22   they -- they have to be evaluated under the rule of reason.

23   And third, they cannot be viewed in isolation.  They have to

24   be viewed as an integrated whole and in the way they operate

25   together synergistically.  So that's the story on efficiency,

1    Your Honor -- on switching; on -- I'm sorry; on the stay.

2         Now as I said, Your Honor, the second reason or the

3    third reason we believe that a stay is inappropriate here is

4    that it would cause real prejudice.  Now you heard this

5    morning that we've sat on our rights and that these license

6    restrictions go back years and years and years.  The switching

7    strategy is new, and it has arisen with the pending/impending

8    expiration of the Roundup Ready® patent.  So it's -- We have

9    not sat on our rights, Your Honor.  This is -- This is not

10   only something that's new but it's taking place as we speak.

11        The Complaint alleges that Monsanto is currently

12   coercing ISCs to switch from Roundup Ready® 1 to Roundup

13   Ready® 2.  The Complaint alleges that they have been told they

14   need to destroy their Roundup Ready® 1 seed lines.  So before

15   the patent expires, Monsanto's goal is to have everybody

16   switched to Roundup Ready® 2.  Roundup Ready® 1 seed lines

17   will be destroyed.  What that means is that when the patent

18   expires, there's not going to be any possibility of generic

19   competition certainly by the ISCs or by the ISCs as a

20   distribution channel for other trait developers, and that's --

21   that's ongoing.  Once that happens, Your Honor, we believe

22   that once the ISCs completely switch from Roundup Ready® 1 to

23   Roundup Ready® 2, that that conversion will become effectively

24   irreversible.  So there is real imminent danger, Your Honor,

25   and it's real prejudice not only to -- not only Pioneer and

1   DuPont who are going to try to sell traits, license traits to

2   these independent seed companies, but to the public interest.

3          Now, finally, Your Honor, on the issue of separate

4   trials, Mr. Webb said earlier that there won't be two trials

5   of the antitrust claims in this case no matter -- no matter --

6   there will not be two trials of the --

7          THE COURT:  Patents?

8          MR. DENVIR:  -- inequitable defense in the *Walker*

9   *Process*.  If Monsanto is willing to waive a second trial

10  today, we'd be happy to take it, but the Courts have held that

11  the elements of the two -- All of the facts may be precisely

12  the same.  The elements of the two are different.

13         If you look, Your Honor, at Page 6 of this outline,

14  the heading is "Bifurcated Trials Is Redundant."  We cite the

15  *Climax Molybdenum v. Molychem* case which is at 414 F.Supp. 2d,

16  1007.  This is the law generally, but this is a clear

17  articulation of the law.  In rejecting bifurcation, the Court

18  held that, "Bifurcation would result in duplication and

19  inefficient use of judicial resources.  Although there is

20  considerable overlap between the issues of inequitable conduct

21  and the fraud necessary to establish a *Walker Process*

22  antitrust claim, the elements are not identical.  Thus, if

23  Molychem were to prevail on its defense on inequitable conduct

24  during a separate trial of the patent issues, no issue

25  preclusion would result from that determination.  A subsequent

1    trial of Molychem's *Walker Process* counterclaims would require

2    another evidentiary presentation about Climax's alleged fraud

3    on the Patent Office.  In this case, a single trial of the

4    patent and antitrust issues would promote the objectives of

5    efficiency and fairness."

6              We would suggest that the same is true here,

7    Your Honor.  Not only is there a large overlap but the factual

8    issues, the evidence is virtually the same; the same

9    witnesses, same documents.  And if we prevail on our

10   inequitable conduct claim, I bet you almost anything that

11   Monsanto is going to come in the next day and say, "Well, wait

12   a minute.  We get a new trial on the antitrust claim because

13   the standards are different," and they are.  So if we prevail,

14   Your Honor, we're going to have two trials.  There's no

15   question about it.

