UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MONSANTO COMPANY and | ) | |
| MONSANTO TECHNOLOGY LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:09CV00686 ERW |
| | ) | |
| E.I. DUPONT DE NEMOURS AND | ) | |
| COMPANY and PIONEER HI-BRED | ) | |
| INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on Plaintiffs' Motion for Partial Judgment on the

Pleadings [doc. #40] and Defendants' Motion to Dismiss Count II of Plaintiffs' Complaint [doc.

#18]. The Court heard arguments from the parties on the former Motion on October 23, 2009.

## I.    BACKGROUND

Plaintiffs Monsanto Company and Monsanto Technology LLC (collectively, "Monsanto")

develop, manufacturer, license, and sell agricultural biotechnology, agricultural chemicals, and

other agricultural products. Monsanto has developed certain technologies that allow it to

produce genetically-modified seed products by transferring into crop seed one or more genes that

give the resulting plants new genetic qualities, called transgenic traits. At issue here are

Monsanto's Roundup Ready® ("RR") soybean and corn traits, known by their respective

technical names 40-3-2 and NK603, which Monsanto developed upon discovering the CP4 gene,

a gene that makes plants resistant to glyphosate, a common herbicide.[1] Monsanto holds United

---

[1] Put another way, "Roundup Ready®" refers to Monsanto's glyphosate-tolerant trait
technology generally, in the sense that the resulting seed products are "ready" for the use of

States Patent No. U.S. RE 39,247E ("the '247 Patent"), which covers the 40-3-2 and NK603 traits along with other glyphosate-resistant traits based on the CP4 gene.

In 2002, Monsanto entered into non-exclusive license agreements with Defendant seed manufacturers E.I. DuPont de Nemours and Company and Pioneer Hi-Bred International, Inc. (collectively, "Pioneer"), giving Pioneer the right to manufacture and sell soybean and corn seed with the 40-3-2 and NK603 traits in exchange for the payment of royalties.[2] For purposes of developing the necessary seed lines, the agreements also obligated Monsanto to deliver to Pioneer certain biological materials and proprietary technical information. Then, in 2006, Pioneer unveiled its own glyphosate-tolerant trait technology, known as Optimum® GAT® ("OGAT"). Pioneer subsequently began to combine, or "stack," the 40-3-2 and NK603 traits with OGAT in some genetically-modified soybean and corn seed products it produces.

In response, Monsanto brought the present action for breach of contract, patent infringement, inducement to infringe, and unjust enrichment, alleging that Pioneer violated Monsanto's contractual and patent rights by producing RR/OGAT stacked seed products. Pioneer counterclaims for a declaratory judgment that the license agreements permit it to stack OGAT with the 40-3-2 and NK603 traits. Pioneer also asserts a number of antitrust counterclaims, alleging that Monsanto has abused its patent monopolies, has inserted anticompetitive restrictions into its license agreements with seed producers, and is attempting to employ an anticompetitive "switching strategy" by using new licensing agreements to shift independent seed companies from the current RR trait seed lines to Roundup Ready 2 Yield®, in

Monsanto's Roundup® glyphosate herbicide, while 40-3-2 and NK603 refer to the specific Roundup Ready® soybean and corn trait technologies, respectively.

[2] The Amended and Restated Roundup Ready® Soybean License Agreement and the Roundup Ready® Corn License Agreement are identical for the purposes of this Motion.

order to prevent generic entry into the market and extend Monsanto' patent protection through 2020.

## II.    MONSANTO'S MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

### A.    *Legal Standard*

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings."  A motion for judgment on the pleadings is subject to a strict standard, as it should only be granted where the material facts are undisputed and the moving party is therefore entitled to judgment as a matter of law.  *United States v. Any & All Radio Station Transmission Equip.*, 207 F.3d 458, 462 (8th Cir. 2000).  Courts ruling on a motion for judgment on the pleadings ordinarily may not consider matters outside the pleadings, but they are permitted to consider "some public records, materials that do not contradict the complaint, or materials that are necessarily embraced by the pleadings." *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 982 (8th Cir. 2008) (internal quotations and citations omitted).  The interpretation of an unambiguous contract is a proper matter for a court to consider on a motion for judgment on the pleadings.[3]  *See Lion Oil Co. v. Tosco Corp.*,

_____

[3] That Monsanto's Motion is only for partial judgment on the pleadings does not affect this conclusion.  *See* 61A Am. Jur. 2d *Pleading* § 618 (2009) ("Although [Rule 12(c)] . . . does not explicitly recognize a partial judgment, when considered in the context of the policy in favor of the expeditious disposition of matters where material facts are not in dispute, the sanctioning of partial judgment on separate claims by [Rule 54(b)] suggests that partial judgment on the pleadings is a procedural option open to the federal courts.").  Given the amount of briefing of this Motion and the complexity of the issues, the Court does not believe that Monsanto's Motion presents the problem of furthering this litigation only through piecemeal resolution of issues. Pioneer does cite to some authority suggesting that partial judgment on the pleadings is inappropriate where it would not dispose of an entire pleaded claim, but if the Court grants Monsanto's Motion, then Pioneer's Count for a declaratory judgment that the agreements permit it to stack glyphosate-tolerant traits must be dismissed.  As such, the Court concludes that partial judgment on the pleadings is an appropriate and efficient means of considering the issues in this litigation that are ripe for resolution.

