IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MONSANTO COMPANY and<br>MONSANTO TECHNOLOGY LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| E.I. DUPONT DE NEMOURS AND<br>COMPANY and<br>PIONEER HI-BRED INTERNATIONAL,<br>INC., | ) | Case No. 4:09-cv-00686-ERW |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MONSANTO'S MOTION TO DISMISS
CERTAIN ANTITRUST, PATENT AND CONTRACT COUNTERCLAIMS AND
TO STRIKE CERTAIN PATENT AND CONTRACT AFFIRMATIVE DEFENSES**

**INTRODUCTION**

In response to Monsanto's discrete patent and contract claims, Defendants have asserted

a sprawling series of antitrust and contract counterclaims and contract and patent defenses in

their Second Amended Answer and Counterclaims ("SAAC"). Defendants' antitrust

counterclaims encompass five different alleged transgenic traits markets in corn and soybean,

impugn a wide range of alleged conduct by Monsanto occurring over the course of more than ten

years, and implicate hundreds of different licensing agreements with seed companies. Likewise,

Defendants' inequitable conduct and patent misuse defenses are based mainly on conduct that

occurred fifteen to twenty years ago.

Because most of their claims and defenses either were ███████████████

███████████████, are untimely, or implicate conduct that is a lawful exercise of Monsanto's

patent rights, the Court should dismiss those claims for failure to state a claim under Rule

12(b)(6), and strike those defenses as insufficient under Rule 12(f).

1

**REDACTED**

**Large parts of Defendants' antitrust, patent, and contract counterclaims and**

**affirmative defenses have been released by** ▮▮▮▮▮▮▮▮▮▮▮▮. Much of

Defendants' allegations of inequitable and anticompetitive conduct are based on stale allegations

of patent fraud, sham litigation, and stacking restrictions – all of which occurred in the 1990s and

were the subject of prior suits between the parties in four federal courts. In ▮▮▮ those suits,

Defendants ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Because at the time they ▮▮▮▮,

Defendants could have alleged inequitable conduct or fraud in the prosecution of the '435 patent,

they have released any patent defenses or antitrust counterclaims based on such conduct.

Similarly, because Defendants previously challenged Monsanto's stacking restrictions, Count VI,

which is predicated entirely on those stacking restrictions, is released, as well as any of their

other antitrust counterclaims to the extent they are based on such conduct. In addition, the

parties' ▮▮▮▮▮▮▮▮ also specifically ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Thus, because

Defendants' contract-related affirmative defenses (Counts IX and XII) and counterclaims

(Counts XI and XIII-XV) are predicated on such allegations, they should be dismissed per the

plain language of the parties' ▮▮▮▮▮▮▮▮.

**Defendants' antitrust counterclaims based on stacking restrictions in their license**

**agreements with Monsanto are also barred by the statute of limitations.** As part of the

alleged scheme to monopolize five transgenic trait markets in corn and soy, Defendants allege

that Monsanto has invoked so-called "stacking restrictions" in the 2002 license agreements

between the parties to prohibit Defendants from stacking their own trait technology with

Monsanto's Roundup Ready® trait. *See* SAAC at ¶¶ 306-308. Yet, these license agreements

were entered more than *seven years* before Defendants asserted their antitrust counterclaims

2

**REDACTED**

here. Thus, Defendants are barred by the four-year statute of limitations for private antitrust

actions from asserting the terms of these agreements as a basis for their antitrust counterclaims.

**Defendants' new "export approval" theory fails to state a cognizable antitrust claim.**

Defendants allege for the first time in the SAAC that "Monsanto is exploiting [foreign regulatory

and registration] barriers to impede competition." SAAC at ¶ 467. They complain that

Monsanto has not provided assurances to rivals that it will not sue for patent infringement or

breach of license agreements if rivals infringe Monsanto's patents for the purposes of obtaining

foreign regulatory approvals for generic Roundup Ready®, and that Monsanto has only

committed to maintain those approvals for three years – not the five years Defendants would

prefer. Defendants seek to impose on Monsanto an affirmative duty to license its patents and to

assist its competitors, neither of which finds any support in the antitrust laws.

BACKGROUND

A.      **Current Litigation**

On May 4, 2009, Monsanto filed this lawsuit against Defendants asserting patent

infringement, breach of contract, and unjust enrichment claims arising out of their

misappropriation of Monsanto's patented biotechnology. The gist of this case is Defendants'

attempts to conceal their inability to develop their own stand-alone glyphosate-tolerant trait by

improperly combining Monsanto's patented Roundup Ready® trait technology with their

genetically-engineered Glyphosate tolerant gene, called Optimum GAT. After publicly

conceding that Optimum GAT by itself could not meet their standards for glyphosate tolerance,

and that it presented an unacceptable risk to farmers, Defendants announced plans to combine or

"stack" their Optimum GAT gene with Monsanto's Roundup Ready® in soybeans, and have

encouraged others to do the same. *See* Compl., ¶¶ 12, 46-48, and 58. Defendants also stacked

their trait with Monsanto's Roundup Ready® trait in corn. *See id.* at ¶ 13. This conduct is

3

REDACTED

outside the scope of the Defendants' Licensed Field and, therefore, constitutes infringement and an inducement to infringe Monsanto's patent, and is a breach of Defendants' licensing agreements.

In their SAAC, Defendants assert, among other things, inequitable conduct and patent misuse defenses, antitrust counterclaims, and contract-related counterclaims and defenses. They claim that Monsanto engaged in fraud and inequitable conduct in the prosecution of its patents – U.S. Patent Nos. 5,633,435 (the "'435 patent"), which was later reissued as RE 39,247E (the "'247 reissue patent"). They also claim that Monsanto violated Section 2 of the Sherman Act by monopolizing or attempting to monopolize five purported trait markets through three types of alleged anticompetitive conduct: patent-related conduct, license-related conduct, and generic competition allegations. *See* SAAC at ¶¶ 26-55 and Counts I-V. They further claim that contract reformation is required due to alleged fraud and deceit by Monsanto in connection with the formation of the Soybean and Corn License Agreements at issue in this case.

***Patent-Related Conduct.*** Defendants claim that Monsanto obtained the '435 patent and its successor, the '247 reissue patent, by fraud and inequitable conduct before the U.S. Patent & Trademark Office. *See id.* at ¶¶ 89-300. The vast majority of those allegations center on alleged conduct that took place during prosecution of the predecessor '435 patent. Defendants also claim that "Monsanto has engaged in a scheme to bring objectively baseless litigation in Federal court against farmers and other competitors for the purpose of hindering, delaying and intimidating competition with its Roundup Ready® products." *Id.* at ¶ 360; *see also id.* at ¶¶ 361-400. And they allege that Monsanto made misleading public statements about their right to stack Optimum GAT trait with Monsanto's Roundup Ready® trait in soybeans to impede Defendants' ability to compete in various markets for stacked traits. *See id.* at ¶¶ 406-411.

