UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MONSANTO COMPANY and | ) | |
| MONSANTO TECHNOLOGY LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:09CV00686 ERW |
| | ) | |
| E.I. DUPONT DE NEMOURS AND | ) | |
| COMPANY and PIONEER HI-BRED | ) | |
| INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendants E.I. DuPont de Nemours and

Company and Pioneer Hi-Bred International, Inc.'s (collectively, "Defendants") Second Motion

to Compel [doc. #493]. The Court began hearing arguments on the Motion from counsel at a

telephone hearing on January 24, 2011, and continued the hearing to January 26, 2011. At the

conclusion of that Hearing, Ms. Ben-Ami for Defendants suggested that before the Court ruled

the Motion, the parties should provide further briefing regarding the interpretation of the parties'

stipulation related to parameters of the scope of production of documents. The Court agreed to

allow further briefing from the parties and scheduled a subsequent in-court hearing on February

11, 2011, where further arguments were offered.

## I.    BACKGROUND

It is undisputed that the parties took seven months to reach an agreement concerning the

identities of custodians whose records would be the subject of searches, with expected subsequent production of physical documents and electronically stored information, after identification of agreed or ordered search terms were available. While the parties have produced hundreds of thousands of documents, there is a present disagreement as to the obligation of Plaintiffs, Monsanto Company and Monsanto Technology LLC (collectively, "Monsanto"), to produce additional documents. In their Motion, Defendants ask the Court to order Monsanto to produce documents responsive to the following twelve topics:

(1) the kinetics of EPSPS enzymes, such as the so-called Class I and Class II EPSPS enzymes and the relationship of kinetics to glyphosate tolerance in plants;

(2) the use of antibodies to detect and/or distinguish Class I and Class II EPSPS enzymes;

(3) the use of nucleic acid probes to detect and/or distinguish Class I and Class II EPSPS enzymes;

(4) the creation and development of Roundup Ready® corn event GA21;

(5) the use, identification, characterization, and isolation of Agrobacterium strain CP4 bacteria, PG2982 bacteria, LBAA bacteria, B. subtilis bacteria, Staphylococcus aureus bacteria, and other bacteria from the Luling, Louisiana glyphosate production facility;

(6) the cloning, synthesis, and use in plants of DNA sequences that encode an EPSPS enzyme having SEQ ID NO:3, SEQ ID NO:5, SEQ ID NO:7, SEQ ID NO:41, SEQ ID NO:42 and the DNA sequence of SEQ ID NO:9;

(7) technology to transform a plant nucleus with DNA that encodes CP4 EPSPS and select cells and/or regenerate plants so transformed;

(8) technology to transform a plant plastid with DNA that encodes CP4 EPSPS and select cells and/or regenerate plants so transformed;

(9) the research and development of the first commercializable glyphosate-tolerant plant of each type in claim 148 and col. 33 lines 48-61 of the '247 Patent, and of any plant type Monsanto attempted to make glyphosate tolerant but did not

commercialize;

(10) the crop yield of glyphosate-treated plants containing a CP4 EPSPS enzyme and any comparison to transgenic or non-transgenic plants containing a different EPSPS enzyme;

(11) the characterization, analysis, and selection of events 40-3-2, NK603, GA21, 89788, and Roundup Ready® Events, and the decision to commercialize those events; and

(12) the negotiations, drafts, course of dealing, and internal analyses related to the key agreements.

Defendants argue that these discovery requests are targeted at matters relevant to the claims and defenses at issue in this case – that is, that they fall within the scope of discovery set forth in Federal Rule of Civil Procedure 26(b). Monsanto argues that the parties took seven months to fashion a stipulation to limit discovery for the benefit of all parties under Fed. R. Civ. P. 29(b), which allows parties to stipulate that "other procedures governing or limiting discovery be modified . . . ." The parties' dispute focuses on whether Monsanto has already met its document production obligations – irrespective of the relevance of these categories of documents – under the terms of the parties' Stipulation and Agreement for Preservation and Production of Documents and Electronically Stored Information ("the ESI Stipulation" or "the Stipulation").

Specifically, the parties dispute the meaning of paragraph 7 of the Stipulation, which provides as follows:

The parties have agreed to a custodian protocol for the production of hard copy documents not located in central files or archives and ESI not located on central servers or in databases. Further, the parties each agree that they will make appropriate inquiries of all such custodians to identify potentially relevant documents or ESI of such custodians, or located in central files, archives or shared servers, and will conduct reasonable searches of any potentially relevant documents or ESI identified by such custodians.

Defendants assert that this provision means that Monsanto is required to first interview identified custodians, determine the location of potentially responsive documents, learn their laboratory technicians, associates, and interns who worked on projects with them, ask them about all central files, archives, and shared servers which they used or accessed in the ordinary course of their work that might contain documents, and then search all such shared data locations for responsive documents, using the search terms for electronic discovery previously approved by the Court. Monsanto argues that it satisfied its obligations by interviewing its custodians about shared data locations where they personally stored their work and then retrieving the custodian's documents from such shared locations and culling potentially relevant documents through application of the search terms.

The Court finds it necessary to review, word for word, statements of respective counsel in the three days of arguments, and recite in an order that is burdened with unusual length, specific language to show how the Court reached its decisions in interpreting, not only the meaning of paragraph 7, but what the parties intended in their seven months of negotiations in arriving at an agreement for searching for and production of documents, and how each party responded in production of documents and how Defendants have changed their position concerning requirements for document production. First, however, it is clear, that the furor over searching and production of documents between the parties became an issue after Defendants deposed Dr. Barry, and learned that Monsanto had not interviewed him about the location of his documents. Monsanto's response, that he is a former employee, and they satisfied their obligation with all current employees, is an inadequate and unsupportable excuse. Dr. Barry is apparently still paid $1,000.00 daily by Monsanto and is undeniably one of the most significant witnesses in this case.

Any relief to be afforded because of this behavior will be measured under the totality of the conclusions reached in this opinion.

The Third Amended Case Management Order - Patent, is dated November 8, 2010. It provides that "[t]he parties shall complete all discovery in this case no later than February 7, 2011." The parties are obligated to disclose expert witnesses and provide reports no later than March 2, 2011, to have expert witnesses available for deposition no later than April 22, 2011, to file dispositive motions no later than May 6, 2011, and to appear for jury trial on October 6, 2011.

Before any substantial change in the Third Amended Case Management Order will be considered, the Court will first examine the behavior of the respective parties to determine whether this motion to compel is the result of a novation by Defendants, after non-expert discovery is closed, or whether Monsanto's reading of the stipulation has resulted in production of documents to Defendants' substantial prejudice, and accordingly, a new order for production of documents is indicated and yet another case management order should be imposed.

Grasping a full understanding of the meaning of the Stipulation is challenging even after many readings. It is the second sentence of paragraph 7 that requires construction diagraming in attempting to understand what ", or" adds to or detracts from the meaning of the sentence. Defendants' position is that the word "or" was inserted by Defendants and embraced by Monsanto, whose counsel states that the word was simply added as a "word choice." Addition of the word "or" makes for an awkward and disjointed reading:

> **Further, the parties each agree that they will make appropriate inquiries of all such custodians to identify potentially relevant documents or ESI of such custodians, <u>or</u> located in central files, archives or shared servers, and will conduct reasonable searches of any potentially relevant documents or ESI identified by such custodians**. (emphasis supplied).

Tracing the manner in which discovery has been conducted is informative in determining the real intention of the parties as the Court tries to interpret the parties' Stipulation. It was Monsanto that first sought discovery beyond the custodian protocol. In a July, 2010 letter, although several attempts have been made by Defendants to minimize the impact of it, Defendants' counsel declined Monsanto's request for collection and production of a broad category of non-custodial documents, stating:

> We are not, however, amenable to Monsanto's new and late suggestion that the parties engage in an additional wholesale review for documents unbounded by the custodian and search-term limitations the parties have agreed to after spending seven months in negotiations. Monsanto's proposal that DuPont and Pioneer engage in an unlimited search for all "documents related to" or "documents regarding" several categories of documents is unacceptable on numerous grounds. First, the proposal re-opens the parties' agreement regarding the appropriate scope and limitations on document discovery. Second, it is not consistent with the scope of document preservation Monsanto has requested the Court to impose. Third, it is contrary to Monsanto's representations to the Court that it is concerned about needlessly expanding the scope of discovery and imposing undue burdens on the parties. Finally, it would require the parties to undertake an entirely new and potentially limitless document collection effort at the very point when the parties should be wrapping up collection and endeavoring to meet the Court's document production deadline.

Now, Defendants are requesting, in seeking twelve categories of documents, two things, documents they believe Monsanto has not produced, with very convincing arguments, and independent document production, separate and apart from the agreed custodian protocol. The Court concludes that Monsanto has failed to comply with the custodian protocol in several regards, and will likely, in one form or another, order further production by Monsanto.

At the Hearings on January 24 and 26, the Court heard from both parties to determine whether Defendants are entitled to relief under their Second Motion to Compel, or whether Monsanto has, as claimed, fully complied with the custodian protocol and the orders of the Court.