16             I assume there's no more dispute about whether we get

17   a jury trial on the inequitable conduct claim because that is

18   absolutely clear law.  So what we end up having potentially is

19   not a savings but we have -- we have two virtually identical

20   trials before two different juries on the same factual issues.

21   I would suggest to Your Honor that that is not a model of

22   efficiency.  It's a prescription for inefficiency and waste

23   and delay.  And if the Court would want -- If there's a way

24   for the Court to guarantee that this case will stay on its

25   docket for a very, very long time, the way to do that is to

1    order a stay and bifurcation because that -- there are some

2    things in this case that we are not going to be able to avoid

3    regardless of whether Monsanto or DuPont, Pioneer prevail on

4    these issues.  So we may -- we may simplify things in the

5    short term.  I can't say that that's not the case, but we're

6    not going to avoid anything.  And as I said, Your Honor,

7    that's -- that's a prescription for inefficiency and waste and

8    waste of judicial resources.

9            THE COURT:  A couple of things.  One thing you didn't

10   talk about, and I'm not suggesting it was oversight, but one

11   concern I do have is the issue of -- of -- I'm already trying

12   to fix in my mind what the jury instructions would look like

13   with one case as opposed to two and, obviously, from my

14   standpoint, it would be a lot easier to simplify it.  However,

15   many of your arguments are persuasive, so I haven't yet sorted

16   it out.

17            Before we came out today, I thought I had a solution

18   to this problem, and that was -- What I intended to do was to

19   tell you to at the conclusion of the arguments, if I were not

20   persuaded to the contrary, would be that the discovery would

21   be wide open; no stay of discovery.  We would schedule the

22   patent case and the inequitable conduct trial, and then you

23   would know right at this time.  When we do the Case Management

24   Order three months later, four months later, something like

25   that, we would schedule the second trial.

1          And part of what you say would be facilitated by

2    doing that in terms of not foreclosing all of the facts you

3    would need for your inequitable conduct issues, but I'm still

4    not convinced exactly what I'm going to do.

5          But what would your view be if some kind of a

6    procedure like that would be adopted?  And then I'll hear from

7    Mr. Webb in a moment.

8          MR. DENVIR:  Your Honor, I think -- I guess I'll go

9    back to my initial point which is what we think the Court

10   ought to do here is, as the Court is apparently inclined, to

11   allow discovery to go forward but to leave open the option of

12   trying both sets of issues at least before the same jury.

13          Now if Your Honor looks at the *C.R. Bard v. 3M -- M3*

14   case we cited in our brief, the Court there did something

15   which I thought was fairly innovative.  It had the same jury

16   consider the patent and the inequitable conduct issues and the

17   patent misuse issues and the antitrust issues, but it had that

18   jury just consider those issues in stages and respond to

19   special verdict forms at the end of each presentation of

20   evidence.  So if there was a single jury, if the claims were

21   tried together, but the Court ordered the evidence in such a

22   way that it really streamlined the case, avoided the issue of

23   jury confusion, and allowed the antitrust Plaintiffs to -- to

24   present their evidence in a way that the Supreme Court says we

25   should be able to present it, which is as an integrated whole,

1    to have the same jury consider all of the evidence.

2          So what I would suggest, Your Honor, is that, again,

3    we -- I would suggest we go forward with full discovery here

4    because it's the only way to preserve that option.

5          It's also -- It will be -- It will be much more

6    efficient by a wide measure than trying to stay discovery

7    because we're just going to have to do it again at some point

8    but defer on the issue of whether we bifurcate the trial

9    because there are -- there's a lot of creativity within this

10   courtroom, and I'm sure we can figure out ways to avoid or

11   minimize any issues of confusion or complexity in the same way

12   that the Court in this *C.R. Bard* case did.  So that's what I

13   would suggest, Your Honor.  Thank you.

14         THE COURT:  Sure.  Mr. Webb?

15         MR. WEBB:  Thank you, Your Honor.  I understand your

16   schedule and I'll try to be brief.