90 F.3d 268, 270 (8th Cir. 1996) (affirming grant of judgment on the pleadings based on interpretation of "clear, unequivocal and unambiguous" contract language); *see also OSI Sys., Inc. v. Instrumentarium Corp.*, 892 A.2d 1086, 1090 (Del. Ch. 2006) (as a matter of Delaware law, "judgment on the pleadings . . . is a proper framework for enforcing unambiguous contracts") (internal citations and quotations omitted).

## B.    Discussion

Monsanto moves for partial judgment on the pleadings that: (1) the license agreements do not permit stacking of any non-RR glyphosate-tolerant traits with Monsanto's 40-3-2 soybean and NK603 corn traits; (2) Pioneer breached those agreements by stacking OGAT with 40-3-2 and NK603; and (3) it is entitled to judgment in its favor on Pioneer's counterclaim for a declaratory judgment that the license agreements permit this type of stacking.  As suggested by its declaratory judgment claim, Pioneer argues that the license agreements do permit RR/OGAT stacking. Pioneer also claims that even if the Court concludes that is not the case, Monsanto's remedy is in a suit for patent infringement, not breach of contract.  Additionally, in support of its argument that the parties did not intend for the licenses to exclude RR/OGAT stacking, Pioneer contends that it is entitled under Delaware law to introduce extrinsic evidence concerning the negotiations that preceded the agreements.

### 1.  Scope of the License Grant in the Soybean and Corn License Agreements

Monsanto contends that the license agreements are unambiguous in not giving Pioneer the right to introduce glyphosate-tolerant transgenic traits in combination with the 40-3-2 and NK603 traits it licensed from Monsanto.  Pioneer argues that the agreements expressly authorize this stacking.  In the alternative, Pioneer takes the position that the agreements are ambiguous, and that partial judgment on the pleadings in favor of Monsanto is therefore inappropriate.

The parties agree that Delaware law governs the license agreements, and under Delaware law the interpretation of a contract is a question of law. *Alliance Data Sys. Corp. v. Blackstone Capital Partners V L.P.*, 963 A.2d 746, 759-60 (Del. Ch. 2009). A contract with plain and unambiguous language should be given its "evident meaning" in order to interpret it in accordance with the parties' intentions, and courts should consider parol evidence only if the contract's language is susceptible to multiple reasonable interpretations. *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006).

As such, the threshold question for the Court is whether the license agreements are ambiguous. Mere disagreement between the parties as to a contract's meaning, however, does not mean that a contract is susceptible of multiple interpretations. *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992). Likewise, there is no ambiguity if "the court can determine the meaning of a contract without any other guide than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends." *Id.* (internal quotations and citations omitted). Thus, in discerning the parties' intent from the language of the contract, "[t]he true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Id.* Moreover, a key principle in interpreting a contract – and therefore also in ascertaining whether it is ambiguous – is that it should be read as a whole and "interpreted in a way that does not render any provisions illusory or meaningless." *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 287 (Del. 2001); *see also Nw. Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996).

The Court's analysis of the license agreements begins with the primary license grant provision itself, in subparagraph 3.01(a) of the agreements[4]:

> Subject to the terms of this Agreement, Monsanto hereby grants to Licensee, and Licensee hereby accepts, a non-exclusive license within the Licensed Field in the territory under Monsanto Patent Rights, Biological Material and Licensed Patent Rights to develop, use, produce, have produced, offer to sell, sell and import Licensed Commercial Seed . . . .

The license grant does not contain any express anti-stacking restrictions, but its scope is refined by the defined terms in the provision. First, there is Licensed Commercial Seed, defined in subparagraph 2.09 as:

> Licensee-brand Soybean seed [or Corn seed] produced by or for Licensee containing Glyphosate-Tolerant Soybean Event: 40-3-2 [or in the case of the corn agreements, Glyphosate-Tolerant Corn Event: NK 603] and not containing any other gene or trait that if alone in Soybean [or Corn] would infringe either the Monsanto Patent Rights or the Licensed Patent Rights.

Like the license grant itself, this provision does not purport to restrict Pioneer from stacking OGAT with the licensed Monsanto trait technology; by its terms, it only provides that the license does not extend to other genes or traits that infringe on the Monsanto Patent Rights or the Licensed Patent rights – defined as the 40-3-2/NK603 patent rights and patent rights related to 40-3-2/NK603 over which Monsanto has sub-licensing authority. Monsanto does not claim that Pioneer's OGAT technology, standing alone, infringes on any of those rights. Thus, the Court agrees with Pioneer that its RR/OGAT stacked seed products are Licensed Commercial Seed under 2.09.