**REDACTED**

*License-Related Conduct.* Defendants also challenge as anticompetitive various provisions in Monsanto's licensing agreements with Defendants and independent seed companies ("ISCs"). Among these provisions are stacking restrictions that allegedly prohibit the combination of Monsanto's traits with those of its rivals. *See id.* at ¶¶ 302-359, 426-431, 446-453. Defendants also challenge two other licensing provisions: so-called "poison pill" provisions in Monsanto's ISC agreements that allegedly have cut off competitors' access to ISCs, *see id.* at ¶¶ 412-425; and an alleged provision in Monsanto's cross-license agreement with Dow that prohibits or discourages Dow from permitting Pioneer to sub-license its rights to Dow's Herculex trait technology, *see id.* at ¶¶ 432-445.[1]

*Generic Competition.* Finally, Defendants allege that Monsanto has used or is using new license restrictions to foreclose generic alternatives to its Roundup Ready® trait by forcing ISCs to switch to its Roundup Ready 2 Yield® trait before expiration of the patents on the older Roundup Ready® traits. *See id.* at ¶¶ 10, 454-466. They claim that Monsanto has done so, among other things, by sun setting ISCs' Roundup Ready® licenses two years before patent expiry and by requiring ISCs that choose to switch to Roundup Ready 2 Yield® to destroy their inventory of seeds containing the older version of Roundup Ready®. For the first time in their SAAC, Defendants also allege that Monsanto is exploiting foreign regulatory barriers to impede future competition in generic Roundup Ready®. *See id.* at ¶¶ 467-480.

In addition to their Section 2 monopolization claims, Defendants assert in Counts VI and VII, respectively, that stacking restrictions in Monsanto's ISC licenses and its alleged agreement with Dow violate Section 1 of the Sherman Act.

---

[1] Monsanto intends to file a separate dispositive motion concerning the Dow-Monsanto agreement allegations in the near future.

**REDACTED**

*Contract-Related Claims.* Finally, Defendants raise several contract-related claims and defenses based on alleged fraud and deceit by Monsanto in connection with the formation of the Soybean and Corn License Agreements. Faced with this Court's ruling that the license agreements unambiguously contain field-of-use restrictions on stacking, Defendants ask the Court for "reformation for mutual mistake, unilateral mistake and knowing silence or fraud as to the legal meaning of the terms of restrictions or obligations" (Ninth Additional Defense), and to bar each of Monsanto's breach of contract causes of action "because of Monsanto's fraud by way of misrepresentations, acts, and omissions as to the legal effect of essential terms of Soybean and Corn License Agreements" (Twelfth Additional Defense). *See also* SAAC, Counts XI, XIII-XV, and ¶¶ 337-342, 354, and 357. [2]

## B.     The Parties' Prior Antitrust And Patent Litigation ████████████

This is not the first time the parties have sued one another under the antitrust and patent laws relating to the Roundup Ready® trait. The parties stood opposed in four separate federal lawsuits in the late-1990s and early-2000s. In those cases, Monsanto asserted the '435 patent (the source of the vast majority of Defendants' inequitable conduct allegations here), among others, against Pioneer for its use of Monsanto's Roundup Ready® soybean trait technology, and Defendants asserted largely the same antitrust claims regarding Monsanto's patent and licensing practices. The parties ████ those disputes *over eight years ago*, resulting in the very ████ ████████████████████████ at issue here. In doing so, Defendants also released all claims and defenses they had asserted or could have asserted and covenanted not to sue Monsanto regarding practices that were the same or similar to those at issue in the prior suits.

---

[2] Defendants assert two other counterclaims that are not the subject of this motion. Count VIII seeks a declaratory judgment of non-infringement of the '247 patent, and Count XII asserts breach of the Soybean License Agreements.

**REDACTED**

### 1.    Missouri Litigation

In 1999, Monsanto filed suit in this Court against Pioneer for breach of contract, patent infringement, and misappropriation of trade secrets arising out of DuPont's acquisition of Pioneer. *See Pioneer Hi-Bred Int'l v. Monsanto Co.*, No. 01C50159 (E.D. Mo.) (the "Missouri Litigation"). Monsanto alleged, among other things, that the acquisition breached the non-transferability provision in Pioneer's licenses for Roundup Ready® traits in soybeans and canola, and that Pioneer's continued use of those traits after the acquisition infringed the '435 and other patents. *See, e.g.*, Mo. Litig. Compl., ¶¶ 24-29, 38-41 (filed Dec. 8, 1999), attached as Ex. 1. This Court denied Pioneer's motion to dismiss, holding that the acquisition constituted a transfer under federal patent law. *See* June 27, 2000 Order in Mo. Litig. at 4, attached as Ex. 2.

### 2.    Illinois Litigation

On May 22, 2001, Pioneer sued Monsanto and its subsidiary DeKalb Genetics Corp. in Illinois federal court asserting that Monsanto had monopolized the corn seed market by fraudulently obtaining patents and enforcing those invalid patents. *See Pioneer Hi-Bred Int'l v. Monsanto Co., et al.*, No. 3:01-cv-50159 (N.D. Ill.) (the "Illinois Litigation"). Pioneer alleged that "defendants have knowingly and willfully engaged in a pattern of wrongful conduct before the United States Patent and Trademark Office ('PTO') with respect to patent applications relating to transgenic corn plants resistant to insects and herbicides, and methods used for producing such corn plants." Ill. Litig. Compl., ¶ 3 (filed May 22, 2001), attached as Ex. 3. Although Monsanto had a pending infringement suit against Pioneer on the '435 patent, Pioneer elected not to assert Monsanto's prosecution and enforcement of that patent as a basis for Pioneer's antitrust claims in the Illinois litigation.

7

**REDACTED**

### 3.    South Carolina Litigation

On May 24, 2001, two days after Pioneer had filed suit in Illinois federal court, DuPont

filed the first of two antitrust suits against Monsanto in South Carolina federal court.  *See E.I.*

*DuPont de Nemours & Co. v. Monsanto Co., et al.*, No. 4:00-952-12 (D.S.C.) ("South Carolina

Litigation").  In that case, DuPont alleged that Monsanto had monopolized or attempted to

monopolize the cotton seed market through, among other things, stacking restrictions and

exclusive dealing arrangements in Monsanto's licenses with cotton seed companies:

- "As part of its scheme to monopolize the cotton seed industry, Monsanto entered into agreements with Delta & Pine and other cotton seed producers whereby Monsanto licensed the cotton seed producers to incorporate Monsanto's glyphosate resistance trait and Bt trait into their cotton seed varieties.  In these license agreements with Delta & Pine and others, ***Monsanto imposed prohibitions against combining non-Monsanto genes which exhibit herbicide or insect resistance with any cotton seed variety that included certain licensed Monsanto traits, without Monsanto's consent***, or that required royalties to be paid to Monsanto for such 'stacking' of traits that were so high as to amount in practice to a prohibition."  (S.C. Litig. Am. Compl. at ¶ 33 (May 24, 2001), attached as Ex. 4 (emphasis added).)

- "The effect of these ***'anti-stacking' provisions*** was to preclude non-Monsanto herbicide or insect resistant gene technologies, including but not limited to those of DuPont, from obtaining a foothold in the cotton seed industry.  These anti-stacking provisions were imposed by Monsanto for the purpose and with the effect of foreclosing all competitive trait technologies so as to facilitate Monsanto's monopolization of the cotton seed industry."  *Id.* at ¶ 34 (emphasis added).