On January 24, 2011, the Court announced that the procedure to be observed was to go over the twelve categories of documents Defendants were requesting in the Second Motion to Compel, first hearing from Monsanto. For purposes of clarity, the parties need to understand that from this point in this opinion, the Court shall be making reference to three transcripts, perhaps in the same paragraph, intending to categorize information most helpful to the Court in ultimately deciding how to rule the pending Motion. Before discussing the twelve categories of document production, the Court will consider arguments concerning interpretation of the custodian protocol.

At the January 24, 2011 hearing, Mr. Jagoe, speaking for Defendants, stated that Defendants were not asking to abandon the protocol, then referred to another stipulation which states, "[t]he parties shall be required to collect and produce documents in ESI only from materials relevant to the claims or defenses in this case that are maintained, used, or identified by an agreed-upon custodian." He argues that Defendants ask for documents relevant to "this claim, the defenses in this case and documents that would be identified by one or more of the 50 custodians." He believes that the reason documents have not been produced is because the original custodians "may not have been asked the right questions to identify the relevant documents." (Hearing Tr. Vol.I 1-24-11 P.11 L.4-25).

At the January 24, 2011 hearing, Defendants' arguments repeatedly made reference to three of Monsanto's disclosed custodians, prominent among those being Dr. Barry. Mr. Jagoe observed that had he been interviewed, he would have identified not only his notebooks, but additionally, those of one of his laboratory technicians, Marcia Weldon, whose notebooks would also have been produced. He does not identify specific language in any stipulation that would

require production of materials of an associate of a custodian. Mr. Jagoe next mentions the name of Dr. Hallas, another of the 50 custodians who only recently produced his notebooks. Mr. Jagoe again confirms that Defendants are not trying to throw away the agreed upon protocol, but believe it is not being executed because Defendants are getting "limited production, scatter shot production, and late production . . . and that's the reason the Motion to Compel was - - was necessary." (Hearing Tr. Vol.I 1-24-11 P.13 L.3-12). The Court agrees with the conclusions, in regards to late production, that Monsanto has been late in making production of documents. Mr. Jagoe believes that all twelve categories of documents Defendants request are "identifiable to the 50 custodians" and those custodians know the location of those documents at Monsanto. (Hearing Tr. Vol.I 1-24-11 P.20 L.19). Mr. Jagoe was very clear that Defendants want not only the custodian's notebooks, but in addition, "[w]e didn't just want Dr. Felony's[1] field books but anybody who was working with him. Otherwise, how would we have known, you know, who the -- who the assistants were and who the other people were working on the project." (Hearing Tr. Vol.I 1-24-11 P.21 L.16-19). The Court specifically asked, "before I hear from Monsanto, what you are expecting Monsanto to honestly tell me is that you are not requesting anything from noncustodians, that you are only requesting information that custodians have, that have been identified, but are not producing." Mr. Jagoe responded, "I think yes, with a small qualification because I think it may be where the - - where the problem lies is that it doesn't have to be from a custodian or in possession of a custodian." (Hearing Tr. Vol.I 1-24-11 P.22 L.2-19).

Monsanto is correct in its conclusions that Defendants' interpretation of the custodian

---

[1]After reading the parties briefs, and after talking to the court reporter, this was an error, and the name of the individual should be reported as "Delannay."

protocol has changed from time to time, and Monsanto's interpretation has always remained the same. Throughout the early arguments on January 24th and 26th, Defendants' counsel did not speak with one voice concerning the interpretation of the custodian protocol. There were arguments that when the 50 custodians were interviewed, there was an obligation of Party counsel to not only identify the custodian, but to identify laboratory assistants, associates and even interns to see where they might store relevant documents.

Mr. Lombardi spoke for Monsanto in response to Mr. Jagoe's argument. His view is that there was no meet and confer on Defendants' Motion to Compel. Irrespective of the conclusion as to the party having the more persuasive argument, the Court proceeded to hear arguments on Defendants' Motion to Compel. Mr. Lombardi emphasized that Defendants do not seek that for which the protocol provides, because,

> [t]hey ask for all documents related to something, whatever the topic might be. Our obligation under the protocol is to go to the 50 custodians and do the searches we were supposed to do relevant -- in the relevant databases, the relevant document sources, for what responds -- what terms -- what responses are generated by the -- by the terms that were agreed on and set by the Court. That -- does not mean that you end up producing all documents relevant to a particular point. And it is certainly possible that there will be documents from non-custodians that could fall within one of these very broad statements that defendants make that say they are entitled to that [which] wouldn't be produced because it doesn't fall within the protocol.

He follows with a statement that both sides have relied on the protocol and that DuPont has refused to produce documents because they say it would require going outside the protocol. (Hearing Tr. Vol.I 1-24-11 P.28 L.24-P.30 L.21). Mr. Lombardi argues that under the terms of the parties' agreement, each side is allowed to identify five additional custodians, above the 50, and Defendants have not identified an additional five custodians through which Monsanto would

have an obligation to conduct further searches. (Hearing Tr. Vol.I 1-24-11 P.29 L.22-P.30 L.4).

As to the argument that Monsanto failed to interview named custodians, he observed that there was no requirement to interview custodians that are no longer employees of Monsanto, but that Monsanto knew where their documents were located at Monsanto and "definitely agreed to go through their documents and make the proper production." (Hearing Tr. Vol.I 1-24-11 P.31 L.15-21). He said some of the former employees were interviewed and documents were produced, including Maude Hinchee. The Court disagrees that Monsanto had no duty to interview former employees, and the failure to do so, under Monsanto's interpretation, has caused many problems in the orderly discovery process and management of this case.

Mr. Lombardi continued, "[n]ow they're coming back and asking us to make additional subject matter searches without limitation all over the company. If the question is, have we done it for these custodians? The answer is, yes, we have." He stated that Monsanto has produced 2.3 million pages of documents in the course of this discovery. (Hearing Tr. Vol.I 1-24-11 P.32 L.14-P.33 L.1).

Mr. Fleming then spoke for Defendants on the protocol. He referenced paragraph 7 of Exhibit S, noting that Mr. Lombardi only referenced the first part of the paragraph. He called to the Court's attention the language which reads, "or, located in central files or caused or share servers and will conduct reasonable searches of any potentially relevant documents or ESI identified by such custodians."[2] Mr. Fleming's interpretation of the second part of paragraph 7 is

---

[2]It appears that there was likely an error in the record. The actual language in the referenced paragraph is "Further, the parties each agree that they will make appropriate inquiries of all such custodians to identify potentially relevant documents or ESI of such custodians, or located in central files, archives or shared servers, and will conduct reasonable searches of any potentially relevant documents or ESI identified by such custodians."

"what it says is you talked to the custodians, your honor, and you asked them, what do you have, or, where in the central files of the company would you go to get these relevant materials.  That was the purpose of - - of the exercise.  And that's what the protocol was."  He went on to say, "[n]ow, when we say without opening it up wholesale, we're not just - - we're not saying if it's somewhere in the bowels of the documents that nobody knew about just because somebody asked for it to be produced, when we say we're not opening things up wholesale, that's what we're talking about."  (Hearing Tr. Vol.I 1-24-11 P.41 L.10-P.42 L.5; L.12-23).

Mr. Jagoe complains that Monsanto is not complying with production or is late in complying.  He mentions that Defendants asked for Marcia Weldon's notebooks at the meet and confer, and Monsanto lawyers produced two or three.  However, those produced "were not in relevant dates, so we put it back into the motion to compel.  And that's why I think we need, your honor, an order from the court saying what has to be produced."  However, apparently, Ms. Weldon is not a custodian, and Monsanto agreed to make production beyond the protocol.  Any such agreed production should be complete, and not on the basis of only what Monsanto wants to produce, so long as Monsanto is complying with the custodian protocol.  Mr. Jagoe is entirely correct in concluding that Defendants should not be required to go back to Monsanto and ask for a second or third notebook, or wait until a deposition is being taken to determine notebooks are missing, if he means for identified custodians.  Mr. Jagoe says, "[w]e ask for material and they say, well, we'll look for it and if we want to give it to you, we will.  And then 10 days later we get a production of three notebooks."  (Hearing Tr. Vol.I 1-24-11 P.43 L.11-P.44 L.13).  There is a clear duty to search under the protocol and to produce documents located by use of the search

terms.  If documents are being located and withheld, that is another issue, more appropriately

addressed by sanctions.

Mr. Jagoe argues that Monsanto has not timely made production of documents which the

Court ordered to be produced, irrespective of whether the '435 and '247 patents were at issue in

the litigation, concerning prior testimony by Monsanto and DeKalb scientists regarding the CP4

gene and its development, or the development of commercial Glyphosate tolerant plants such as

GA21 corn.  Defendants identified *Rhone-Poulenc Agro v. Monsanto*, from the Middle District of

North Carolina, as the case having transcripts of Drs. Padgette and Armstrong.  Defendants also

identified *Dekalb v. Syngenta,* 2007 Lexis 93948 and the Shaw litigation from the Eastern District

of Delaware No. 04-cv-305, as cases from which expert transcripts should be produced.   Mr.

Jagoe claims that at docket #392, Defendants' Memorandum in Support of Defendants' Motion

to Compel, at page 22,  Defendants sought prior testimony by Monsanto and Dekalb scientists

regarding the CP4 gene "and/or" the development of commercial glyphosate tolerant plants such

as GA21 corn.  He then represents, "[y]our honor, I believe, understood these arguments,

understood the brief, and issued an order on December 7 granting the defendant's motion."