17         THE COURT:  All right.  That's all right.  Well, it's

18   my problem.  Actually, I should have allowed more time, but

19   I'm sorry I didn't.  But if we go over a little bit, I'm sure

20   the attorneys, some of whom are here already, will not object

21   precipitously.  Go ahead.

22         MR. WEBB:  Your Honor, as far as the -- The first

23   point that counsel made was basically one of saying, "Well,

24   just preserve your ability to have one trial and, therefore,

25   in order to do that, just put all the discovery on one track

1    and then decide later."  And what that totally ignores,

2    Your Honor, is our right to an efficient and hopefully

3    reasonably quick trial on what are very simple patent and

4    contract issues.  The discovery -- The discovery on those

5    issues is not that great.  So that -- The parties are going to

6    have a Rule 26 conference here today, Your Honor, and try to

7    talk about the scheduling procedure, and there's no question

8    that from the standpoint of Monsanto, we would like to get the

9    patent and the contract case to trial in reasonable short

10   order.

11        The amount of discovery that will be needed on all of

12   these antitrust issues that I put on my first chart, all the

13   market power, market definition issues, the discovery, I

14   respectfully suggest, Your Honor, would extend discovery two

15   or three times beyond what is going to be needed to get the

16   discovery done on the antitrust case.

17        If you go to their chart, their chart which was No.

18   1, their Chart No. 1, Your Honor, the honest to God truth is

19   that the only -- the only issue in that left-hand column that

20   needs to have discovery taken and to litigate in the -- in the

21   patent contract case is the patent fraud issue.  Every other

22   issue is an antitrust issue that goes beyond what is needed to

23   litigate the -- the contract and the patent issues.  And so if

24   you were -- If we were to -- If you stayed discovery on the

25   antitrust issues and when you get done with the patent trial,

1   no one can guarantee what's going to happen, but I'm as

2   certain as I'm standing here, it is going to moot some

3   significant segments of that antitrust case.  In fact, the

4   whole case may go away and there will no discovery, but none

5   of us can predict that today.  But I think what's in the back

6   of many Courts' minds when they do this is the recognition

7   that this discovery may never have to be taken or at least it

8   will be taken in a much more truncated way.  Just -- For

9   example, just on the issue of patent fraud in the patent fraud

10  cases I've been involved in, that gets proven up with one or

11  two, at the most three witnesses.  That's all.  That's what

12  happens.  I would -- I would be surprised if their patent

13  fraud case has more than two witnesses in it when all the dust

14  settles when this case gets tried before Your Honor.

15          And -- So that -- that the -- And by the way, on the

16  issue of -- of what would actually happen and whether there

17  will have to be two trials, I don't know what's going to

18  happen, but here's -- Let me just -- What happens normally is

19  that the law is pretty clear in the patent case that what will

20  happen is that Your Honor is going to set down a jury trial on

21  the causes of action at law that relate to the patent and

22  contract claims.  But the inequitable patent fraud issues get

23  tried.  They're under the case law of the Federal Circuit.

24  Those issues are tried in equity but before Your Honor in a

25  bench trial, and that's what will happen here.

1      Now once that's all resolved, whether under their

2  *Walker Process* theory there's something left that needs to be

3  tried in front of an antitrust case jury, we can evaluate that

4  at the time, but that does not need to be resolved today and

5  there's no reason to resolve it today and it may never need to

6  be resolved.  So -- And by the way, if there -- if there are

7  two trials some day, if there are, it almost never happens but

8  if there actually is a second trial that follows, there is no

9  question that the discovery on that antitrust case is going to

10  be so much narrower than -- than what is now being presented,

11  and the trial itself is going to be so much more narrow that

12  there will be enormous judicial efficiencies.

13      Let me now address what they call their real

14  prejudice which is their, in effect, their concern that

15  they're not going to be able to compete in the marketplace

16  effectively if the antitrust trial is delayed.  Let me just

17  make sure the Court -- First of all, by the way, in any case

18  that I've been in, when the other side tries to oppose my

19  Motion to Stay on prejudice, they normally file some kind of

20  affidavit.  They just can't get up and make up facts.  Okay?