---

[4] As noted above, the soybean and corn license agreements are identical for purposes of this Motion, and that includes the numbering of sections and subparagraphs.

That does not end the Court's inquiry, however, as the § 3.01(a) grant is limited to a non-exclusive license to produce and sell Licensed Commercial Seed "within the Licensed Field," which subparagraph 2.11 defines as:

> Licensed Commercial Seed which exhibit genetically-engineered protection against Glyphosate herbicide solely due to the presence of the Glyphosate-Tolerant Soybean Event: 40-3-2 [or Corn Event: NK603].

Monsanto contends that this is an unambiguous and enforceable field of use restriction, permitting Pioneer to commercialize seed products with the 40-3-2 and NK603 traits, provided that the final seed product's glyphosate resistance is "solely due to" those traits. Thus, in Monsanto's view, Pioneer exceeds the scope of the permissible field of use when it stacks OGAT with 40-3-2 and NK603. Pioneer contends that this provision is not concerned with stacking; instead, Pioneer argues that it merely establishes that Pioneer's license only extends to the 40-3-2 and NK603 traits, and not to any other glyphosate-tolerant traits covered by the '247 Patent.

The principal problem with Pioneer's interpretation is that it effectively reads the word "solely" out of subparagraph 2.11. If 2.11 stated that the Licensed Field is "Licensed Commercial Seed which exhibit genetically-engineered protection against Glyphosate herbicide *due to* the presence of the Glyphosate-Tolerant Soybean Event 40-3-2 / Corn Event NK603," it might be reasonable to read it as preventing the grant from extending to other Monsanto technology covered by the '247 patent, and as such, as unrelated to Pioneer's ability to stack other glyphosate-tolerant traits. Stated differently, a stacked seed product with the OGAT and 40-3-2 traits would indeed qualify as exhibiting glyphosate tolerance "due to the presence of" 40-3-2. Instead, however, 2.11 states that Licensed Commercial Seed may only exhibit glyphosate resistance that is *solely due* to 40-3-2 or NK603; any reasonable reading of this provision requires

the conclusion that it excludes from the Licensed Field any seed product that exhibits glyphosate tolerance from a transgenic trait other than 40-3-2 or NK603.

In Pioneer's view, however, other provisions of the license agreements indicate that 2.11 is meant only to exclude other Monsanto-patented technologies from the Licensed Field, or at the very least, that these provisions demonstrate that the agreements are ambiguous. First, Pioneer points to 3.01(e), which authorizes stacking as a general matter and does not refer to any different treatment for stacking glyphosate-tolerant traits:

> The parties agree that except for applicable patents, Licensee shall be free to introduce any gene and/or trait into, and commercialize as set forth in subparagraph 3.01(a), Licensed Commercial Seed produced by traditional plant breeding or crossing any gene and/or trait without the prior consent of Monsanto, except as specifically provided in subparagraph 3.01(g) and 3.01(h). . . .

Pioneer's argument fails to note, however, that this provision permits Pioneer to commercialize stacked traits only "as set forth in subparagraph 3.01(a)." Because 3.01(a) is the primary license grant itself, which grants Pioneer a license only to operate in the Licensed Field, 3.01(e) does nothing to support Pioneer's argument. In order for the Court to accept Pioneer's argument, it must first conclude that Licensed Field means what Pioneer asserts it to mean.

Pioneer next turns to a series of collateral provisions that refer to Pioneer's rights with respect to Licensed Commercial Seed. For example, 6.03 gives Pioneer the right to market Licensed Commercial Seed that meets applicable quality control specifications, 3.04 requires Pioneer to display Monsanto's trademark on all seeds tags of Licensed Commercial Seed, and 4.01(a) bases the royalties Pioneer must pay to Monsanto on the number of units of Licensed Commercial Seed Pioneer "uses" in the relevant year. Pioneer argues that Monsanto's interpretation of Licensed Field – as a limitation on the definition of Licensed Commercial Seed –

cannot be correct because none of these provisions limits the use of Licensed Commercial Seed to the Licensed Field.

This argument, like Pioneer's reading of 3.01(e), ignores that the license grant in 3.01(a) is subject to the definition of Licensed Field. There is no reason why these other provisions need to be limited by the Licensed Field definition, for the simple reason that Pioneer would not undertake to market, test, or sell the relevant seed products if it is not permitted to produce and commercialize them pursuant to 3.01(a). Furthermore, even if the Court were to determine that this creates some sort of ambiguity, the ambiguity would relate to whether the Licensed Field definition must be read into these provisions; it would not concern or affect the definition of the Licensed Field or whether Pioneer's licenses are subject to it. *Cf. Mueller v. Farmers Ins. Co.*, 2009 WL 3275529, at *4 (E.D. Mo. 2009) (ambiguity as to amount of coverage available under insurance policy would not create ambiguity as to whether coverage was available).