Although the case involved the cotton seed market, DuPont alleged that Monsanto's stacking

restrictions were "a consistent practice followed by Monsanto in a number of seed markets,

including corn and soybeans," and that those restrictions were "pursuant to a common scheme

and practice of seeking to monopolize seed markets for the purpose of gaining monopoly profits

in those markets."  *Id.* at ¶ 36.

8

**REDACTED**

### 4. Delaware Litigation

In June 2001, DuPont filed the second of two antitrust suits against Monsanto in Delaware federal court. *See E.I. du Pont de Nemours & Co. v. Monsanto Co., et al.,* No. 00-359-SLR (D. Del.) ("Delaware Litigation"). In that case, DuPont also alleged that Monsanto and its subsidiary, Asgrow Seed Co., had monopolized the soybean seed market through, among other things, stacking restrictions and exclusive dealing arrangements in Monsanto's licensing agreements with soybean seed companies:

- "One anticompetitive restriction that Monsanto has imposed on soybean seed producers is a ***prohibition against combining or 'stacking'*** the Roundup Ready gene with any non-Monsanto genes, without Monsanto's permission." Del. Litig. 2nd Am. Compl. at ¶ 118) (Jun. 22, 2001), attached as Ex. 5) (emphasis added).

- "***The effect of these anti-stacking restrictions is to prevent competing technologies from obtaining a foothold in the soybean seed market***. Monsanto imposed the anti-stacking restrictions on soybean seed companies for the purpose and with the effect of foreclosing all competitive trait technologies so as to facilitate Monsanto's monopolization of the soybean seed industry." *Id.* at ¶ 119 (emphasis added).

### 5. ████████████████████

The parties ████ each of these four cases (and seven others) in April 2002. As part of ████████████, they entered ████████████████████████████████████████████████████████████████████. DuPont's subsequent breach of ██████████████████ is the subject of Monsanto's claims here.

At the same time, the parties executed a ████████████████ ("████") ████████████████████. *See* ████, attached as Ex. 6. In one of its key provisions,



**REDACTED**



*Id.* ████. Under Paragraph ████████████████████████████

████████████████████████████████████████████████

███████████████████████████ discussed above:

*Id.* ██████ (emphases added).  Finally, ██████████████████

████████████████████████████.

*Id.* ██ (emphases added).  The covenant extended to ████████████

████████████████████████████ specifically enumerated in Paragraph ████

████████████████████████████████████████████████

██████████████. *Id.* ████.

10

**REDACTED**

These ████████████ provisions were broadly written. The ████ defined ████████
expansively, expressly encompassing ████████████████████████ *Id*. at
████. The ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████ *Id*. ██ (emphasis added).

Finally, the ████ prefaced the forgoing ██████████████████████
████████████████████████████████████████████████████
████████████████████████ at issue here:



*Id*. at ████. The amended Soybean and Corn License Agreements likewise stated ████████
████████████████. Compl. Exs. B & C, ████. Thus, many of Defendants' claims and
defenses here were ████████████████████████████████ that are
in dispute and are claims that Defendants specifically ████████████████.

## ARGUMENT

In *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), the U.S. Supreme Court clarified the
applicable standard for a motion to dismiss for failure to state a Sherman Act claim pursuant to
Rule 12(b)(6). Under *Twombly*, "a plaintiff's obligation to provide the 'grounds' of his
'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of
the elements of a cause of action will not do." *Id*. at 555. The complaint "must be enough to

**REDACTED**

raise a right to relief above the speculative level." *Id.*[3] The Supreme Court's rationale behind this new pleading standard was to avoid the "enormous expense of discovery" associated with an unwarranted antitrust case. *Id.* at 558 ("when the allegations in a complaint, however, true, could not raise a claim of entitlement to relief, 'this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court'") (citation omitted).[4]

In *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), the Supreme Court further clarified the proper standard for reviewing motions to dismiss, noting that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* at 1949; *see also Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 870 (8th Cir. 2002) ("[T]he court is free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations."). Thus, a trial court should begin its analysis by weeding out conclusory allegations that are not entitled to the assumption of truth and then consider whether the remaining factual allegations "plausibly suggest an entitlement to

---

[3] In deciding a Rule 12(b)(6) motion, the court generally does not look beyond the pleadings. *Enervations, Inc. v. Minn. Mining & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004). There are several exceptions, however. For example, a court may consider any documents attached to or referenced within the complaint. *Id.; see also Cohen v. United States*, 129 F.2d 733, 736 (8th Cir. 1942); *McCarty v. Dana Holding Corp.*, No. 4:08-CV-690 (CEJ), 2008 WL 4865038, at *3 (E.D. Mo. Nov. 7, 2008); *Bendson v. George Weston Bakeries Distrib. Inc.*, No. 4:08CV50 JCH, 2008 WL 4449435, at *1 n.2 (E.D. Mo. Sept. 26, 2008). Similarly, a court can take judicial notice of facts outside pleadings and consider matters such as pleadings in other cases and facts not subject to reasonable dispute. *See Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 983 (8th Cir. 2008). In any event, were the Court to consider the ▆▆▆ as a fact outside the pleadings, the Federal Rules permit the Court to convert the motion to a motion for summary judgment. *See* Fed. R. Civ. P. 12(d).

[4] In that regard, the Court noted the need for specificity: "As we indicated over 20 years ago in *Associated Gen. Contractors of Cal. Inc. v. Carpenters*, 459 U. S. 519, 528, n. 17 (1983), 'a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id.; see also Car Carriers, Inc. v. Ford Motor Co.*, 745 F. 2d 1101, 1106 (7th Cir. 1984) ("[T]he costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint"); Note, Modeling the Effect of One-Way Fee Shifting on Discovery Abuse in Private Antitrust Litigation, 78 N.Y.U. L. Rev. 1887, 1898-1899 (2003) (discussing the unusually high cost of discovery in antitrust cases); MANUAL FOR COMPLEX LITIGATION, FOURTH, § 30, p. 519 (2004) (describing the extensive scope of discovery in antitrust cases); Memorandum from Paul V. Niemeyer, Chair, Advisory Committee on Civil Rules, to Hon. Anthony J. Scirica, Chair, Committee on Rules of Practice and Procedure (May 11, 1999), 192 F.R.D. 354, 357 (2000) (reporting that discovery accounts for as much as 90% of litigation costs when actively employed).

12

**REDACTED**

relief." *Iqbal* at 1951. Defendants' antitrust counterclaims fail to meet this standard in all respects and should be dismissed.

## I.   DEFENDANTS HAVE RELEASED BY ██████████████ MANY OF THEIR CLAIMS AND DEFENSES.

Defendants allege an anticompetitive scheme by Monsanto to monopolize five alleged transgenic trait markets in corn or soybean in violation of Section 2 of the Sherman Act. Three key components of that scheme are alleged *fraud* in the procurement of Monsanto's patents, purported *sham litigation* to enforce those patents, and *stacking restrictions* that allegedly prohibit the combination of rival traits with Monsanto's technology. Defendants also claim that the alleged patent fraud constitutes inequitable conduct that makes Monsanto's patents unenforceable, and that the stacking restrictions constitute an illegal exclusive dealing arrangement in violation Section 1 of the Sherman Act.