The Court has examined document #392, and as to its content, Mr. Jagoe speaks

accurately.  However, his argument misrepresents the ruling of the Court on December 7, 2010.

That Order related to nine categories of documents.  The nine categories are as follows:

> Defendants' Motion relates to the following nine categories of documents: (1)
> specific documents concerning the research and development efforts underlying the
> work and disclosures described in the '247 Patent; (2) specific documents
> concerning related research into glyphosate tolerance; (3) documents concerning
> the scientific articles identified in Defendants' Second Amended Answer &
> Counterclaims ("SAAC"); (4) regulatory documents related to Roundup Ready
> products and other products allegedly covered by the '247 Patent; (5)

documentation of Monsanto's decision on the inclusion of SEQ ID NO:70 in the '696 Patent; (6) documents concerning the scope of the claims in the patent-in-suit and the products those claims cover; (7) documents concerning secondary indicia of non-obviousness; (8) documents concerning the negotiation and drafting of the YieldGard agreement; and (9) previously-compelled documents concerning prior litigations.

While it is true that the Court granted Defendants' first motion to compel, in part, it did not grant the relief indicated by counsel. The Court specifically found that these wide-ranging requests, encompassing a large amount of material that is admittedly not at issue in the present case, are not "reasonably calculated to lead to the discovery of admissible evidence," Fed. R. Civ. P. 26(b)(1), and the Court, therefore, declines to order the requested production. The Court agreed with Defendants:

> some documents related to the underlying patent research are relevant to their contention that the claims in the '247 Patent which recite a DNA sequence encoding an EPSPS enzyme having the sequence of SEQ ID NO:3, SEQ ID NO:5, and SEQ ID NO:7, as well as those claims to glyphosate-tolerant plants, are not enabled.

The Court likewise agrees that some of these research materials may be relevant to Defendants' arguments that certain asserted claims are invalid or unenforceable because they fail to fulfill the written description requirement in 35 U.S.C. § 112.

Contrary to Mr. Jagoe's representations, the matters he referenced above were not mentioned in the Court's December 7, 2010 Order. However, his argument that he needs the transcript which he specifically identified concerning Dr. Padgette is persuasive, and it must be produced, immediately. The Court understands the request was made just prior to the scheduled deposition of Dr. Padgette, and further relief, regarding use of the transcript, may be indicated. To the extent Monsanto uses prior litigation transcripts in any future depositions, they will

provide Defendants with a copy of such transcripts, sufficiently in advance of the depositions(s), to allow adequate preparation by Defendants.

Mr. Lombardi argues persuasively, in discussing paragraph 7, that Defendants' interpretation covers a general search of all documents of which a witness might have some awareness. "That would turn this into a non custodial protocol." He said,

> If you were to interpret it the way defendants are suggesting, then this would be a loophole that rendered the custodian production protocol meaningless because what they're saying is you all -- you go to these custodians and you ask them where might there be any documents that have any relevance to this case, and then you have to look wherever they say. That's no limitation at all, Your Honor.

(Hearing Tr. Vol.I 1-24-11 P.55 L.2-5;16-24). His view is that Monsanto's obligation was to make inquiries of the custodians for potentially relevant documents or ESI that are located in electronic storage areas or in central files, archives, or shared servers. But, when he says, "that is what we did," he is inaccurate, because admittedly, all identified custodians were not interviewed. He understands Defendants' position to be, you go to those custodians and you ask them where might there be any documents that are relevant to the case and you have to look wherever they say.

Mr. Rosenthal negotiated the protocol for Monsanto. His version of the negotiations was that each side discussed where custodians kept their files, whether on personal computers, on a server or another centrally stored location, and how to get the information. He said there was an agreement to interview the person who would disclose the information if it was at a central place it would be retrieved. He said Monsanto wanted an agreement where both parties would identify central storage and get categories of documents beyond the custodial protocol, but DuPont would not agree. As to the issue raised by Mr. Jagoe concerning the pMON database, Mr. Rosenthal

said that Monsanto wanted a discussion about databases, but DuPont did not want to do that, and they reached the custodial protocol limiting the scope of searches.  (Hearing Tr. Vol.I 1-24-11 P.55 L.21-P.58 L.1).

Mr. Fleming was a member of Defendants' negotiating team.  He said that when the teams began negotiating, both recognized they were not going to ask for wholesale production of both of the major companies, but follow a logical and meaningful process by which custodians would be identified and from the custodians, identify relevant documents, not just of custodians, but relevant documents from those custodians in inquiries, and those would be the areas to look to to collect information.  He said that there were several custodians identified by DuPont, Pioneer and Monsanto who were no longer employees.  He said those former employees identified where they kept their files "in the x database and I kept my - - my files in this database and I sent memos regarding science.  And my team consisted of Mary, John and Sam, and - - and - - and you should look to them for the notebooks that have been involved with the work that were underlying this patent, for example."  He said both sides disclosed all of the computer systems maintained by each, "and in this case it was for both DuPont and Pioneer individually, their e-mail system, their shared spaces where individual employees kept their materials, their general databases."

"All of these things, all of - - all of the systems employed by the companies so that people would understand where all of these types of information could theoretically be stored.  So what I -- what I think we're seeing here, your honor, is a fundamental difference of opinion as to scope."

Mr. Fleming explained that when Monsanto wanted the "GAT alone soybean documents," Defendants went to an independently maintained database not specific to any one custodian, but identified by custodians as containing files that would have this information, and the information

was culled, processed and produced. He believes that Monsanto has not done the same scope as Defendants. He cites to a deposition of Grace Bonner, a former Monsanto employee, where she said no one came and talked to her. He then cites to Dr. Barry, a former employee and consultant formerly mentioned by Mr. Jagoe. Mr. Fleming's view is, "we go to the custodians and say, where are, in your office, for instance, what file cabinets, what folders on your computer, you point us to those, and then where else would you look for relevant documents. And that's why it says identify potentially relevant documents, your honor. " (Hearing Tr. Vol.I 1-24-11 P.61 L.4-P.64 L.22). Mr. Fleming believes that former employees have been contacted by Monsanto, but have not been asked for their documents, or where to identify or locate relevant documents. (Hearing Tr. Vol.I 1-24-11 P.67 L.9-20). Mr. Fleming also believes that the parties have agreed, in addition to custodial documents, to produce documents to be used at deposition or at trial. He says that Defendants have interviewed custodians and asked them where to look for relevant documents based on the issues in this case, whether specific to them or known to them to be relevant. (Hearing Tr. Vol.I 1-24-11 P.74 L.19-P.75 L.6).

Defendants also complain that documents of former employees of Monsanto are not being produced, e.g. Dr. Kishore, where Defendants here made numerous requests for documents from this "highest level scientist who is an inventor on the patent." Additionally, Defendants mention Drs. Eichholtz and Hinchee as individuals to be deposed, and that Monsanto responds that they are having problems locating them. Mr. Jagoe notes that when Dr. Barry was deposed, he said no one had previously contacted him as to whether he had documents. He believes that Monsanto should have contacted these men before November 1, 2010, interviewed them and asked if they had documents. The Court agrees with Mr. Jagoe. In the event any named custodian could not

be located by either party, that party should have notified the other party and the Court.

Mr. Jagoe makes a compelling argument when he speaks of the experience with Dr. Barry who was deposed by Defendants. Dr. Barry, he represents, stated that he stored - - Monsanto stored - - information about vectors and plasmids that he made in a central archive within the company. Mr. Jagoe says Defendants do not have any documents or any printouts from that central database. He believes, and it seems logical, that if Dr. Barry had been contacted prior to November 1, 2010, and asked if there were databases at Monsanto where he stored information about his work on the '247 patent, database(s) would have been searched with the agreed search terms and Defendants would have received a lot more information, and in particular, the sequences of the vectors in the Patent. (Hearing Tr. Vol.I 1-24-11 P.68 L.9-P69 L.11). Mr. Jagoe believes that Dr. Eichholtz was never contacted before November 1, 2010, the document production cut-off date.

Mr. Rosenthal spoke further about his views on the interpretation of the custodian protocol:

> And it is preposterous to say that we agreed or the parties even contemplated that we would go to a custodian and say, tell me, in light of the hundred-and-some page Second Amended Counterclaim, where every potential document in this company could be located relating to these topics would virtually touch every single aspect of the company, from marketing to sales to distribution to, if you believe the defendant's view, Glyphosate tolerance, not CP4, but Glyphosate tolerance.
> So what they're saying is, Monsanto, you had an obligation to go to X employee and tell me, not -- don't tell me where your documents are and don't tell me where your documents are located in centralized sources, but tell me every place in the company where you believe there may be relevant documents to Monsanto's business.
> That's -- that's -- that's a preposterous reading. What we agreed to, what both sides agreed to, was a simple fact. We would go, ask them where do you keep your documents on your PC, where do you keep them in your paper files, and

where do you keep them on the server or individual drive or group directory or any other shared repository space, and if they identified those, we would go collect those custodians' documents.

That's consistent with the parties' intent. That's consistent with the language of section 2, paragraph 7. And any other reading would literally be preposterous in light of the scope of the allegations here.