21  They have to -- But they haven't filed any affidavit that

22  supports any argument of prejudice.  They've waited years to

23  bring this antitrust claim.

24      The Seed License Agreements go back to 1996, 1997,

25  and these restrictions have been in those Agreements since

1    that time.  Their own License Agreement got changed because of

2    a settlement called the Master Settlement Agreement in '02 but

3    that's seven years ago.  So if somehow these restrictions were

4    causing some huge anticompetitive problem for them, I can't

5    imagine why they could possibly wait and now come into court

6    and say, "Oh, we're going to have all this prejudice."

7              THE COURT:  What they're saying is that Roundup -- in

8    switching from the 2014 to the 2020 limitation of the patent

9    laws by going from Roundup® 1 to Roundup® 2, that was recent.

10             MR. WEBB:  And I -- But, Your Honor, if you go to

11   their Chart No. 2 in their book, they're trying to combine --

12   they're trying to argue that all of these restrictions are

13   somehow connected to the switching which they say is recent

14   which is the circle that talks about switching.  But all of

15   these stacking restrictions, all the poison pills, the

16   germplasm, those are all licenses that existed back in 1996

17   and 1997.  And so those are not new.  And so we all agree that

18   the switching issue will get litigated in a second trial, if

19   that ever becomes necessary, but it doesn't include all of

20   these other restrictions which have been there for years and

21   years and years and is not new.

22             And also, I would like to point out to Your Honor as

23   far as any prejudice in their ability to compete, so

24   Your Honor understands, DuPont now has a License Agreement

25   from Monsanto.  We -- They have a License Agreement.  They

1  right now -- They -- They have our Roundup Ready® technology,

2  and they are -- they are allowed to compete against Monsanto's

3  Roundup Ready® product, and they're able to do so all the way

4  up to 2014.  Now in 2014 they're going to be able to be a

5  competitor by stacking anything they want to stack, based on

6  whatever restrictions there are at that time, but they'll be

7  able to stack off the patent on Roundup Ready® and be able to

8  compete in that marketplace.  And so the idea -- The reason

9  they haven't filed a suit before this is they've had no

10  trouble competing against us because we didn't -- we gave them

11  a license.  They have a License Agreement now, and it's going

12  to run up to the time that the patent expires.  And they're

13  going to be able to compete in the marketplace.  And so the

14  idea that they're going to suffer some enormous prejudice, I

15  respectfully suggest, is just not true and it's belied by the

16  fact that they, in fact, have not done anything to pursue any

17  such causes of action for years under these License

18  Agreements.

19          Let me -- Could I comment on Your Honor's proposal?

20          THE COURT:  Sure.

21          MR. WEBB:  As a -- If I understood your proposal --

22  Maybe I should -- Can I repeat it?

23          THE COURT:  Well, it was -- It actually was just a --

24          MR. WEBB:  A thought.

25          THE COURT:  -- something less than a thought maybe.

1    I don't know; not a proposal.

2            MR. WEBB:  I'm sorry.

3            THE COURT:  Just something that -- I was trying to

4    sort out some kind of an accommodation that would address all

5    of the issues of both parties so persuasively raised in

6    their -- in their briefs, and that's all it was.  It's not

7    anything that I have in mind secretly imposing on you.  I have

8    to go back through and try to sort all of this out after

9    hearing your good arguments, so.