In contrast, Monsanto correctly asserts that subparagraph 3.01(i) of the agreements supports its interpretation. This provision states that Pioneer "agrees not to commercialize a variety of Licensed Commercial Seed which carries a gene or genes not supplied by Monsanto and which results in increased tolerance to a non-glyphosate herbicide," unless Pioneer demonstrates, with "credible scientific evidence," that it does not reduce the seed product's glyphosate tolerance. Thus, in order to stack traits imparting tolerance to herbicides other than glyphosate – which the parties agree is permitted under § 3.01(e), subject to some limitations – Pioneer must demonstrate to Monsanto that the stacking does not adversely affect the seed's glyphosate tolerance. If, as Pioneer claims, the agreements also permit glyphosate-resistant trait stacking, it would make little sense for the agreements not to include an analogous testing requirement for glyphosate-resistant trait stacking. Thus, reading all the provisions together, the

conclusion is that the license agreements do not provide for the testing of seed products with other glyphosate-tolerant traits precisely because the agreements do not contemplate that type of stacking.

As such, the Court concludes that the Licensed Field definition in 2.11 is a field of use restriction, permitting Pioneer to use the 40-3-2 and NK603 traits only in seed products containing no other glyphosate-tolerant traits. Subparagraph 2.11 acts as a limitation both on (1) the license grant in § 3.01(a), in the sense that Pioneer's authority to use the licensed trait technology is limited to the Licensed Field of seed products with glyphosate tolerance "solely due" to 40-3-2 or NK603, and (2) the definition of Licensed Commercial Seed in 2.09, to the extent that even if Pioneer's RR/OGAT stacked seed products otherwise satisfy that definition, Pioneer still may not "develop, use, produce, have produced, offer to sell, sell and import" them under 3.01(a) because they are not within the Licensed Field.

The Court therefore finds that Monsanto is entitled to judgment on the pleadings that the soybean and corn license agreements, when read in their entirety, are unambiguous and do not grant Pioneer the right to stack non-RR glyphosate-tolerant trait technologies with the licensed traits. As a result, Monsanto is also entitled to judgment in its favor on Pioneer's counterclaim for a declaratory judgment that the agreements permit RR/OGAT stacking.

### 2. The Admissibility of Extrinsic Evidence to Demonstrate Ambiguity

Pioneer claims that even if the Court finds that the license agreements are unambiguous, Delaware law permits it to introduce extrinsic evidence of the negotiations leading up to the agreements to demonstrate that the agreements are in fact ambiguous. The general rule, of course, is that courts may not consider extrinsic evidence in interpreting a facially unambiguous contract. *See, e.g.*, *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del.

1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."); *United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007) ("[E]xtrinsic, parol evidence cannot be used to manufacture an ambiguity in a contract that facially only has one reasonable meaning.").

In support of its argument, however, Pioneer cites to authority stating that "[w]hile extrinsic evidence cannot be used to manufacture an ambiguity where one does not exist on the contract's face, an understanding of the context and business circumstances under which the language was negotiated is to be considered, as seemingly unequivocal language may become ambiguous when considered in conjunction with the context in which the negotiating and contracting occurred." *Concord Steel, Inc. v. Wilmington Steel Processing Co.*, 2009 WL 3161643, at *6 (Del. Ch. 2009) (unpublished) (internal quotations and citations omitted).[5]

The Court concludes, however, that this language does not mean what Pioneer claims it means. First, that interpretation would make the quoted language internally contradictory – extrinsic evidence is either admissible or inadmissible to demonstrate that a facially unambiguous contract is in fact ambiguous, and Pioneer's interpretation seeks to have it both ways. More importantly, however, an examination of *Concord Steel* reveals that the phrase "an understanding of the context and business circumstances under which the language was negotiated" is meant to refer to background knowledge necessary to understand that certain language is ambiguous, and not to evidence of the parties' negotiations leading up to the formation of the contract.[6]

---

[5] Under Delaware law, unpublished opinions have precedential value. *See* Del. Super. Ct. R. 17(a); *New Castle County v. Goodman*, 461 A.2d 1012, 1013 (Del. 1983).

[6] Pioneer also cites to two other Delaware cases in support of its argument. The first contains the quoted language, but it only appears in a somewhat tangential footnote and is not relied upon by the court. *See U.S. West, Inc. v. Time Warner Inc.*, 1996 WL 307445, at *10 n.10 (Del. Ch. 1996) (unpublished). The court there also refined the otherwise broad language – and

In *Concord Steel*, the court considered a non-competition provision in an asset purchase agreement between two firms in the steel-processing business, providing that the defendant seller would not engage in any business "competitive" with that of the plaintiff buyer for a certain period of time. *Id.* at *6. The two firms employed distinct methods for cutting steel, and the defendant seller maintained that for any given job, only one of those two technologies would be appropriate. *Id.* at *7. The defendant contended that the term "competitive" was susceptible to two possible interpretations, and the court determined that choosing one over the other would only affect the outcome of the case if the defendant seller was correct that only one of the two steel-cutting methods would be suitable for a given job. *Id.* Thus, the court needed to entertain extrinsic evidence – to determine whether the defendant's contention was accurate – in order to determine whether the term "competitive" was ambiguous. *Id.*; *cf. Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) ("Ambiguity does not exist where the court can determine the meaning of a contract without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.") (internal citations and quotations omitted).