Each of these three alleged practices occurred in the 1990s, and each was the subject of litigation filed *nearly a decade ago* by Defendants in various federal courts. In ██████ those suits, Defendants agreed – in exchange for substantial consideration – to release Monsanto from liability for any claims that existed at that time or that might arise in the future out of practices that are the same or similar to those challenged. This ██████████████ bars Defendants from asserting an inequitable conduct defense or antitrust counterclaims based on allegations of patent fraud in the prosecution of the '435 patent and sham litigation that pre-dates the ████████. Similarly, because the stacking restriction allegations here mirror those in prior cases, Defendants are barred by the prior ██████████████ from asserting them as a basis for their antitrust counterclaims. The ██████████████ further bars Defendants from asserting any claims for fraud or deceit in connection with the ████████████████████████.

13

**REDACTED**

**A.    The ▮▮▮ Is A Valid And Enforceable ▮▮▮▮ Under Delaware Law And May Be Considered On A Motion To Dismiss.**

▮▮▮▮▮▮▮▮▮▮. *See* ▮▮ at ▮▮▮, attached hereto at Ex. 6.

Under Delaware law, "[a] settlement agreement is enforceable as a contract," and courts "favor[] the voluntary settlement of contested disputes." *Loppert v. Windsortech, Inc.*, 865 A.2d 1284, 1285, 1290 n.53 (Del. Ch. 2004 ), *aff'd*, 867 A.2d 903 (Del. 2005); *see also Foster v. Hallco Mfg. Co., Inc.*, 947 F.2d 469, 477 (Fed. Cir. 1991) ("[T]he Federal Circuit has repeatedly expressed the view that there is a strong public interest in settlement of patent litigation.").

In Delaware, broad and general releases of claims are considered valid and enforceable. *Chakov v. Outboard Marine Corp.*, 429 A.2d 984 (Del. 1981). Generally, parties may expand by agreement the preclusive effect to claims not raised in the underlying suit. *See, e.g., Larkin v. Wray*, 189 F.3d 729, 733-34 n.9 (8th Cir. 1999) ("If it is clear that the parties agreed to settle claims that were not reflected in the original pleadings, preclusion may extend to claims that were not even formally presented.") (quoting 18 Charles Alan Wright *et al.*, Federal Practice and Procedure § 4443, at 386-87 (1981)); *Keith v. Aldridge*, 900 F.2d 736, 741 (4th Cir. 1980) (citing and applying same); *W.J. Perryman & Co. v. Penn Mut. Fire Ins. Co.*, 324 F.2d 791, 793 (5th Cir. 1963) ("The compromise, settlement and release are as conclusive as a judgment would have been if the claim had been litigated rather than compromised and settled. The dismissal with prejudice adds *res judicata* to the release as barring recovery by the appellant.").

This Court may consider on a motion to dismiss whether the ▮▮▮ bars any of Defendants' antitrust counterclaims or patent defenses. While such motions generally test the sufficiency of the allegations in the complaint, courts may also consider documents "necessarily *embraced* by the complaint." *Enervations, Inc. v. Minn. Mining & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004) (emphasis added). Applying this rule, courts have considered on a motion

14

**REDACTED**

to dismiss whether settlement agreements bar a plaintiff's claims. *Willis Corron Corp. of Utah v. United Capitol Ins. Co.*, No. 97-2208 MHP, 1998 WL 30069, at \*4 (N.D. Cal. Jan. 5, 1999) (granting motion to dismiss for failure to state claim due to terms of settlement agreement); *see also Wang v. Paterson*, 2008 WL 5272736, at \*4-8 (S.D.N.Y. Dec. 18, 2008) (granting motion to dismiss where claims were precluded by release in settlement agreement); *Larson v. Burlington Northern & Santa Fe Rwy. Co.*, No. Cir. 01-527 (RHKRLE), 2002 WL 47005, at \*1 (D. Minn. Jan. 10, 2002) (considering releases on Rule 12(b)(6) motion to dismiss).

Under Eighth Circuit law, the ███ is *embraced* by the SAAC. *See Missouri ex. rel Nixon v. Coeur D'Alene Tribe*, 164 F.3d 1102, 1107 (8th Cir. 1999) (holding that "[s]ome materials that . . . do not contradict the complaint may be considered by a court in deciding a Rule 12(b)(6) motion to dismiss"). Moreover, the very ██████ that form the basis of Defendants' SAAC were ████████████. *See* ███ at █ ("████████████████ ████████████████ ████████████)"; *see also* SAAC Answer at ¶¶ 9-10, 16-22, 24-25, 27, 31-37, 39-40, 42; SAAC Countercls. at ¶¶ 308, 311-359. Indeed, it is the stacking restrictions in ████████ agreements that Defendants allege are part of Monsanto's anticompetitive efforts to monopolize various alleged trait markets. *See id.* at ¶¶ 306-359, 426-431.

**B.    Defendants Have ████ All Claims And Defenses Based Upon Allegations Of Fraud Or Inequitable Conduct In Prosecuting The '435 Patent.**

Under the ███, Defendants ████████████ ████████████ ████████████ ████████████

**REDACTED**

████████████████████████████████████████████████" ████████.

Because Defendants' current antitrust counterclaims and inequitable conduct defense relate to

matters "███████████████████" in the Missouri Litigation where infringement of the '435

patent was asserted, the ████ bars Defendants from ████████████████████ now.

     The vast majority of Defendants' current patent-related antitrust counterclaims and

inequitable conduct allegations arise out of Monsanto's prosecution of the '435 patent in the

early 1990s.  The SAAC devotes 155 paragraphs and 45 pages to allegations of fraud and

inequitable conduct in the prosecution of that patent.  *See* SAAC at ¶¶ 93-247.  In addition,

Defendants' allegations concerning the '247 reissue patent are primarily recycled assertions that

Monsanto failed to disclose the alleged misconduct in prosecuting the '435 patent.  *See id.* at

¶ 295 ("The '247 Reissue Patent is invalid and unenforceable due to the fraud and inequitable

conduct that occurred during the prosecution of the '435 Patent which was perpetuated during

the prosecution of the reissue application."); *see also id.* at ¶¶ 257, 263 (asserting that in

prosecuting '247 reissue patent Monsanto failed to disclose prior misconduct and misstatements

made during prior prosecution); ¶¶ 267-280 (alleging that failure to disclose enablement

problems during '435 patent prosecution infects '247 patent); ¶¶ 283-286 (claiming that

Monsanto continued to fraudulently withhold references during '247 patent prosecution that it

withheld during '435 patent prosecution).

     Monsanto, however, already sued DuPont for infringement of the '435 patent based upon

Defendants unlicensed use of the Roundup Ready® soybean trait (unstacked with OGAT) in the

Missouri litigation.   All of the foregoing inequitable conduct allegations could have been made

in defense of the Missouri Litigation.  Thus, "Monsanto's alleged failure to disclose the various

references affecting the patentability of the '435 patent" (which issued in May of 1997) was thus

years old by the time Defendants and Monsanto ████████████████████████

16

**REDACTED**



). Soybean License Agreement at ▮, attached to Compl. Ex. B. The clear nexus between the asserted patents, the accused products and the resulting licenses show that the current challenges to validity and/or unenforceability "▮▮▮▮▮▮" and/or are "▮▮▮▮▮" claims that could have been brought in the Missouri Litigation. Such claims are now released.