A contract dating all the way back to 2002, a patent dating back two decades, an antitrust allegation that virtually reached every aspect of Monsanto's business. It's just not -- not plausible.

(Hearing Tr. Vol.I 1-24-11 P.76 L.10-P.77 L.16).

While the Court believes that Mr. Rosenthal's view exaggerates what Defendants believe the custodian protocol requires, the protocol is not as expansive as Defendants suggest. In any event, as already noted, Monsanto has not done what it confesses it had an obligation to do.

Mr. Rosenthal continued:

We would go, ask them where do you keep your documents on your PC, where do you keep them in your paper files, and where do you keep them on the server or individual drive or group directory or any other shared repository space, and if they identified those, we would go collect those custodians' documents."

The Court asked Mr. Rosenthal:

Well, if you take your view of it, which seems -- we'll start there. What defendants are saying is you didn't do that. You didn't go to Barry, you didn't go to these other people and ask, where do you keep -- what hard papers do you have, what e-mails do you have, where's your information on servers.

They're saying you didn't do that and, therefore, you violated the –

Mr. Rosenthal responded:

Your Honor, with respect to all current employees, we did that. With respect to former employees, you are correct that -- that to the extent that we didn't have conversations, we weren't in touch with those former employees, we did not contact the former employees and say where your documents are.

What we did is we went to the legal department and we went to the successors that would have held that position or the department manager and interviewed them and also went to the off-site inventories of files and looked for any of those persons' files, and also looked -- checked with the e-mail administrator and the

server administrator for any drive locations where those individuals may have kept documents.

For the majority of these people, they have been gone for so long that they just did not have electronic documents to begin with, and whatever they would have would be sent to an off site paper storage file.

But with respect to all the former employees, we did have a protocol that we followed to go to these several different sources and try and understand where their documents could be located and then search more.

(Hearing Tr. Vol.I 1-24-11 P.77 L.17-P.78 L.21).

Mr. Rosenthal continued:

Your Honor, with respect to all Mr. Lombardi stated, regarding the pMON database, that it is a noncustodial database, that the parties had discussions about searching those databases, and Defendants refused to agree to that.

(Hearing Tr. Vol.I 1-24-11 P.81 L.8-P.82 L.2).

At the hearing on January 26, 2011, Ms. Ben Ami spoke as to her understanding of the

implications of the protocol:

I'm sorry. We do have a disagreement on this -- on what that stipulation is. The simple matter is that a lab head, like a Dr. Barry or a Dr. Padgette, has his hands, if you will, are the people who work in his lab. There can be lab notebooks that don't have anyone's name on them. They could be cloning notebooks and it doesn't say someone's name on it. They can say – have technicians that are in their group, in their lab, in their physical lab, all -- we're not asking and we never have asked to have endless numbers of custodians. But what we understood and what we did -- and this is a very important point -- what we did was we would say lab heads, where are your documents relating to GAT alone, or whatever the issue might be, and they might say, well, that research, you know, is done by -- my technician did that.

I'm sorry, Your Honor. They'd say, my technician did that, and then we would take the technician's notebooks. We didn't then go and say, you have to ask the technicians questions and then everyone the technicians mentions, you have to ask them questions and then go through this endless process. That's not what we're saying. But what we're saying is how in the world would we know the name of every technician in Dr. Barry's lab or what possible junior scientist would have run a specific experiment? How could we possibly know that, to make them a custodian? That's impossible. We couldn't have agreed to something like that

19

because it would make no sense. We would -- we would have no ability to know who helped the inventors in doing the actual experiments. Just using an example. So we still believe that the ESI stipulation contemplates that you will ask the custodians questions, and if they say my technician's lab notebook would have that, you go to the technician's lab notebook. You don't have to then go to the technician and ask a million questions, but you go to the technician's lab notebook. If the custodian says, I put my data in the database, he's the custodian of that information, he put it somewhere. And that is a fundamental disagreement in this case, Your Honor. Because it -- if you read the ESI the way Mr. Lombardi is, no defendant could get any discovery.

(Hearing Tr. Vol.II 1-26-11 P.56 L.22-P.58 L.23).

Mr. Rosenthal responded:

She would want us to go to our -- our -- our -- for example, the vice president of marketing, who was a custodian, and say, please tell me everywhere in the company that you are aware of, of every single document that is related to the marketing, distribution, and sale of Roundup Ready 1 in soy or corn and Roundup Ready in soy, and then we have an obligation to go to every one of those locations and pull those documents. That was never the intent. The whole discussion was, is in today's corporate environment, people just don't store their documents on a PC. They store them on a server, on a central location. And those central locations are not subject to easily running search terms against them because of the design of the technology. So the agreement was -- and this was their concern, how do we get to that. The agreement was, it was done in almost every case, complex case in the United States, this is standard protocol, you go interview them and you ask them, where do you store your documents on these central locations. That's what we did with the custodian, and we went and got those documents. Their interpretation is inconsistent with the negotiation, with industry practices.

(Hearing Tr. Vol.II 1-26-11 P.59 L.11-P.60 L.13).

He stated his view of the custodian protocol:

And what they haven't focused, Your Honor, on there were extensive negotiations regarding what documents beyond the custodians we would go get from central sources.
And what they haven't submitted to Your Honor is all the correspondence on that. They did submit one letter from Mr. Fleming which makes it abundantly clear that they were unwilling to go beyond the custodial protocol. We made several proposals and those proposals were uniformly rejected.
Now, there were certain categories where we told them we would go beyond the

custodial protocol to get things unilaterally, and despite their unwillingness to do that, we did that.

So, for example, market share documents, pricing documents, agreements, we went beyond the custodians and got those, and we told them we were doing that. But we tried to negotiate, and we can submit to Your Honor the letters back and forth, but the letters are abundantly clear that we made several proposals and those proposals were rejected.

It's just not accurate that somehow they ever thought or intended that we were going to seriously sit there and interview a custodian and say we're going to go back to 1983 and please tell us everywhere in the company you think there may be any relevant documents and then we had an obligation to go get them.

That just doesn't comport with reality and it doesn't comport with the plain language of the stipulation.

(Hearing Tr. Vol.II 1-24-11 P.60 L.14-P.61 L18).

The parties offered further opinions concerning the meaning of the custodian protocol on February 11, 2011, when the Court, again heard arguments on Defendants' Second Motion to Compel. The Court has attempted to set those arguments in order.

At the February 11, 2011 hearing, the scope of the differences in the interpretation of the custodian protocol by Defendants was narrowed. Mr. Fleming began Defendants' argument by saying, you do an interview with the custodians and ask, "[w]here are the central files, archives or shared servers that you put your material on and that you use in access in your business." He said, "it's not, tell me everything you do and everybody you know who does it." (Hearing Tr. Vol.III 2-11-11 P.26 L.13-19). He clarified further, "[a]re we saying that we want the custodians to tell us - - tell us anywhere in the company where things are maintained. And, Your Honor, the answer is: No." (Hearing Tr. Vol. III 2-11-11 P.27 L.5-7).

Mr. Fleming believes that the parties differ in their concept of a "custodial-based protocol," which Defendants believe is in place, and a "custodial-only protocol," which he believes Monsanto embraces. His view of the custodial-only protocol is that appropriate inquiries

would be made of all custodians to identify potentially relevant documents or ESI of said custodians located in the files and a subsequent relevant search would occur. The custodian-based protocol provides for inquiry of all custodians "to identify potentially relevant documents or ESI, first, of said custodians, and then, second or identify relevant documents or ESI located in central files, archives and servers and will conduct reasonable searches of potentially relevant documents." He believes the way paragraph 7 should be read is, "you would make appropriate inquiries of all such custodians to identify potentially relevant documents or ESI located in central files, archives or shared servers and will conduct reasonable searches of any potentially relevant documents identified by such custodians." (Hearing Tr. Vol. III 2-11-11 P.28 L.25-P.29 L.13). Defendants' position is that "we don't want it to be custodian only, meaning only their documents. . . ." (Hearing Tr. Vol. III 2-11-11 P.30 L.25-P.31 L.1). He said,

> [i]t is a restricting system that's in place because if a custodian doesn't identify a particular central file or server or SharePoint, then the obligation doesn't exist to go there to look for files. But what happens, and this is the core of the difference, Your Honor, because if you - - And you have read Monsanto's papers, they said they have looked in places like SharePoint and central files for data. You recall that they said that. And this is where the point of differentiation is.

(Hearing Tr. Vol. III 2-11-11 P.32 L.24-P.32 L.8). Mr. Fleming said, when Monsanto went to a central file, "they applied a file patent methodology, and they looked for that custodian's documents." He said that Defendants "designed the protocol, Your Honor, is once you - - once you identified that server or that SharePoint, we collected the data. We looked at the folders as opposed to looking at a specific file path." (Hearing Tr. Vol. III 2-11-11 P.32 L.11-14).

Mr. Fleming continued to define Defendants' position on document production. He said Defendants are not saying Monsanto has to talk to everyone and ask for everyone's documents.

What we're saying is that you need to talk to the identified custodians who you
believe are most knowledgeable, and we thought the practical thing to ask them is:
What are the central servers or the shared servers or these file locations that you
use and access in the commonplace of your business? And then if identified by that
custodian, they're collected. And then the rest of the processing goes on,
including, ultimately, Your Honor, applying the search terms that you ordered be
applied.