10           MR. WEBB:  I understand completely.  Could I respond

11   briefly --

12           THE COURT:  Sure.

13           MR. WEBB:  -- to what is less than your thought --

14           THE COURT:  Sure.

15           MR. WEBB:  -- but just an idea that you had?

16           Your Honor, the problem with putting the antitrust

17   case discovery on the same track as the patent case discovery

18   is that they shouldn't be on the same length of time.  The

19   patent case discovery can be done in very short order and a

20   trial can take place.  The antitrust discovery is going to

21   take two or three times longer because of the complexity of

22   those issues that I walked through with Chart No. 1 and,

23   therefore, I respectfully suggest that that's not -- Well, I

24   respectfully suggest that that doesn't solve the problem.  If

25   -- If Your Honor were to decide to go somewhat in that

1    direction, then what I would -- I guess my brief response is

2    that the antitrust discovery would have to run out, would have

3    to be extended a year or so beyond the conclusion of the

4    patent discovery and that it would run out for another year or

5    so because it's going to take that amount of time to get the

6    discovery done.  But I respectfully suggest that what in this

7    case should happen is the same thing that happened with DuPont

8    in the case I referred to earlier a few years ago; that the

9    stay of discovery be granted and that separate trials be

10   granted for the same reasons DuPont prevailed in that earlier

11   case which is because of mootness and judicial efficiency and

12   jury confusion.

13          And by the way, Your Honor, about instructions,

14   there's no question if you were to take the instructions that

15   you will give to a jury on the patent and contract claims and

16   put them together tomorrow and then stack on top of them the

17   enormous complexity of these -- Every time I try an antitrust

18   case and I read over those instructions we have to give them,

19   I wonder -- I don't know how jurors track the intricacies of

20   those instructions, but they do the best they can.  But to put

21   those instructions on top of the patent instructions would

22   clearly, I respectfully suggest, lead to jury confusion.

23          Thank you for your time, Your Honor.

24          THE COURT:  Ordinarily this would end it, but go

25   ahead; a brief response and then Mr. Webb will get the final

1    word.

2            MR. DENVIR:  Just one minute, Your Honor.

3            On the complexity and length of discovery, there

4    are -- there's six law firms on that side.  We have at least

5    three on our side.  Your Honor, we are going to have a

6    conference today, and we were going to propose a very

7    aggressive schedule for both the antitrust and patent

8    discovery, and we don't think there's any reason that they

9    both can't be done at the same time and in a very timely

10   manner.  We have every incentive for the reasons I've stated

11   earlier to get the antitrust issues before a jury as quickly

12   as we can, and we will do everything we can to do that.

13           In terms of the complexity of the allegations in this

14   case, Your Honor, the most fact-intensive, discovery-intensive

15   allegations relate to this patent fraud issue.  The rest of

16   these issues are -- are not nearly so fact intensive.  The

17   market power, market definitions are expert issues which I

18   think Mr. Webb said today.  There's not a lot of discovery on

19   that stuff.  It's going to be mainly a matter of statistics,

20   and experts will testify as to that, but I think there's been

21   a -- it's been a huge exaggeration of the complexity of the

22   antitrust case as compared to the patent case.

23           So with that, Your Honor, thank you very much for

24   hearing us today.

25           THE COURT:  Final word?  Your motion.  You get the

1    final word, if you want it.

2            MR. WEBB:  Yes.  I'm going to be very brief.

3    Your Honor, there is no antitrust case with five relevant

4    markets and five different markets in which we're going to

5    have to analyze the definition of the market to figure out the

6    issue of who has market power, sort out barriers to entry.

7    There will be economists lined up on both sides of this case

8    until the cows come home.  There is no way that I'm

9    exaggerating the complexity.  If there's only one or two

10   relevant markets, it becomes extremely complex.  With five

11   pled relevant markets and with the number of witnesses, both

12   fact and expert, they're going to have to address those

13   issues, and then combine on top of it, address an issue of

14   antitrust injury in each market.  To say that that -- that I'm

15   overstating that, I just respectfully suggest that that's not

16   correct.

17           THE COURT:  All right.  Thank you.  Well, thank you

18   all for being here, and I would like to go down and actually

19   meet some of you that I haven't met before just as a courtesy,

20   if you don't mind.

21           (Hearing adjourned at 10:05 AM.)

22

23

24

25

CERTIFICATE

I, Deborah A. Kriegshauser, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 44 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 3rd day of September, 2009.

_____

/s/ Deborah A. Kriegshauser

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR

Official Court Reporter