In contrast to the situation in *Concord Steel*, Pioneer does not seek to introduce extrinsic evidence to provide the court with background knowledge necessary to understand that the license agreements are ambiguous. Instead, Pioneer merely wishes to demonstrate, through evidence of the negotiations, that the writings are ambiguous because they differ from the parties'

---

thereby made it of no help to Pioneer – by noting that it is meant to refer to extrinsic evidence of latent or hidden ambiguities that do not "vary or contradict the writing." *Id.* (internal quotations and citations omitted). The second case refers to the use of extrinsic evidence to determine whether a contract is fully or partially integrated, not to ascertain whether a contract term or provision is ambiguous. *See Addy v. Piedmonte*, 2009 WL 707641, at *9-*10, *9 n.44 (Del. Ch. 2009) (unpublished).

prior understandings. This is precisely the type of extrinsic evidence that the parol evidence rule is meant to exclude. *See, e.g.*, Williston on Contracts § 33:1 (4th ed. 2009) (The parol evidence rule "effectuates a presumption that a subsequent written contract is of a higher nature than earlier statements, negotiations, or oral agreements by deeming those earlier expressions to be merged into or superseded by the written document.").

Thus, the Court concludes that the parol evidence rule bars Pioneer from introducing evidence of the parties' negotiations, preventing Pioneer from attempting to show that Monsanto and Pioneer intended the agreements to permit Pioneer to stack the licensed traits with its own glyphosate-resistant technologies.

### 3. Breach of Contract

The Court concluded above in Section II.B.1 that the license agreements did not grant Pioneer the right to stack OGAT with the 40-3-2 and NK603 traits, and Monsanto also asks that the Court enter judgment on the pleadings that Pioneer breached the license agreements in so doing. Monsanto contends that in entering into the agreements, Pioneer covenanted not to exceed the scope of the licenses – covenants Pioneer breached by engaging in the prohibited stacking. In the alternative, should the Court determine that there were no relevant express covenants, Monsanto argues that Pioneer's OGAT/RR stacking breached an implied negative covenant in the agreements. Pioneer argues that Monsanto's sole remedy for Pioneer using the licensed technologies outside of the licensed field is a suit for patent infringement, not breach of contract.

At the outset, the Court disagrees with Pioneer that subparagraph 3.01(e) of the license agreements prohibits a claim for breach of contract in these circumstances. That provision provides that:

> The parties agree that except for applicable patents, Licensee shall be free to introduce any gene and/or trait into, and commercialize as set forth in subparagraph 3.01(a), Licensed Commercial Seed . . . . It is understood that the only remedy available to Monsanto to prevent any activity in this subparagraph 3.01(e) shall be through enforcement of any applicable patent rights against such product(s) and such activity shall not be considered a breach of this Agreement.

The Court found above that this provision does not authorize the stacking at issue in this litigation because it is expressly subject to subparagraph 3.01(a), and accordingly to the field of use restriction referenced therein. As such, "any activity in this subparagraph" refers solely to the stacking of traits imparting characteristics other than glyphosate tolerance, and this provision is therefore irrelevant to RR/OGAT stacking.

The threshold issue here is whether Pioneer expressly covenanted not to exceed the grant in the license agreements, and Monsanto asserts that a number of provisions are applicable. Monsanto first points to the license grant itself in subparagraph 3.01(a), but neither it nor the Licensed Field definition in 2.09, as referenced in that provision, is a covenant on the part of Pioneer. Subparagraph 3.01(a), stating that "Monsanto hereby grants to Licensee, and Licensee hereby accepts" the non-exclusive license grant, does not represent a promise on the part of Pioneer not to exceed the scope of that grant. Subparagraph 2.09 defines the Licensed Field as "Licensed Commercial Seed which exhibit genetically-engineered protection against Glyphosate herbicide solely due to the presence of" either 40-3-2 or NK603; it likewise does not include any language suggesting a covenant on the part of Pioneer not to exceed that restriction.

The Court also disagrees with Monsanto's argument that 1.07 is a covenant breached by Pioneer. Subparagraph 1.07 states that:

> Under this Agreement, [Pioneer] will continue to sell Soybean [and Corn] varieties containing Glyphosate-Tolerant Soybean Event: 40-3-2 [and Glyphosate-Tolerant Corn Event: NK603], subject to the terms and conditions provided herein. Such terms and conditions shall include a program directly with the grower (e.g., the Technology Agreement in the U.S.) or such other activities as may be required by

the regulatory authorities of any of the countries in the Territory, as set forth in
this Agreement.

Monsanto takes the position that the first sentence of this subparagraph is, in effect, Pioneer's

contractual promise not to breach any of the terms and conditions of the license agreements.