Defendants' claims and defenses based on the '435 patent prosecution also "could have been alleged" in the Illinois Litigation, another case between Pioneer and Monsanto that was ▮▮▮▮▮▮▮▮. In that case, Pioneer *had specifically raised* antitrust claims based on similar allegations of patent fraud. As here, Pioneer alleged that Monsanto had obtained its biotechnology patents through fraud on the PTO and used those fraudulently obtained patents to monopolize markets for corn seed and corn seed containing an insect-resistant trait. *See* Illinois Compl. at ¶ 4 ("[T]o improperly obtain the patents discussed herein, Defendants made material misrepresentations and omissions with the intent to deceive the PTO, and actually did deceive the PTO."); and ¶ 25 ("Monsanto achieved its monopoly power in the relevant markets by exclusionary conduct including threatened and actual enforcement of patents:  (a) that were obtained by fraud; and (b) that were otherwise invalid and known by Defendants to be invalid.").

Because the alleged fraud in the procurement of the '435 patent relates to matters that ▮▮▮▮▮▮▮▮▮ in either the Missouri or the Illinois Litigations, Defendants (i) are barred from asserting those claims and defenses here, and (ii) ▮▮▮▮▮▮▮

17

**REDACTED**



## C.   Defendants Have ███████ All Sham Litigation Claims ███████████.

Defendants also assert that as part of the alleged anticompetitive scheme to monopolize

five transgenic traits markets in corn or soy, Monsanto has brought "objectively baseless

litigations in Federal court against farmers and other competitors." SAAC at ¶ 360. *First*, if, as

should be the case, Defendants' allegations of patent fraud and inequitable conduct are not

actionable by virtue of ███████, then the "sham" allegations are likewise released. Defendants

assert that the litigations are baseless *because of* the fact that Monsanto allegedly committed

fraud on the PTO and its patents must be unenforceable or invalid. The sham allegations rely on

the same fundamental facts and thus are claims "████████████████████████████,"

As such, they necessarily fall with the underlying claims for patent fraud.

*Second*, even if the sham litigation claims could be considered separable from the

underlying inequitable conduct claims, they would be separately ███████. One of the suits

Defendants identify as baseless was filed by Monsanto against Mitchell Scruggs in September

2000 – nearly a year-and-a-half before the execution of the ███. Defendants plainly could have

asserted an antitrust claim based on the Scruggs litigation before ███████. Indeed, the Illinois

Litigation involved similar allegations of sham litigation by Monsanto in the enforcement of its

biotechnology patents in corn, as Table 1 below shows:

| Table 1.  Comparison Of Sham Litigation Allegations In This And Prior Antitrust Suits | |
|---|---|
| **This Lawsuit** | **2001 Illinois Suit** |
| "Monsanto has engaged in a scheme to bring objectively baseless litigations in Federal court against farmers and other competitors for the purpose of hindering, delaying and intimidating competition with its Roundup | "This is an action for Defendants' violation of the antitrust laws of the United States, including violations of Sections 1 and 2 of the Sherman Act . . . based in part on Monsanto's . . . pursuit of *sham and objectively baseless* |

18

**REDACTED**

| Table 1.  Comparison Of Sham Litigation Allegations In This And Prior Antitrust Suits | |
| --- | --- |
| **This Lawsuit** | **2001 Illinois Suit** |
| Ready® products – all in furtherance of its scheme to unlawfully protect and extend its monopoly power."  SAAC at ¶ 360.<br><br>"Monsanto has made numerous knowingly false statements to litigants, Federal Judges and the PTO in the enforcement of the '435 Patent and '247 Reissue Patent – patents Monsanto knowingly procured by fraud." *Id.* at ¶ 361.<br><br>"Monsanto has engaged in the above-described conduct with the specific intent to maintain monopoly power and with the specific purpose of hindering farmers and other competitors' successful entry into the market for glyphosate-tolerant products without any legitimate business purpose or justifiable cause." *Id.* at 400. | *litigation* predicated on known invalid and fraudulently obtained patents."  Ill. Litig. Compl. at ¶ 1 (May 22, 2001) (emphasis added), attached as Ex. 3.<br><br>"Defendants have in bad faith filed and pursued infringement actions based upon these patents against Pioneer and other competitors knowing that these patents were invalid and unenforceable." *Id.* at ¶ 4.<br><br>"Defendant[']s motives for engaging in this campaign of pursuing sham litigation based on invalid and fraudulently obtained patents includes impeding and thwarting Pioneer's ability to innovate and bring new products to farmers in the relevant market.  Defendants want to deter Pioneer's development of alternate insect resistant technology, and compel Pioneer to continue relying on Monsanto based technology."  *Id.* at ¶ 30. |

### D.    Defendants Have ███████ All Antitrust Claims Based Upon Stacking Restrictions.

Under the █████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

███████.  Because the stacking restrictions at issue here are identical to those raised in the

South Carolina and Delaware Litigations, Defendants are barred from raising them now.

Defendants challenge three different types of stacking restrictions in the SAAC:

- Monsanto has invoked provisions in ███████████████████████ with Defendants "to block Pioneer from stacking or combining OGAT and Roundup Ready® in soybeans."  SAAC at ¶¶ 306, 308.

19

**REDACTED**

- Monsanto's license agreements with ISCs "prohibit[] the stacking of Monsanto's Roundup Ready® trait with any alternative glyphosate-tolerant trait developed by Monsanto's competitors." *Id.* at ¶ 428.

- Monsanto's subsidiary, Holden's Foundation Seeds, has included restrictive provisions in germplasm licensing agreements that "prohibit[] its licensees from introducing non-Monsanto traits into Holden's germplasm, effectively preventing ISCs from creating inbred lines of 'stacks' comprised of Holden's germplasm, a Monsanto trait, and a non-Monsanto trait," *id.* at ¶ 451.

The common element to all of these allegations is that Monsanto's licenses prohibit others from stacking Monsanto's traits with those of Defendants and other rivals.