(Hearing Tr. Vol. III 2-11-11 P. 33L.10-22).

Mr. Fleming further clarified Defendants' position related to whether there was an

expectation of "whether you really were looking not only for the custodian's work but the

assistants' work, the interns' work and all of that." He said, "[w]ell, the simple answer to your

question is no." He went on to say as to "certain senior executives who were named on the

custodial - - the custodian identification log." If the custodian said, "I don't know; ask this

person, then it's practical and logical that you would have to do that. It's not the question that if

Dr. Barry had 14 lab technicians, we're saying you have to ask every one of the lab technicians,

because we think if you ask Dr. Barry, the servers and the central files that he identifies are likely

to have that information in those documents, Your Honor, if you look for more than just Dr.

Barry's name." (Hearing Tr. Vol. III 2-11-11 P.37 L.19-P.38 L.16).

Mr. Fleming was forthcoming when he explained in saying, "the last thing we want to do

is to cause a reworking." He said, "[y]our Honor, we are painfully aware of the fact that if I

asked you to - - to ask Monsanto to go back and do this all over again, we will do violence to

many things." (Hearing Tr. Vol. III 2-11-11 P.40 L.3-5; 16-19). He recognizes, what for the

Court, is a challenge. He said,

I think the toughest answer for us to give you is: What do we really want you to
do? And - - And - - And I think that's because we think we understand what
should be done, but we also have a practical understanding of what the Court can

23

do within the confines of what's going on.  Now I'll tell you one thing, and I don't mean this for any sort of prejudicial effect, is that we're fairly far along with regard to negotiating, independent of what you're doing, a schedule adjustment that doesn't alter the trial date.

(Hearing Tr. Vol. III 2-11-11 P.42 L.17-P.43 L.1).

This explanation is very helpful to the Court, in trying to fashion an order that will provide fair disclosure under all of the facts and circumstances, while refraining from entering an order that will actually be regressive.  It is the Court's supposition, that depositions have revealed much clarity as to what the parties did and did not do in document production; what custodians have revealed as to the location of their data after being asked where their data was located and the scope of the search completed, or in those instances, when custodians were not asked questions, which it is known has occurred; what discovery has revealed as to what deficiencies resulted from those circumstances, and whether other searches supplied the missing information.          Finally, Mr. Fleming explained that insofar as there are central file servers that Monsanto went to, "what's not clear to me is whether they collected those systems and then ran the search terms against them or they just collected the custodians' documents from that system.  That's that file path versus the redweld thing I tried to explain before, Your Honor."  He concluded the initial argument, saying,

> if an individual custodian, who's a named custodian, identifies a shared server as somewhere where he or she puts things, and they are collected, should that shared be collected, regardless of who put things in there?  And the answer to that is: Yes. But I'm not saying that you have to go interview those people now.  I'm just saying as a natural consequence of the custodial process, that that would be identified.

(Hearing Tr. Vol. III 2-11-11 P.60 L.21-P.61 L.2;16-23).

Ms. Christian was on the custodian protocol drafting team for Defendants.  She explained, in the context of the inquiry that Monsanto was making, their description indicates

that they only asked where the custodians stored information and only went to collect from file paths where custodians stored information. So, the central locations that they identified were limited and did not include locations where the custodian may have obtained information which could be a different central location. It's very possible in a large corporation that there are certain central locations where template documents or certain kinds of information are kept that the custodian never puts the information on but that they use, they access, they refer to. So the picture created in that interview process did not get both sides of the puzzle.

(Hearing Tr. Vol. III 2-11-11 P.62 L.4-16).

Mr. Lombardi expressed confusion after Mr. Fleming's argument, saying, "there were things said that are different that what were said in our last telephone conference before you. There are things that are even different than were said in the brief that were - - in what were said in the brief that was filed a couple of days ago. And we, honestly, don't know what is being asked of us by DuPont in this case. It has been a moving target." (Hearing Tr. Vol. III 2-11-11 P.63 L.17-23). He said that Monsanto's position has been the same "from the word go. It hasn't changed." He believes Monsanto finds itself responding to changes. (Hearing Tr. Vol. III 2-11-11 P.64 L.1-6). Mr. Lombardi argued that from the beginning the parties agreed to the custodian document production plan. (Hearing Tr. Vol. III 2-11-11 P.66 L.15-22). The affidavits filed by Mr. Rosenthal, Mr. Campbell, Mr. Spears, and Mr. Gutzler confirm Mr. Lombardi's argument that "this custodian process was a way of getting at the documents of the custodians." (Hearing Tr. Vol. III 2-11-11 P. 67 L.16-17). He believes that Defendants' claim that the custodian protocol relies upon the use of the words "use, access and obtain" must be objected because these are newly-adopted words, none of which appear in paragraph 7, and "DuPont has not come forward with an e-mail, an assertion, a letter, something contemporaneous to the negotiation of this that indicates that that's what the obligation was." (Hearing Tr. Vol. III 2-11-11 P.70 L.12-

21).  He believes, "a custodian protocol . . . means that it's a protocol that is oriented towards custodians and the documents that custodian have." (Hearing Tr. Vol. III 2-11-11 P.71 L.4-7).

Mr. Lombardi states his reading of the agreed protocol, "[the] parties each agree that they will make appropriate inquiries of all such custodians to identify potentially relevant documents or ESI of such custodians or located in central files, archives or shared servers and will conduct reasonable searches of any potentially relevant documents or ESI identified by such custodians." Then he states, "we think that the plain reading of that and what is consistent with what Monsanto has said from the word go in this case is it sets forth specific possible types of documents.  You were to talk to the custodian, have the custodian identify any documents in those sources, and go and do the search that you have to do based on what the custodian tells you." (Hearing Tr. Vol. III 2-11-11 P.71 L.12-24).  He dispels, in the Court's view, some complaints by Defendants when he says, "[s]o when it talks about located in central files, archives or shared servers, it's telling you that there are files in those locations, then you need to go and do a search in those locations. There is nothing there about documents you use, documents you obtain documents that you access.  It is a custodian protocol . . . ."  (Hearing Tr. Vol. III 2-11-11 P.71 L.25-P.72 L.6).

It is true that Monsanto's position on the meaning of the custodian protocol has always been consistent and unchanged, and that interpretation is most acceptable to the Court, under all of the known facts and circumstances in the case.  The issue remaining unresolved is how to address Monsanto's confessed failure to abide by its definition of the protocol, in failing to confer with all of the 50 custodians named by Defendants.

Mr. Lombardi makes reference to Exhibit "P," attached to Mr. Rosenthal's affidavit which is persuasive.  It explains in the negotiation process, the custodial document production

was agreed, then the parties move on to production by non-custodians. He then explains that on June 16, 2010, the parties were discussing production of documents outside the 50 agreed custodian search. He again points to Defendants' July 12, 2010 letter rejecting such searches, "unbounded by the custodian and search term limitations the parties have agreed to after spending seven months in negotiations." (Hearing Tr. Vol. III 2-11-11 P.75 L.20-22). The letter goes on, "Monsanto's proposal that DuPont and Pioneer engage in an unlimited search for all documents related to or documents regarding several categories of documents is unacceptable on numerous grounds." (Hearing Tr. Vol. III 2-11-11 P.76 L.5-8). The balance of the letter will not be repeated, again, but it contributes to Monsanto's better arguments interpreting the custodian document production protocol. The contents of the July 12, 2010 letter are confirmed in an August 4, 2010 letter. It is also significant because it demonstrates, before the document production deadline occurred, Defendants' counsel knew that Monsanto was only interested in production from designated custodians. Mr. Lombardi then argues that the "next time we heard anything about the protocol from the other side was when this Motion to Compel was filed and when they came up with their interpretation that says that we hadn't handled the protocol correctly."[3] (Hearing Tr. Vol. III 2-11-11 P.79 L.23-P.80 L.2).

The revelation that Monsanto had not talked to Dr. Barry about where he stored his documents extended the loss of time in the management of this case in ruling this Motion. Mr. Lombardi is specific in describing Monsanto's responsibilities under the custodian protocol. He said, "[w]e were to make appropriate inquiries of all custodians, the 50 custodians, to identify

---

[3]The Court's recollection is that Defendants' Second Motion to Compel was filed shortly after Dr. Barry's deposition was taken by Defendants and it was discovered that Monsanto counsel had not talked to him about where he stored his documents.

potentially relevant documents or ESI, whether they were in their own computer or whether they were shared spaces, or whatever. We did that. We did that. Now the exception is ex-employees, and this is a place where I - - And I don't want to overstate this, Judge . . ." (Hearing Tr. Vol. III 2-11-11 P.81 L.22-P.82 L.3). The Court disagrees with counsel over the significance of the omission, particularly as it relates to Dr. Barry, an inventor and a recipient of $1,000.00 per day from Monsanto. As to the other eleven former employees, the obligation, in the Court's view existed, but the failure to interview them may have been less significant.

The Court concludes that there was never any intent of the parties through counsel, in drafting the custodian protocol, to be required to ask named custodians names of other individuals with whom they worked and then search under those names with search terms locations where documents were allegedly located. That would impose an impractical burden for any responding custodian, after the passage of many years from the time relevant documents were being created. Such a concept is totally unrelated to the agreed protocol. After any such attempted disclosure and after a subsequent deposition of a custodian, failure to remember and disclose every person who had anything to do with a particular project would be portrayed to a jury as intentional failure to produce, in the event it is discovered that some associate was not mentioned. The parties, under the agreed custodian protocol, had no duty to identify laboratory technicians, associates or interns associated with identified custodians and make searches for documents under their names.