While the Court agrees that this provision is a covenant, it disagrees with Monsanto's

interpretation. If it stated "Pioneer will sell," the Court might agree with Monsanto. Instead,

however, the operative phrase is "will *continue* to sell," which indicates that this is Pioneer's

promise not to cease commercializing seed products with the Monsanto-licensed technology while

the agreement remains effective, a provision that is eminently sensible given that Monsanto,

pursuant to subparagraph 9.02(b), may not terminate the agreements unless Pioneer is in default

of royalties or other payments due to Monsanto. Thus, this provision ensures that Pioneer cannot

hold Monsanto to its obligations under the agreements without continuing to commercialize the

relevant seed products (and continuing to pay Monsanto the corresponding royalties).

The Court therefore finds that there is no relevant express covenant, but this does not

resolve the issue, as Monsanto still may be able to maintain an action on the contract if Pioneer

impliedly covenanted not to stack glyphosate-tolerant traits. A survey of the authorities indicates

that the presence of a field of use restriction, in certain circumstances, counsels in favor of

recognizing an implied negative covenant not to operate outside that field. In *Lanova Corp.*, for

example, the license agreement at issue authorized the defendant to practice the plaintiff's patent

in manufacturing certain types of motors, in exchange for which the defendant paid the plaintiff

royalties. *Lanova Corp. v. Atlas Imperial Diesel Engine Co.*, 55 A.2d 272, 275 (Del. Super. Ct.

1947). The court concluded that the defendant did not covenant in the agreement not to use the

patented technology in other, larger motors, and therefore found that the plaintiff's only remedy

for that use would be a suit for infringement. *Id.* The Delaware court noted obliquely, however,

that this result would not follow in all circumstances, given that "a restriction of this nature in a license implies a negative covenant . . . in many types of contracts where the very nature of the restriction necessarily implies such a covenant." *Id.* at 276.

More recent authority suggests that the relevant inquiry in determining whether "the nature of the restriction" suggests an implied negative covenant is whether the contract merely represents the licensor's promise not to sue for infringement in exchange for the payment of royalties, or whether the licensor has taken on additional contractual obligations to assist the licensee in its use of the licensed technology. *See* Einhorn, *Patent Licensing Transactions* § 1.03[4] (2009). As Einhorn explains:

> [A] straight patent license is essentially a promise by the licensor to forbear from bringing suit so long as the licensee operates within the terms of the grant. Should the licensee transcend the terms of the grant, the licensor has an adequate remedy in a suit for infringement.
>
> However, should the license be based upon a grant of technical information, then the balance tips in the opposite direction. Here the licensor has granted more than a mere forbearance from suit. He has actually delivered a package of valuable information to the licensee. Should the licensee exceed the terms of the grant, the sole appropriate remedy is a suit for breach of contract based on an implied covenant not to do so.

*Id.*; *see also* Modern Licensing Law § 11.27 (2009) ("Some argue that acts outside the scope of the [licensing agreement] do not breach a contract obligation (unless the license terms expressly so indicate). . . . That approach, however, must be rejected in context of most forms of modern commercial licensing . . . . At minimum, standards of good faith indicate that going beyond a contract for limitation breaches the contract."); *Shaw v. E.I. DuPont de Nemours & Co.*, 226 A.2d 903, 909 (Vt. 1967) ("[A] reasonable interpretation of the common understanding of the parties to a restrictive licensing agreement" mandates that "[w]hen permission is granted to

operate in a restricted area, the acceptance of the privilege implies a condition that the area reserved will not be invaded.").

The court in *Emisphere Technologies* recognized this distinction between an ordinary infringer and one whose infringing use was made possible by the nature of the relationship between the parties. *See Eli Lilly & Co. v. Emisphere Techs., Inc.*, 408 F. Supp. 2d 668 (S.D. Ind. 2006). In that case, Emisphere, the holder of patents on certain chemical carrier compounds, had entered into a license agreement with Eli Lilly under which the parties collaborated on researching and developing practical applications of these compounds, primarily related to oral administration of a hormone used to treat osteoporosis. *Id.* at 672-73. After Emisphere discovered that Lilly had been conducting secret research on using the carrier compounds to deliver other chemicals, Emisphere brought a claim for breach of contract, arguing that Lilly's unauthorized research breached the license agreement. *Id.* at 672. The court agreed with Emisphere, concluding that Emisphere had "granted much more than a patent license," in that it had entered into a "close and collaborative research relationship" and "provide[d] Lilly with a vast quantity of technical information." *Id.* at 689. In dicta, the court intimated that those facts suggested that the court would imply a negative covenant breached by Lilly, but that inquiry was ultimately unnecessary because the court found that the license agreement contained an express covenant on the part of Lilly not to use Emisphere's technology outside of the licensed field. *Id.* at 690-91.