These stacking restriction allegations, however, are ***identical*** to those Defendants made in the prior antitrust litigations between the parties, as Table 2 below makes clear:

| Table 2.  Comparison Of Stacking Allegations In This And Prior Antitrust Suits | | |
|---|---|---|
| **This Lawsuit** | **2001 South Carolina Suit** | **2001 Delaware Suit** |
| "In the latter part of 2008, Monsanto, on information and belief, issued a new ISC license agreement for Monsanto's Roundup Ready® 2 Yield soybean trait, which contains addenda amending existing corn and soybean trait licenses (the 'New License Agreement'). . . .  In addition to general stacking restrictions, ***the New License Agreement prohibits the stacking of Monsanto's Roundup Ready® trait with any alternative glyphosate-tolerant trait developed by Monsanto's competitors.***" SAAC at ¶ 427-28 (emphasis added).<br><br>"Monsanto's restrictions on ISCs' ability to stack non-Monsanto traits with Monsanto traits have | "As part of its scheme to monopolize the cotton seed industry, Monsanto entered into agreements with Delta & Pine and other cotton seed producers. . . .  In these license agreements with Delta & Pine and others, ***Monsanto imposed prohibitions against combining non-Monsanto genes which exhibit herbicide or insect resistance with any cotton seed variety that included certain licensed Monsanto traits, without Monsanto's consent. . . .***" (S.C. Litig. Am. Compl. at ¶ 33 (May 24, 2001) (emphasis added).), attached as Ex. 4.<br><br>"The effect of these '***anti-stacking' provisions*** was to preclude non-Monsanto herbicide or insect resistant gene technologies, including | "One anticompetitive restriction that Monsanto has imposed on soybean seed producers is a ***prohibition against combining or 'stacking'*** the Roundup Ready gene with any non-Monsanto genes, without Monsanto's permission." Del. Litig. 2nd Am. Compl. at ¶ 118) (Jun. 22, 2001), attached as Ex. 5) (emphasis added).<br><br>"***The effect of these anti-stacking restrictions is to prevent competing technologies from obtaining a foothold in the soybean seed market.*** Monsanto imposed the anti-stacking restrictions on soybean seed companies for the purpose and with the effect of foreclosing all competitive trait technologies so as to facilitate Monsanto's |

**REDACTED**

| Table 2.  Comparison Of Stacking Allegations In This And Prior Antitrust Suits | | |
|---|---|---|
| **This Lawsuit** | **2001 South Carolina Suit** | **2001 Delaware Suit** |
| foreclosed a substantial part of the relevant markets to competing trait developers, including Pioneer." *Id.* at ¶ 431. | but not limited to those of DuPont, from obtaining a foothold in the cotton seed industry.  These anti-stacking provisions were imposed by Monsanto for the purpose and with the effect of foreclosing all competitive trait technologies so as to facilitate Monsanto's monopolization of the cotton seed industry." *Id.* at ¶ 34 (emphasis added). | monopolization of the soybean seed industry." *Id.* at ¶ 119. |

Not only are the stacking allegations identical, but so is the way in which Defendants claim those stacking restrictions violate the antitrust laws.  In Count VI, Defendants assert that these provisions in ISC licenses constitute exclusive dealing arrangements.  *See* SAAC at ¶ 530 ("Monsanto has licensed traits to and entered into restrictive licensing agreements with ISCs on the condition that ISCs not deal in the traits of rival trait developers.").  In the Delaware litigation, Defendants also claimed that these provisions were exclusive dealing arrangements, alleging that "Monsanto has used a variety of other illegal means to monopolize the soybean seed and soybean herbicide markets, including, *inter alia*, the imposition of . . . exclusive dealing arrangements on seed producers and dealers, herbicide dealers and distributors, and growers."  Del. 2nd. Am. Compl. at ¶ 124, attached as Exhibit 5.

Having voluntarily entered into a ████████████████, Defendants cannot now file a second lawsuit raising the very same allegations predicated on the very same conduct.

21

**REDACTED**

E.   **Defendants Have ████ All Contract Claims and Defenses Based Upon Monsanto's Alleged Fraud Or Deceit In Connection With The Formation of the License Agreements**

Desperate for a defense following the Court's ruling that the License Agreements contain an express field of use restriction that do not authorize stacking glyphosate-tolerant traits, Defendants devote the bulk of their amended contract counterclaims and defenses to arguments that Monsanto defrauded and deceived Defendants in the formation of those agreements. For example, Defendants' Ninth Additional Defense asks the Court for "reformation for mutual mistake, unilateral mistake and knowing silence or fraud as to the legal meaning of the terms of restrictions or obligations." Defendants' Twelfth Additional Defense asks the Court to bar each of Monsanto's breach of contract causes of action "because of Monsanto's fraud by way of misrepresentations, acts, and omissions as to the legal effect of essential terms of Soybean and Corn License Agreements." In addition, Defendants' counterclaims include four counts in which they seek reformation (Counts XI, XIII-XV) based on Monsanto's alleged fraud or deceit. All of these claims and defenses are based on a litany of allegations that involve fraud and deceit. *See, e.g.*, SAAC ¶¶ 337-342, 354, 357.[5] Indeed, during the hearing on Monsanto's Motion for Judgment on the Pleadings, counsel for Defendants argued that Monsanto had defrauded and/or deceived when Monsanto "slipped [the anti-stacking restriction] in" the final agreement. *See* MJOP Tr. at p. 45.

These exact claims, however, have already been waived by Defendants. Under ████████ of the ████, Defendants expressly ████████████████████████

████████████████████████████████████████████████

---

[5] While Counterclaim Count XIII is technically a claim for mutual mistake, the entirety of the underlying facts involve allegations of fraud and/or deceit rather than mistake by Monsanto. Indeed, as Monsanto successfully argued to the Court, the License Agreements do, in fact, contain a field-of-use restriction, which is precisely Monsanto's position. As such, there was no mistake by Monsanto. It intended and negotiated for exactly what this Court found—a field-of-use restriction that does not authorize glyphosate-tolerant trait stacks.

22

**REDACTED**

██████████████████████████████████   As noted above, under Delaware law,

broad and general releases of claims are considered valid and enforceable. More specifically,

contract clauses that waive fraud claims are also enforceable under Delaware law.

In *MBIA Insurance Corp. v. Royal Indemnity Co.*, the Third Circuit affirmed the

Delaware federal district court's holding that contract disclaimers for fraud are enforceable under

Delaware law. 426 F.3d 204 (3d Cir. 2005) (Alito, J.). Noting that the Delaware Supreme Court

had not addressed the standards for effective waiver of a defense based on fraud in the

inducement, the appellate court agreed with the district court's prediction that the Delaware

Supreme Court would enforce an unambiguous waiver negotiated by sophisticated parties. *Id.* at

214. The court ultimately affirmed summary judgment on the issue, concluding that when

sophisticated parties include a broad but unambiguous fraud waiver provision in their agreement,

"the Delaware Supreme Court will likely indulge the assumption that they said what they meant

and meant what they said." *Id.* at 218.

Here, Defendants, who are undeniably sophisticated parties, clearly and unequivocally

████████████████████████████████████████████████████

████████—the very claims now permeating their contract counterclaims and affirmative

defenses here. Indeed, Defendants' Ninth and Twelfth Affirmative Defenses and Counterclaim

Counts XI and XIII-XV are all premised on allegations of fraud, deceit, and misrepresentations

which Defendants argue require reformation and/or that Monsanto's breach of contract causes of

actions be barred. Defendants' reformation claims must be barred as a matter of law due to

Defendants' express waiver of such claims.

Defendants' contract counterclaims and defenses are precisely the type of claims that the

sophisticated parties, following extensive negotiations, sought to eliminate entirely.