The Court finds that adopted or engrafted language onto the custodian protocol which states, "that were stored or accessible as used in their work," or the words "access" or "obtained" will not be read into the meaning of paragraph 7. (Hearing Tr. Vol. III 2-11-11 P.88 L.23-24).

28

All of the facts and circumstances convince the Court that Monsanto's interpretation of the custodian protocol is what was intended by the parties in early 2010 when the final version was drafted.

## II.     THE TWELVE CATEGORIES OF REQUESTED PRODUCTION

**Number (1)** the kinetics of EPSPS enzymes, such as the so-called Class I and Class II EPSPS enzymes and the relationship of kinetics to glyphosate tolerance in plants.

The Court invited Monsanto to first make a response as to documents produced and Defendants' responses followed.  Mr. Lombardi claims that with respect to producing documents concerning Class I EPSPS enzymes, Monsanto is in full compliance in accordance with the Court's prior order which set forth which particular enzymes are relevant.  (Hearing Tr. Vol.I 1-24-11 P.88 L.23-P.89 L.16).  He explained that Class I EPSPS enzymes were not within the sequences ordered, but there probably was some production of Class I EPSPS enzymes included in produced custodial documents.

Defendants' position, as articulated by Mr. Jagoe, is that an issue in the case is whether the CP4 EPSPS enzyme is patentable over prior art and whether the claims are double patenting over prior patents.  He believes that identified custodians with identified search terms when applied to database information will show the kinetics analysis of all EPSPS enzymes that Monsanto has, and it is not burdensome for them to produce.  He believes that Drs. Padgette, Eicholtz, Barry, Kishore and Shaw would have knowledge of that database.  His belief is that Monsanto, under the protocol, is obligated to produce all kinetics on the Class I EPSPS enzymes in order to make comparisons of the Class II or the CP4 EPSPS enzyme.  He said Defendants also want discovery on "the double mutant plant EPSPS enzymes which Monsanto categorizes as

Class I" and Defendants also "want the kinetics on the triple mutant plant EPSPS enzymes that Monsanto has." (Hearing Tr. Vol.I 1-24-11 P.101 L.21-25).

Mr. Lombardi first asked if Mr. Jagoe could identify the Court Order that required Monsanto to preserve and produce Class I enzymes. Mr. Jagoe responded that the Court ruled on the first motion to compel that Defendants' request was too broad, and that the present request is narrow. He believes that if these documents "are preserved in these central databases and they're just being preserved in the normal course of business or they're being preserved because they were preserved for other litigation and they're responsive and they're relevant and there's no burden to produce them, they should be produced." He acknowledges that he cannot point to a Court Order where Monsanto was ordered to produce this, but believes just because the Court did not order this preserved, does not preclude relief. (Hearing Tr. Vol.I 1-24-11 P.102 L.22; P.104 L.22).

Mr. Jagoe asked to be heard further on the issue of double patenting, stating that Dr. Shaw was a named custodian on patents '835 and '642 which expired in 2007. He argues that the '247 patent should have no patent extension beyond Dr. Shaw's two expired patents, both of which were not disclosed to the patent office. He believes the CP4 EPSPS enzyme falls within the scope of the claims of the Shaw patents, and expects Monsanto to argue that CP4 has some type of unexpected results based on the range of the kinetics that the enzyme showed in some laboratory assay. He thinks these results were not unexpected or are valid results which internal Monsanto documents will confirm. Mr. Jagoe said Defendants "need, [Monsanto's] internal data on the Class I new plant EPSPS enzyme kinetics to show that in fact there is no unexpected results and in fact the CP4 is not critical for establishing Glyphosate tolerance in - - in plants." He

said Defendants also need the litigation documents for prior cases where Monsanto made certain arguments about expression of genes and plants and what is required for Glyphosate tolerance. (Hearing Tr. Vol.I 1-24-11 P.107 L. 21-25).

It is true that Mr. Jagoe makes a relevance argument, that is unchallenged in its convincing nature. Some of the parties' arguments applicable are stated under categories 2 through category 4.

**Number (2)** the use of antibodies to detect and/or distinguish Class I and Class II EPSPS enzymes.

Mr. Jagoe continued the argument into point Number 2. He stated that his argument for number 2 is "pretty much the same [as number 1]." He believes Monsanto will argue "that the CP4 had some type of unique structure, that it's - - it's - - it is not prima facia obvious over the structures that existed before, and they'll say so because it - - the antibodies to the Class I do not bind to Class II EPSPS." He believes that with requested data he can refute Monsanto's argument. (Hearing Tr. Vol.I 1-24-11 P.108 L.11-16).

Monsanto relies on the same answer given in response to the first category, except counsel notes that antibodies relating to Class I EPSPS enzymes have been produced as part of the custodian process, appearing in documents where there was a discussion of Class II EPSPS enzymes. (Hearing Tr. Vol.I 1-24-11 P90. L.8-18).

**Number (3)** the use of nucleic acid probes to detect and/or distinguish Class I and Class II EPSPS enzymes.

Mr. Jagoe makes the same argument for number 3, except he says Defendants need the documents because Monsanto has patent '876 which expired in August 2010, and it claims the

same DNA molecules claimed in the '247 patent. He says Defendants need Monsanto's internal documents which will be probative of whether these DNA probes are the same as the DNA molecules claimed in the '247 patent, and just because Monsanto produced probes that relate to SEQ ID NO:3 is not sufficient, because "we need the data and the documents that compare the probe sequences and whether or not they bind to different molecules, different EPSPS enzymes." (Hearing Tr. Vol.I 1-24-11 P.108 L.25-P.109 L.16).

Monsanto relies on the same answers given above. (Hearing Tr. Vol.I 1-24-11 P.90 L.21-P.91 L.3).

**Number (4)** the creation and development of Roundup Ready® corn event GA21.

It appears to be undisputed by the parties that GA21 was commercialized by Monsanto as Roundup Ready Corn. Mr. Jagoe believes that the gene in GA21 is a double mutant plant EPSPS enzyme and is the prior art Class I EPSPS enzyme. (Hearing Tr. Vol.I 1-24-11 P.109 L.18). He claims Monsanto is not producing to Defendants the commercial embodiment of prior art work. It seems undisputed that this gene was the product of DeKalb before Monsanto acquired that Company. Mr. Jagoe believes that the glyphosate tolerance is based on prior work of Dr. Comai "who made the first mutant EPSPS enzymes." Mr. Jagoe says this was all well known before the CP4 enzyme which has no unexpected results and is not something special that changed the way people grow plants. He thinks Monsanto should not be permitted to sit on critical documents. He states that Catherine Mackey is a named custodian at DeKalb's Mystic, Connecticut plant. Monsanto, according to Mr. Jagoe, says that it found a few Mackey documents in St. Louis and produced them. Mr. Jagoe believes Ms. Mackey should be asked "where are your documents discussing the commercialization and the research and the discovery of - - of GA21 corn, . . . ."

He believes she could readily identify "whose notebooks - - the notebook archives where the GA21 research" is located. He also suggests that if Defendants need to name another custodian, Monsanto should inform Defendants of the identity of such a custodian with the knowledge of GA21 documents. (Hearing Tr. Vol.I 1-24-11 P.109 L.4-P. 112 L.20).

Mr. Lombardi stated that Monsanto has not produced documents concerning GA21, except as to production related to other documents, because GA21 "has nothing to do with this case. It's not the CP4 Gene. It's a completely different gene. It is not among the documents - - genes that you said we need to preserve information on." He also stated that it was his belief that none of the identified custodians had knowledge of GA21. (Hearing Tr. Vol.I 1-24-11 P.91 L.4-20). As to Ms. Mackey, Mr. Lombardi said that she came to Monsanto "many, many years ago, stayed for about a year. We found - - initially didn't find any documents from her. We ultimately found some documents in a remote location and we just gave them to the other side." (Hearing Tr. Vol.I 1-24-11 P.113 L.8-15). Mr. Lombardi does not answer the question as to whether anyone from Monsanto interviewed her and sought information as to her documents. It is the Court's understanding that she is not a named custodian. If she is, and Monsanto has not interviewed her, as for all named custodians who Monsanto has not interviewed, the Court may, as later explained, order Monsanto to interview her, to search locations identified by her as to places where her documents and data are located, and conduct searches under the agreed and ordered search terms.

**Number (5)** the use, identification, characterization, and isolation of Agrobacterium strain CP4 bacteria, PG2982 bacteria, LBAA bacteria, B. subtilis bacteria, Staphylococcus aureus bacteria, and other bacteria from the Luling, Louisiana glyphosate production facility.

Mr. Jagoe relates that Defendants "asked and asked for documents showing [] [the CP4] isolation from the waste water stream at the Glyphosate tolerant plant. We identified Dr. Hallas as an initial custodian." Mr. Jagoe says that Monsanto would not release his notebooks until Defendants named him as one of the five additional custodians, notwithstanding that Defendants had already named him as one of the fifty initial custodians. (Hearing Tr. Vol.I 1-24-11 P.114 L.5).