The Monsanto-Pioneer license agreements involve the presence of the two factors that have led courts and commentators to find implied negative covenants: a restriction on the field of use – the prohibition on stacking glyphosate-tolerant traits discussed above in Section II.B.1 – and a grant of technical information – Monsanto's delivery of biological materials and confidential

proprietary information to Pioneer. Pioneer would have presumably been unable to infringe on the '247 Patent in the manner alleged here – that is, by stacking OGAT with the 40-3-2 and NK603 events – had Monsanto not supplied it with the necessary biological materials and related proprietary technical information, delivery of which was expressly conditioned through the license agreements on Pioneer both (1) using the biological materials and subsequently commercialized seed products within the licensed field,[7] and (2) not sharing confidential proprietary information received from Monsanto with third parties, except in certain limited circumstances.[8] These circumstances demonstrate that instead of leaving Pioneer in the shoes of the average infringer, which is how Pioneer claims it should be treated in asserting that Monsanto's sole remedy is a suit for patent infringement, the nature of the agreements – and Monsanto's performance of its corresponding obligations – enabled Pioneer to stack the 40-3-2 and NK603 traits with OGAT, such that it is appropriate to recognize an implied negative covenant on the part of Pioneer not to do so.

The Court therefore concludes that the license agreements contain implied negative covenants connected to the field of use restrictions, and if the agreements and underlying patent rights are otherwise enforceable, Monsanto may properly assert claims for breach of contract for Pioneer's unlicensed use of Monsanto's patented 40-3-2 and NK603 traits.

---

[7] As set forth in the definition of Licensed Commercial Seed, discussed above, and also in subparagraph 3.01(g) of the agreements relating to biological materials, a term defined as "the biological material previously supplied by Monsanto to [Pioneer] for the purpose of developing Licensed Commercial Seed from" the 40-3-2 and NK603 events.

[8] As set forth in Section 10 of the license agreements.

### C.    Conclusion

The Court emphasizes that its ruling on this Motion is a narrow one, in that the Court only reaches judgment that (1) the license agreements do not extend licenses to Pioneer to stack OGAT with 40-3-2 and NK603; (2) a suit for breach of contract is a proper remedy for Pioneer's use of Monsanto's patented technologies outside the licensed field; and (3) Pioneer's counterclaim for a declaratory judgment that the license agreements permit RR/OGAT stacking must therefore be dismissed. The Court does not express any opinion on the viability of Pioneer's other counterclaims, which allege, among other things, that the license agreements and the '247 Patent itself are unenforceable as a matter of patent law and on antitrust grounds. Accordingly, Pioneer may be able to demonstrate that Monsanto may not recover for patent infringement or breach of contract, notwithstanding this grant of partial judgment on the pleadings.

## III.    PIONEER'S MOTION TO DISMISS COUNT II OF MONSANTO'S COMPLAINT

### A.    Legal Standard

The notice pleading standard of Federal Rule of Civil Procedure 8(a)(2) requires a plaintiff to give a short and plain statement "plausibly suggesting . . . that the pleader is entitled to relief." *Bell Atlantic v. Twombly*, 550 U.S. 544, 557 (2007). Under this standard, a claim is facially plausible where "the pleaded factual content allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009) (internal citations omitted). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). That said, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to

provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal alterations and citations omitted). Thus, application of this standard suggests a two-step analysis under which the court may first (1) determine whether there are factual allegations in the complaint sufficient to entitle the plaintiff to "the assumption of truth," and if so, (2) "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 129 S. Ct. 1937, 1950.

### B.     Discussion

Pioneer contends that Monsanto's Count II for inducement to infringe must be dismissed because Monsanto has failed to sufficiently allege both direct infringement by a third party and that Pioneer had the affirmative intent to induce a third party to infringe on the '247 Patent. Monsanto argues that its allegations are sufficiently detailed to give Pioneer fair notice of the claims alleged and their factual basis.

The basis for Monsanto's claims for inducement to infringe is 35 U.S.C. § 271(b), which provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." To establish liability under this provision, the patent holder must establish (1) that there has been direct infringement by a third party; and (2) "that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1312 (Fed. Cir. 2007) (citing *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1304-05 (Fed. Cir. 2002)).

The Court first considers whether Monsanto has adequately alleged the first element: direct infringement by a third party. Monsanto's Count II contains the following relevant allegation with respect to whether a third party has directly infringed Monsanto's patent:

> 72. Upon information and belief, [Pioneer's] statement to . . . third-party licensees that the licensees can permissibly stack Monsanto's patented 40-3-2 Soybean Event with the Optimum® GAT® gene is inducing these licensees to directly infringe the '247 Patent.

Although Monsanto could have articulated its claim more precisely, the allegation that Pioneer's statement "is inducing these licensees to directly infringe" the relevant patent does adequately convey Monsanto's belief that direct infringement has resulted from Pioneer's statement. It unquestionably would have been sufficient to communicate direct infringement if Monsanto had used the phrase "has induced" instead of "is inducing," and dismissal of this Count based on that distinction would be an overly technical application of Rule 8(a)(2)'s pleading requirements. Furthermore, contrary to Pioneer's assertions, the implausibility of direct infringement at the time of the Complaint, given that the alleged statement was made only several months beforehand, does not make this Count subject to dismissal. This would require the Court to make assumptions as to the amount of time required to produce such an agricultural product and as to what specifically constitutes infringement, both of which would require the Court to consider matters outside the pleadings.