23

**REDACTED**

Accordingly, pursuant to the express language of ▉▉▉▉, Defendants' Ninth and Twelfth

Affirmative Defenses and Counterclaim Counts XIII-XV must be dismissed.[6]

## II.    THE STATUTE OF LIMITATIONS BARS DEFENDANTS' CLAIMS BASED ON STACKING RESTRICTIONS IN THEIR LICENSE AGREEMENTS.

Even apart from the contractual release, Defendants' antitrust counterclaims based on

stacking restrictions in their licensing agreement with Monsanto accrued well outside of the four-

year statute of limitations period for private antitrust actions provided for under the Clayton Act,

15 U.S.C. § 15b.  An antitrust action accrues when the defendant commits an act that injures the

plaintiff's business or property.  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321

(1971).  It is black letter law that an initial refusal to deal triggers the limitations period.

*Midwestern Mach. Co. Inc. v. Northwest Airlines, Inc.*, 392 F.3d 265, 270 (8th Cir. 2004) ("[T]he

statute of limitations begins to run from the initial violation . . . , such as a refusal to deal . . . .")

(internal sources omitted)).  *Accord Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods,

Inc.*, 824 F.2d 582, 588 (8th Cir. 1987); *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d

705, 715 (11th Cir. 1984); *Barnosky Oils, Inc. v. Union Oil Co. of Cal.*, 665 F.2d 74, 81-82 (6th

Cir. 1981); *David Orgell, Inc. v. Geary's Stores, Inc.*, 640 F.2d 936, 937-38 (9th Cir. 1981).

Here, Defendants' claims are, in essence, that Monsanto refuses to deal with Pioneer in

its efforts to stack traits with Monsanto's Roundup Ready® trait in the corn and soybean markets.

*See* SAAC at ¶ 307 ("Monsanto seeks to restrict Pioneer from combining Monsanto's Roundup

Ready® trait with other genetically-modified traits or genes conferring glyphosate tolerance,

including the OGAT gene").[7]  Indeed, Defendants allege that Monsanto uses its patent "license

---

[6] For the same reasons, the portion of Defendants' Counterclaim Count Eleven which alternatively asks for reformation of the License Agreements must also be dismissed.  *See* SAAC ¶ 558.

[7] Monsanto does not concede that there has been any refusal to deal.  In fact, Monsanto has offered to permit Defendants the right to stack OGAT and Roundup Ready® based on commercially reasonable terms.  For the purpose of this instant motion to dismiss, however, Monsanto must take the allegations of a refusal at face value.

**REDACTED**

agreements" with Pioneer to "block" Pioneer from stacking.  *Id.* at ¶ 306 ("Monsanto invoked an invalid and unenforceable patent and purported licensing restrictions based on that patent to block Pioneer from stacking or combining OGAT and Roundup Ready® in soybeans.").  A patentee, however, may refuse to sell or license its property, and courts construe allegations based on such acts as claims relating to refusals to deal.  *See In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1327 (Fed. Cir. 2000).  Because Monsanto's 2002 refusal to allow Pioneer to stack the Roundup Ready® trait triggered the four-year statute of limitations, their claims are time barred in 2009, more than seven years later.  *Barnosky Oils, Inc. v. Union Oil Co. of Cal.*, 665 F.2d 74, 81-82 (6th Cir. 1981).

That Monsanto is enforcing the stacking restrictions now does not make Defendants' claim timely.  Where, as here, antitrust claims derive from an agreement between the parties and the "complaining party was fully aware of the terms of an agreement when it entered into the agreement, an injury occurs only when the agreement is initially imposed[.]"  *Varner v. Peterson Farms*, 371 F.3d 1011, 1020 (8th Cir. 2004).  In *Varner*, the court dismissed the plaintiff's Sherman Act § 2 claims brought in 2002 but based on the defendant's allegedly anticompetitive 1996 "tying" contracts, because the plaintiff's first and only injury occurred at the time of contracting.  *See id.* at 1018-19.  Because subsequent enforcement of the contracts was not a new injury, the plaintiff's claims were held to be time barred.  *Id.* at 1020; *see also Barnosky Oils*, 665 F.2d at 81-82 (Section 1 claims); *Southeast Mo. Hosp. v. C.R. Bard*, No. 1:07-CV-0031 TCM, 2008 WL 4104534, at *3-4 (E.D. Mo. Aug. 27, 2008) (Section 1 and Section 2 claims).

Nor can Defendants seek refuge in a continuing antitrust violation doctrine.  Invoking that doctrine requires allegations of some injurious act during the limitations period, and "not merely the abatable but unabated inertial consequences of some pre-limitations action."  *United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exchange*, 892 F. Supp. 890, 912 (W.D. Tex. 1995).

**REDACTED**

Monsanto's recent enforcement of the terms of the 2002 license agreements does not create a new injury, but rather is merely the inevitable consequence of the unambiguous terms in those agreements. *See Varner*, 371 F.3d at 1020. Accordingly, the Court should dismiss as untimely Defendants' antitrust counterclaims to the extent they are predicated on allegations that stacking restrictions in Defendants' license agreement with Monsanto constitute exclusionary conduct. *See Guy v. Swift & Co.*, 612 F.2d 383, 385 (8th Cir. 1980) (dismissal appropriate when complaint establishes that claims are time barred).

**III.    DEFENDANTS' NEW THEORY CONCERNING BARRIERS TO EXPORT APPROVAL FOR GENERIC ROUNDUP READY® CANNOT SUPPORT A SECTION 2 CLAIM.**

Defendant's newest antitrust theory is that "Monsanto is exploiting [regulatory and registration] barriers to impede competition." SAAC at ¶ 467. Defendants' allegations are based on a false premise: that, as a patent holder, Monsanto has an obligation to take affirmative steps to enable generic competition.

Defendants assert that Monsanto must allow competitors to begin the process of obtaining independent regulatory approval of generic versions of Roundup Ready® ***prior to patent expiry*** "to ensure Roundup Ready® is in fact 'publicly available' on patent expiration." *Id.* at ¶ 479. According to Defendants, "seed companies must be enabled to (i) use or reference Monsanto's existing Roundup Ready® regulatory data packages to support their own registrations of [generic Roundup Ready] products . . . , and (ii) use Roundup Ready® to generate any new regulatory data that may be required to support global registrations for these new products." *Id.* at ¶ 478. Defendants also complain that "Monsanto has refused to provide assurances that it would not assert patent infringement or breach of license claims against companies that do begin the approval process prior to patent expiration or license termination." *Id.* at ¶ 473.

26

**REDACTED**

An agreement not to sue for infringement, however, is the very essence of a patent license. *See Spindelfabrik Suessen-Schurr Stahlecker & Grill Gmbh v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 829 F.2d 1075, 1081 (Fed. Cir. 1987) ("a patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee"). Thus, Defendants' allegations are nothing more than a dressed up refusal to license claim – *i.e.*, that Monsanto has refused to license competitors to use its patent rights during the life of the patent for the purposes of preparing to commercialize a generic version of Roundup Ready as soon as the patent expires. Yet, a patent holder may generally license or refuse to license all or part of his patent rights without inviting antitrust scrutiny. *See, e.g., Gen. Talking Pictures v. Western Elec.*, 305 U.S. 124 (1938); *In re ISO*, 203 F.3d 1322.

Monsanto's refusal to permit competitors to infringe its patents for the purpose of obtaining regulatory approval prior to patent expiration is not unlawful. Neither is Monsanto's decision to license those patents in such a way that prevents licensees from using or referencing Monsanto's patented technology to obtain regulatory approval of a generic product during the term of its patents without Monsanto's approval. Such conduct does not violate the antitrust laws. Rather, it is part of the patent monopoly granted to a patent holder. As such, reasonable license restrictions within a patent grant, such as the license restrictions here, are universally recognized as valid field of use restrictions. *See B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1426 (Fed. Cir. 1997), *aff'd* 23 F.3d 1373 (Fed. Cir. 1999); *United States v. Studiengesellschaft Kohle, m.b.H*, 670 F.2d 1122, 1136 (D.C. Cir. 1981); *see also Pacific Bell Tel. Co. v. Linkline Commc'ns Co.*, 129 S. Ct 1109, 1118 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing.").

27

**REDACTED**

Indeed, neither Defendants nor anyone else has a right "to ensure Roundup Ready is . . . 'publicly available' on patent expiration." SAAC at ¶ 479. This is function of the patent laws and the timing of the regulatory process, not any alleged illegal conduct by Monsanto. A patent grants its owner the exclusive right to make, use, or license (or not) the rights therein for the entire term of the patent. Nothing compels a patent holder to give up a portion of his patent term (through licenses or otherwise) so that generic competition is available upon patent expiry.

Similarly, Defendants' allegations that Monsanto should be required to maintain regulatory approval for five years after patent expiration – not the three years Monsanto has announced[8] – fare no better as a basis for antitrust liability. As the Supreme Court held in *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, a firm generally has no duty to assist its competitors, which is precisely the obligation Defendants seek to impose on Monsanto here. *See* 540 U.S. 398, 410 (2004) ("Verizon's alleged insufficient assistance in the provision of service to rivals is not a recognized antitrust claim under this Court's existing refusal-to-deal precedents."); *see also Int'l Bus. Mach. Corp. v. Platform Solutions, Inc.*, 658 F. Supp. 2d 603, 614 (S.D.N.Y. 2009) (analyzing refusal to deal claim under *Trinko* and holding that IBM was "not required to support and maintain its [prior generation] technology").

Defendants' new "export approval" theory is nothing more than an attempt to impose either a compulsory licensing obligation on Monsanto or a duty to assist competitors. Neither theory supports a viable antitrust claim. Accordingly, the Court should dismiss Defendants' Counterclaims to the extent they are based on the "export approval" theory.

---

[8] Although not relevant for the purpose of this motion, Monsanto has since announced publicly that it will maintain regulatory approvals through 2021.

**REDACTED**

## CONCLUSION

For the foregoing reasons, the Court should dismiss Defendants' Count X and strike their inequitable conduct defense to the extent either are based on alleged misconduct in the prosecution of the '435 patent.  The Court should also dismiss Defendants' antitrust counterclaims to the extent they are based on allegations of (a) patent fraud in the prosecution of the '435 patent; (b) sham litigation pre-dating ███████; (c) stacking restrictions in Monsanto's licensing agreements, including Count VI, which is based entirely on those stacking restrictions; and (d) Defendants' new "export approval" theory.  Finally, the Court should dismiss Defendants' Counterclaims XIII-XV, partially dismiss Defendants' Counterclaim XI, and strike Defendants' reformation and fraud affirmative defenses because all are premised on allegations of fraud and deceit that were expressly waived by Defendants in ███████.

Dated:  September 10, 2010                          Respectfully submitted,

                                                    HUSCH BLACKWELL LLP


                                                    By:  /s/ Joseph P. Conran                   .
                                                    Joseph P. Conran, E.D.Mo. # 6455
                                                    joe.conran@huschblackwell.com
                                                    Omri E. Praiss, E.D.Mo. # 35002
                                                    omri.praiss@huschblackwell.com
                                                    Greg G. Gutzler, E.D.Mo. # 84923
                                                    greg.gutzler@huschblackwell.com
                                                    Tamara M. Spicer, E.D.Mo. # 122214
                                                    tamara.spicer@huschblackwell.com
                                                    Steven M. Berezney, E.D.Mo. # 499707
                                                    steve.berezney@huschblackwell.com
                                                    190 Carondelet Plaza, Suite 600
                                                    St. Louis, MO  63105
                                                    (314) 480-1500 – telephone
                                                    (314) 480-1505 – facsimile

**REDACTED**

WINSTON & STRAWN LLP
Dan K. Webb
dwebb@winston.com
George C. Lombardi
glombardi@winston.com
Todd J. Ehlman
tehlman@winston.com
James M. Hilmert
jhilmert@winston.com
35 W. Wacker Drive, Suite 4200
Chicago, IL  60601
(312) 558-5600 – telephone
(312) 558-5700 – facsimile

John J. Rosenthal
jrosenthal@winston.com
Matthew A. Campbell
macampbell@winston.com
Jovial Wong
jwong@winston.com
1700 K Street, N.W.
Washington, DC  20006
(202) 282-5000 – telephone
(202) 282-5100 – facsimile

Gail J. Standish
gstandish@winston.com
333 South Grand Avenue
Los Angeles, CA 90071-1543
(213) 615-1700 -- telephone
(213) 615-1750 – facsimile

MCDERMOTT WILL & EMERY
Steven G. Spears
sspears@mwe.com
Scott W. Clark
sclark@mwe.com
1000 Louisiana Street, Suite 3900
Houston, TX  77002-5005
(713) 653-1700 -- telephone
(713) 739-7592 – facsimile

30

**REDACTED**

COVINGTON & BURLING LLP
Kurt G. Calia
kcalia@cov.com
1201 Pennsylvania Avenue, NW
Washington, DC  20004-2401
(202) 662-6000 – telephone
(202 662-6291 – facsimile

ARNOLD & PORTER LLP
Anthony J. Franze
anthony.franze@aporter.com
555 Twelfth Street, N.W.
Washington, DC  20004
(202) 942-5000 – telephone
(202) 942-5999 – facsimile

*Attorneys for Plaintiff Monsanto Company and
Monsanto Technology LLC*

**REDACTED**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 14th day of September, 2010, the foregoing was filed electronically with the Clerk of the Court for the United States District Court for the Eastern District of Missouri, Eastern Division, and was served by operation of that Court's electronic filing system, upon the following:

Andrew Rothschild, Esq.
C. David Goerisch, Esq.
Lewis, Rice & Fingersh, L.C.
600 Washington, Suite 2500
St. Louis, MO 63101

Leora Ben-Ami, Esq.
Thomas F. Fleming, Esq.
Christopher T. Jagoe, Esq.
Howard S. Suh, Esq.
Jeanna Wacker, Esq.
Kaye Scholer LLP
425 Park Avenue
New York, NY  10022

Donald L. Flexner, Esq.
Hershel Wancjer, Esq.
Cynthia Christian, Esq.
Robert M. Cooper, Esq.
Boies, Schiller & Flexner LLP
575 Lexington Avenue, 7th Fl.
New York, NY  10022

James P. Denvir, Esq.
Amy J. Mauser, Esq.
Boies, Schiller & Flexner LLP
5301 Wisconsin Avenue, N.W.
Washington, D.C.  20015

*Attorneys for Defendants*

/s/ Joseph P. Conran

32

**REDACTED**