At this point, the January 24th hearing was concluded, as to Defendants' twelve categories of requested documents. The January 26th hearing resumed with a statement by Ms. Ben Ami who said, with reference to the January 24th hearing, "it was fair to say we were shocked by what we heard on Monday." Her view was, that under Monsanto's view of the interpretation of the discovery protocol, Monsanto is out of compliance. Her first point was that Mr. Lombardi said Defendants never asked for Class I ESPS enzymes, but it was, in fact, in the search terms.

Next, she said that Dr. Barry has testified that he knows where "those pMON documents are," that "all of them are search terms, and he said, yeah, this was his data but at some point it was put in a database. Now, that's not compliance not searching that database. And, that's not compliance to go ahead and not ask Barry where his documents were put even if they're in databases." (Hearing Tr. Vol.II 1-26-11 P.5 L.5-P.6 L.25).

Mr. Lombardi retorted that there was an untrue implication that Class I EPSPS is a search term, and that Monsanto did not do that search. In stating that the implication was false, he noted that this Court has previously ruled that Monsanto is not required to produce all EPSPS Class I information beyond the search terms. He said that Dr. Barry's documents have been produced. He went on to say, "[h]e said he left his documents in a box at Monsanto. They were reviewed,

they were produced." The holes to be explained are exposed in a statement, first by Ms. Ben Ami where she says, "[Dr. Barry] knows where those pMon Documents are . . . ." Then she said, "yeah, this was his data but at some point it was put in a database." The next statement comes from Mr. Lombardi. He says that Monsanto has made a search by the search terms, and that Dr. Barry's documents were in a box at Monsanto. Unless electronically stored, and documents were copied before being put in the box, it would seem that there is a high likelihood that the information is not in that box. At the same time, it becomes apparent that Dr. Barry may be saying that he knows where the pMon documents are located, but the statements do not confirm they are in the pMON database. He said he put the documents in a database. It may be another database that Monsanto has searched. Ms. Ben Ami suggests that Dr. Barry should have been asked "where his documents were put even if they're in databases." She is correct. As noted previously, the Court may order Monsanto to interview him, to search locations identified by him as places where his documents and data are located, and conduct searches under the agreed and ordered search terms.

Ms. Ben Ami next claims that someone identified as Ms. Bonner, a former Monsanto employee, and patent prosecutor, was never asked for her documents. (Hearing Tr. Vol.II 1-24-11 P.8 L.18-P.9 L.12;P.10 L.13-P11 L.13; P.12 L.11-P.13 L.18). If she has been identified as a custodian, the Court may order Monsanto to interview her, to search locations identified by her as places where her documents and data are located, and conduct searches under the agreed and ordered search terms.

Mr. Jagoe claims that documents of Drs. Hallas, Weldon and Mackey have not been produced. Mr. Lombardi responds that "the documents for Hallas" have been produced and that

for all three, "[s]omething was produced for all of them." This does not answer whether all documents for all three, required by the custodian protocol, have been produced. If not, the Court may order Monsanto to interview them, to search locations identified by them as places where their documents and data are located, and conduct searches under the agreed and ordered search terms, provided all are named custodians.

Mr. Jagoe continued with his argument. He said that in addition to CP4, Patent '247 clearly says there are other strains of bacteria that have "Class II genes in them." He said Defendants want documents showing "how they are identified, how they were characterized, and why the patent would call those genes Class II EPSPS genes." He again makes reference to the lack of documents from Dr. Hallas, and how there has been inadequate production concerning what he calls Class II genes, pg2982 or with LBAA and B. subtilis. He reiterates that Monsanto is expected to argue CP4 produced unexpected results over prior art "when there is a clear indication that the gene from B. subtilis is in the prior art, . . . ." He says B. subtilis is ordered search term (98). Further, he argued under this point, that the CP4 Agrobacterium strain is not deposited in any public depository of biological material, ergo, no public access and Defendants want to show the jury that this strain is unique to the one place controlled by Monsanto. He believes Monsanto documents show cloning was the best method of getting DNA, which is relevant to the best mode requirement of the Patent. (Hearing Tr. Vol.II 1-24-11 P.16 L.1-P.22 L.3).

Mr. Lombardi responded by saying that Monsanto has searched and produced documents pursuant to the protocol which the Court indicated should be preserved and produced, including CP4, PG2982 and LBAA bacteria. He said Monsanto did not search for B. subtilis or

Staphylococcus aureus bacteria and other bacteria because they were not the type of documents required to be preserved and produced. (Hearing Tr. Vol.I 1-24-11 P.91 L.21-P.92 L.23). On January 26th, Mr. Lombardi said, "I'll accept Mr. Jagoe's assertion that there is a B. subtilis related search term, and if that's there, that search was done. What we did not do is an additional search beyond - - beyond what's in the search term for everything related to B. subtilis." (Hearing Tr. Vol.II 1-24-11 P.22 L.24-P.23 L.5). If Monsanto has not searched the records of Dr. Hallas and B. subtilis is a search term, Monsanto may be ordered to search locations identified by Dr. Hallas as places where his documents and data are located using the search term, B. subtilis. Monsanto has no duty to do an independent search of databases and servers using the term B. subtilis, without regard to an association to an agreed custodian.

Defendants raise a salient point. That point is that Monsanto has not produced Class I EPSPS enzyme documents because they claim the Court did not order those documents preserved. To the extent agreed or ordered search terms associated with custodians identify Class I EPSPS enzymes, limited by the Court's prior order of identified sequences, Monsanto must produce Class I EPSPS enzyme documents, if they have not already done so. No independent search of Class I EPSPS enzymes, separate and apart from agreed and ordered search terms associated with identified custodians with ordered sequences, will be ordered.

The purpose of the order to preserve is to assure, early in the case, that information will not be destroyed. In this case, the parties agreed to a production protocol, rejecting the concept that every document that could be relevant would be produced. Production of all relevant documents would be practically impossible, as both sides confess. The issue is not whether Defendants are entitled to receive relevant documents, the issues are, what is the custodian

protocol and are the parties in compliance. (Hearing Tr. Vol.I 1-24-11 P.100 L.1-P115 L.18). However, Monsanto submits no authority holding that an order of preservation establishes a limitation on the authority of the Court to order production of documents never ordered to be preserved, and an independent search by the Court has found no countervailing authority. If all of the facts and circumstances of the case suggest that documents, not ordered preserved, in the judgment of the Court should be produced, orders in that regard may follow.

Ms. Ben Ami injected that Monsanto has been "dribbling" document production, e.g. lab note books were not produced until January 15th. Mr. Lombardi then said Defendants produced 800,000 pages of documents in early December and "400,000 last week." (Hearing Tr. Vol.II 1-26-11 P.33 L.14-P.35 L.1). The Court expects, that by the time the parties get this order, both sides will have more carefully examined documents recently produced.

**Number (6)** the cloning, synthesis, and use in plants of DNA sequences that encode an EPSPS enzyme having SEQ ID NO:3, SEQ ID NO:5, SEQ ID NO:7, SEQ ID NO:41, SEQ ID NO:42 and the DNA sequence of SEQ ID NO:9.

Mr. Lombardi said that Monsanto did search and produce sequences pursuant to the protocol including SEQ ID NO:3, SEQ ID NO:5, SEQ ID NO:7 and SEQ ID NO:9, but the other two sequences have been, according to Mr. Lombardi, at issue at least two other times and the Court has rejected Defendants' requests. (Hearing Tr. Vol.I 1-24-11 P.92 L.24-P.93 L.14). As to number 6, the Court ruled at the hearing that if search term 98 includes SEQ ID 4, it must be produced. "Any search term I ordered searched must be searched." (Hearing Tr. Vol.II 1-26-11 P.42 L.12-16).

**Number (7)** technology to transform a plant nucleus with DNA that encodes CP4 EPSPS

and select cells and/or regenerate plants so transformed.

Mr. Jagoe stated that number 7 relates to the soybean event 40-3-2. Information on the transformation of the nucleus of a soybean, Mr. Jagoe believes, is critical to Defendants' case because of the enablement requirement of the patent law. Transformation of soybeans, he reports, was done at Agracetus, a third party from Monsanto, but a company now owned by Monsanto. Drs. McCabe, Martinell and Barton, he believes, were responsible for the transformation project and are all named custodians. He believes documents related to wheat, rice, and cotton with the CP4 gene and the regeneration of those plants are relevant and called for in discovery and have not been produced. (Hearing Tr. Vol.II 1-2-11 P.43 L.8-45 L.18).

Mr. Lombardi claims that under the protocol, Monsanto has gone to custodians, searched and produced those documents that came up in the search.

Mr. Lombardi says, "we have produced documents on this subject, particularly the Agracetus documents, pursuant to the custodian protocol." (Hearing Tr. Vol.II 1-26-11 P.45 L.20-P.46 L.7).

**Number (8)** technology to transform a plant plastid with DNA that encodes CP4 EPSPS and select cells and/or regenerate plants so transformed.

Mr. Jagoe pointed back to statements made by Mr. Lombardi and Mr. Hilmert. Mr. Lombardi said that there has been no production on the category, "technology to transform a plant plastid with DNA that encodes CP4 EPSPS and select cells and/or regenerate plants so transformed" because Defendants named no custodians that might have that information. In response to a question by the Court as to how Defendants could get that information, Mr. Hilmert for Monsanto supplemented Mr. Lombardi's statement by saying Defendants raised no issues on

plant plastids "until quite recently and it was not - - there was not a specific search done just for plant plastids in the abstract or chloroplast transformation in the abstract, but there was searches that were being done on the underlying sequences that were relevant. And to the extent that any of those sequences were in the custodial files, they would have been identified as being relevant and being produced."

Mr. Hilmert suggested that Mr. Lombardi was correct that the notion of chloroplast transformation "is so far removed from the relevant issues, none of the custodians would have any documents on that." He invited Defendants to designate additional custodians on this topic and Monsanto would search their files. (Hearing Tr. Vol.I 1-24-11 P.93 L.25-P.95 L.14).

Mr. Jagoe responds that Defendants have filed a motion for summary judgment which, if granted, would invalidate all of the claims asserted as being "literally infringed." Monsanto claims issues of fact remain. He also states there are other arguments. He says the '247 Patent has an express statement in column 33, line 20, concerning plastid transformation. (Hearing Tr. Vol.II 1-26-11 P.51 L.6-P.53 L.3).

Mr. Lombardi responds, "[i]f documents related to the CP4 gene, we searched, and that would include if there were plant plastid documents related to the CP4 gene and they were within the custodians' files as set forth in the protocol, we were gathering them and producing them." He said, based on communications with opposing counsel, Monsanto offered, and Defendants declined to submit additional names for searches. (Hearing Tr. Vol.II 1-26-11 P.53 L.5-P.54 L.5).

**Number (9)** the research and development of the first commercializable glyphosate-tolerant plant of each type in claim 148 and col. 33 lines 48-61 of the '247 Patent, and of any

plant type Monsanto attempted to make glyphosate tolerant but did not commercialize.

Mr. Lombardi said at the first hearing that Monsanto has searched in connection with the custodian protocol and produced documents, accordingly. (Hearing Tr. Vol.I 1-24-11 P.96 L.1-10).

Mr. Jagoe argued that Monsanto claims they could make plants of several different species Glyphosate tolerant, not just soybeans and corn. Defendants want the research that led up to commercialization, to show that the technology they needed to make a commercial plant or to make any Glyphosate tolerant plant of these types was not enabled. He said Dr. Barry revealed in his deposition that he had a lot of information and knowledge about other crops. Mr. Jagoe makes a convincing argument in saying if there is a named custodian, Dr. Barry, and an agreed or ordered search term, CP4, "we would have those documents and we don't have them." There is not much missing from that equation! (Hearing Tr. Vol.II 1-26-11 P.55 L.7-P.56 L.5).

**Number (10)** the crop yield of glyphosate-treated plants containing a CP4 EPSPS enzyme and any comparison to transgenic or non-transgenic plants containing a different EPSPS enzyme.

Mr. Jagoe said this is a similar discussion to number 1. (Hearing Tr. Vol.II 1-26-11 P.66 L.8-20). Mr. Lombardi said, on the first day of the hearing, that Monsanto has searched in connection with the custodian protocol and produced documents, accordingly. (Hearing Tr. Vol.I 1-24-11 P.96 L.19). This already verbose work will not be further expanded with further discussion of the point.

**Number (11)** the characterization, analysis, and selection of events 40-3-2, NK603, GA21, 89788, and Roundup Ready® Events, and the decision to commercialize those events.

Mr. Jagoe refers to number 11 as "the characterization, analysis, and selection of events 40-3-2, NK603, GA21, 89788, and the Roundup Ready events." (Hearing Tr. Vol.II 1-26-11 P.74 L.17-18). Mr. Jagoe says that Mr. Lombardi represented that Monsanto applied their version of the protocol in terms NK603 and 40-3-2 and that is all Monsanto will produce. Mr. Jagoe says that GA21 is a transgenic event in corn where an EPSPS enzyme was transformed into the plant at DeKalb before it was owned by Monsanto, and the EPSPS enzyme in that event would be characterized as a Class I EPSPS enzyme, and it shows that the distinction - - that isn't a Cass II enzyme, to make a commercial plant, is not supportable and two, the invention of GA21 is in fact prior art. Mr. Jagoe argues that GA21 documents were external documents at the time of the invention and qualify as prior art. Mr. Jagoe says that Monsanto is not producing documents on 89788, which is called the Roundup Ready 2 soybean event, which has the CP4 EPSPS enzyme in it, currently commercialized by Monsanto as Roundup Ready 2 Yield. Mr. Jagoe believes 89788 should be produced. (Hearing Tr. Vol.II 1-24-11 P.74 L.22-P. 76 L.15).

Mr. Lombardi believes that Monsanto has made proper production with respect to 40-3-2 and NK603, but says that when Monsanto was making its patent application(s) on CP4, Monsanto did not own GA21. He says, "the documents DeKalb has internally are - - are in no respect prior art. Certainly, wouldn't have been prior art at the time that the patent applications were filed. They're internal documents." He continues, "once Monsanto acquired the GA21 documents, if they even had them before this patent issued, the '435 patent issued in '97, even, - - even if they - - you assume they had access to those documents because of the acquisition of DeKalb, there's no obligation on the part of a patent prosecuting attorney to scour the documents of an acquisition company to determine whether that acquisition company has some document

that might contradict the statement that was made in the prosecution of patents that would be gone long before the acquisition took place." (Hearing Tr. Vol.II 1-26-11 P.76 L.25-P.78 L.18). Mr. Lombardi is correct. While other searches using other search terms will likely result in production of GA21 documents, Monsanto will not be required to do an independent search on GA21. It must search custodians with agreed and ordered search terms including records in its possession. It seems undisputed, that 89788 was a product not in existence at the time the applicable patent applications were filed, and no persuasive relevance argument is made for search and production of this term.

Mr. Lombardi reported that Monsanto has searched in connection with the custodian protocol and produced documents, relative to the 40-3-2 event and the NK603 event. He reiterated what he said earlier that the GA21 event has nothing to do with the case in accordance with the Court's prior orders, and the same is true as to the 89788 event. (Hearing Tr. Vol.I 1-24-11 P.96 L.12-P.89 L.12).

**Number (12)** the negotiations, drafts, course of dealing, and internal analyses related to the key agreements.

Mr. Lombardi said, as to the request in number 12, "we have produced the documents pursuant to the custodian protocol that are responsive there." (Hearing Tr. Vol.I 1-24-11 P.98 L.13-18).

Mr. Jagoe then argued that there are deficiencies in Monsanto's production. Defendants acknowledge that the Court's prior order stated Defendants' prior requests were too broad, but argue this Motion to Compel is narrow. Defendants say that they want Class I EPSPS enzyme information produced, even though it was not ordered preserved, and they can get it because it is

relevant.

## III.    CONCLUSION

The Court finds that under all of the facts and circumstances of the case, Monsanto has the most convincing argument as to the proper interpretation of the custodian protocol. Each side was to discuss with named custodians where they kept their documents in paper, files on personal computers, on a server or servers, on any other central location, or in conventional storage, and custodians would be asked how to retrieve the information which would be produced.

The deposition of Dr. Barry caused, at the very least, the perception by Defendants that Monsanto was not in compliance with the parties' custodian protocol which, it is undisputed, took seven months to draft. Shortly after that deposition, this Motion was filed and others followed this Motion. There have been many depositions taken in this case, not all of which have been brought to the attention of the Court. It may be that since this Motion was exhaustively briefed and argued, all of the relief sought may no longer be requested. Both parties suggest that neither wants to abandon the custodian protocol. The Court is persuaded that one option of the Court, to order Monsanto to interview the named custodians, gather information under the custodian protocol, and conduct searches thereafter, may, as Mr. Fleming said, do "violence." Because of late production by both parties, each party may already have information previously requested. Therefore, the Court will make limited orders in response to this Motion, order the parties to immediately meet and confer and report to the Court any agreement that can be reached on a recommendation to the Court concerning how to proceed with non-expert discovery. Thereafter, depending on the extent of any joint recommendations to the Court, the Court may set a prompt hearing on briefed motions before the Court, allow timed arguments, and orally rule the motions.

Obviously, extension of the period of non-expert discovery will be necessary. Any other recommendations, in addition to those presently before the Court, concerning amendment of the current effective Third Amended Case Management Order, will be considered, and a Fourth Amended Case Management Order will be executed. All current discovery deadlines are suspended.

As to relief sought in the twelve categories mentioned in Defendants' Second Motion to Compel, except relief already granted, the Court must first decide if discovery will be permitted outside the parameters of the Court interpreted custodian protocol, after deciding whether the Court will order Monsanto to interview named custodians, admittedly not previously interviewed, or if Defendants will be naming up to five additional custodians for Monsanto to interview, conduct searches and make production from sources of information identified by the additional custodians. That decision can hopefully be made promptly, after the above mentioned meet and confer session is concluded and reported.

**IT IS HEREBY ORDERED** that the parties shall meet and confer as set forth in this Order and report the results of said meet and confer to the Court no later than 3:00 p.m. on March 22, 2011.

So Ordered this 18th day of March, 2011.

_____
E. RICHARD WEBBER
SENIOR UNITED STATES DISTRICT JUDGE