Furthermore, Paragraph 72 also sufficiently identifies the alleged direct infringers as among Monsanto's other licensees of the 40-3-2 and NK603 traits. Had Monsanto merely stated that a third party is directly infringing the '247 Patent, the Court would agree with Pioneer that the allegations are no more than a "formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal alterations and citations omitted). Here, however, Monsanto has reduced the potential universe of direct infringers to the third-party licensees to whom Pioneer made the alleged statement, and the Court concludes that this gives Pioneer adequate notice of the factual basis for Monsanto's allegation that there has been direct infringement.

The second element of Monsanto's claim is that Pioneer had the specific intent to induce infringement – i.e., "that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements." *ACCO Brands*, 501 F.3d at 1312 (citing *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1304 (Fed. Cir. 2006)). Thus, the specific intent requirement means that "the alleged infringer must be shown . . . to have knowingly induced infringement, not merely knowingly induced the *acts* that constitute direct infringement." *DSU Med. Corp.*, 471 F.3d at 1306 (internal citations and quotations omitted) (emphasis in original).

Monsanto's allegations in paragraph 73 of its Complaint address the intent element of its claim for inducement to infringe:

> 73. [Pioneer] knowingly made [the statement that stacking OGAT with 40-3-2/NK603 is permissible under the license agreements] to third-party licensees with the specific intent to encourage the third-party licensees to directly infringe the '247 Patent.

This allegation specifies that Pioneer made a statement to Monsanto's third-party licensees, what the content of the statement was, and that it was made with the specific intent to encourage them to infringe Monsanto's patent. This more than adequately communicates Monsanto's belief that Pioneer intended for these licensees to stack Optimum GAT with the 40-3-2 or NK603 traits, and that Pioneer knew that such stacking would constitute direct infringement. Pioneer points to certain general allegations in Monsanto's Complaint that would make it unlikely that Pioneer actually had such intent in making the alleged statement, but those allegations were not necessary to Monsanto's claim as a matter of Rule 8(a)(2), nor may the Court permissibly conclude that Monsanto will not make more detailed factual allegations concerning this claim after the parties have had an opportunity to conduct discovery. Even with the refinements to Rule 8(a)(2) set out in *Twombly* and *Iqbal*, notice pleading remains the rule, and the Court sees no reason to believe

that Pioneer is not on notice of the conduct Monsanto alleges to be the basis of its claim –
especially given that the general allegations in Monsanto's Complaint evidently were sufficient to
lead Pioneer to the conclusion that the evidence of inducement to infringe will ultimately be
inadequate.

The Court therefore finds that Pioneer's motion to dismiss Monsanto's Count II will be
denied, as Monsanto adequately pled its claim for inducement to infringe under 35 U.S.C. §
271(b).

## IV.    CONCLUSION

The Court concludes that Monsanto is entitled to partial judgment on the pleadings that
the license agreements do not grant Pioneer the right to stack its OGAT glyphosate-tolerant trait
technology with the licensed Roundup Ready® soybean and corn traits, as the agreements are
unambiguous in restricting Pioneer's right to manufacture and commercialize seed products to
those products that exhibit glyphosate tolerance solely due to 40-3-2 and NK603.  Furthermore,
because the agreements are unambiguous, Delaware authority does not permit Pioneer to
introduce extrinsic evidence of the negotiation of the agreements in order to show that the parties
intended otherwise.  The Court also finds that the license agreements contain an implied negative
covenant on the part of Pioneer not to exceed the scope of the licenses granted by the agreements,
and assuming the agreements and the '247 Patent are otherwise enforceable, Monsanto may
properly assert claims for breach of contract as a result of Pioneer stacking OGAT with the
licensed traits.

Turning to Pioneer's Motion, the Court concludes that Pioneer is not entitled to dismissal
of Monsanto's Count II for inducement to infringe Monsanto's '247 Patent.  While the general
allegations in Monsanto's Complaint may indicate that it is unlikely that Monsanto will ultimately

be unable to prove these claims, the allegations in its Count II provide notice of the claims and their factual basis such that dismissal under Rule 12(b)(6) is unwarranted.

Accordingly,

**IT IS HEREBY ORDERED** that Monsanto's Motion for Partial Judgment on the Pleadings [doc. #40] is **GRANTED**.   As a result, Monsanto is entitled to judgment in its favor on Pioneer's Count Eleven for a declaratory judgment.

**IT IS FURTHER ORDERED** that Pioneer's Motion to Dismiss Count II of Plaintiffs' Complaint [doc. #18] is **DENIED**.

Dated this <u>15th</u> Day of <u>January</u>, <u>2010</u>.

E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE