UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MONSANTO COMPANY and | ) | |
| MONSANTO TECHNOLOGY LLC, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:09CV00686 ERW |
| | ) | |
| E.I. DU PONT DE NEMOURS AND | ) | FILED UNDER SEAL |
| COMPANY and PIONEER HI-BRED | ) | |
| INTERNATIONAL, INC., | ) | |
| Defendants. | ) | |

### MEMORANDUM AND ORDER

This matter comes before the Court on Plaintiffs Monsanto Company and Monsanto Technology LLC's (collectively "Monsanto") Motion for Sanctions against Defendants E.I. Du Pont De Nemours and Company and Pioneer Hi-Bred International, Inc. (collectively, "Defendants") [ECF No. 864]. The Court heard arguments from the parties on the Motion at a hearing on November 30, 2011. After consideration of the arguments, the parties' moving papers, the exhibits, and the hearing transcript, the Court has reached a decision on the Motion.[1]

## I.      BACKGROUND

A corporation functions through its officers. When a corporation is involved in a lawsuit, in-house or outside counsel or some combination thereof consult with corporate officers to prepare for the prosecution of claims or defenses. Corporate officers and the corporation's counsel are expected to abide by the same rules of honesty and obedience to the rule of law that all individual litigants are required to follow. When corporations and their counsel deviate from these rules, the administration of justice is derailed.

---

[1]   Defendants' Surreply was not considered. *See* ECF No. 929.

In this case, the parties are huge multi-national corporations involved in high-stakes litigation. Discovery has been expansive and marked by bitter exchanges in depositions, hearings, and court filings. After two years of vitriolic litigation, several documents have come to light that call to question Defendants' and their counsel's candor to the Court.

Since the beginning of this case, Defendants have taken the position that they contracted for, and have *always* believed that the 2002 soybean and corn license agreements provided them with, the right to stack and commercialize Monsanto's Roundup Ready® ("RR") traits in soybeans and corn with Defendants' Optimum® GAT® ("OGAT") trait.[2] This position provides the basis for many of Defendants' breach of contract defenses and reformation counterclaims. Monsanto now presents persuasive evidence that Defendants' position was never rooted in fact, but was a fabrication based on a false misrepresentation to the Court.

Monsanto asserts that Defendants' recently produced documents contradict the truthfulness of this position, and by maintaining this position, Defendants have committed a fraud against the Court. Monsanto asks the Court to invoke its inherent power to sanction Defendants by dismissing Defendants' reformation counterclaims and all contract-related defenses, by assessing Monsanto's attorneys' fees and costs on these claims to Defendants, or by precluding Defendants from offering any evidence relating to their contract defenses and their reformation counterclaims.

## II.    LEGAL STANDARD

A district court has broad discretion in imposing sanctions. *Everyday Learning Corp. v. Larson*, 242 F.3d 815, 818 (8th Cir. 2001). Various Federal Rules of Civil Procedure authorize the Court to impose sanctions, including Rules 11, 26, and 37. *Chambers v. NASCO, Inc.*, 501 U.S. 32,

---

[2] RR and OGAT are glyphosate-tolerant traits. Defendants' research and development of their product lines show that combining RR traits with OGAT result in a more effective glyphosate-tolerant seed product.

43 n.8 (1991). The Court also has inherent power to fashion sanctions based on litigation conduct that is disruptive of the judicial process. *Id*. at 44-45.

Monsanto only invokes the Court's inherent power for the imposition of sanctions against Defendants. The Court's inherent power "extends to a full range of litigation abuses," but, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Id*. at 46, 44. The Court may sanction conduct "by means of its inherent power" even if the conduct is sanctionable under other rules or statutes, although utilizing a rule or statute as authority for sanctions is preferable. *Id*. at 50; *see also Sentis Grp., Inc., v. Shell Oil Co.*, 559 F.3d 888, 900 (8th Cir. 2009).

The Court may use its inherent power "to dismiss actions, assess attorney's fees, and to impose monetary or other sanctions appropriate for conduct which abuses the judicial process." *Harlan v. Lewis*, 982 F.2d 1255, 1259 (8th Cir.1993) (internal citations omitted). "An award of sanctions under the court's inherent power must be based on 'clear evidence' and must be accompanied by 'a high degree of specificity in the factual findings[.]'" *Mickle v. Morin*, 297 F.3d 114, 125-26 (2d Cir. 2002).

In the Eighth Circuit, a finding of bad faith is not always necessary for the Court to exercise its inherent power to impose specific types of sanctions. *Stevenson v. Union Pac. R. Co.*, 354 F.3d 739, 745 (8th Cir. 2004); *Harlan*, 982 F.2d at1260 (noting bad faith requirement does not extend "to every possible disciplinary exercise of the court's inherent power" including imposing monetary sanctions). However, a finding of bad faith "is specifically required in order to assess attorneys' fees." *Stevenson*, 354 F.3d at 751. "This bad faith conduct must have practiced a fraud upon the court or defiled 'the temple of justice,' and cannot be based solely on the pre[-]litigation conduct that led to the substantive claim of the case." *Id*. (internal citations omitted).

A motion for sanctions adjudicates a collateral issue – malfeasance by a party – and does not adjudicate the merits of the case.  *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396 (1990). However, an adverse ruling on a motion for sanctions can have the effect of adjudicating the merits by foreclosing a claim or affirmative defense.  *Martin v. DaimlerChrysler Corp.*, 251 F.3d 691, 694 (8th Cir. 2001). During the hearing, Defendants spent much of their time presenting their case for contract reformation.  Irrespective of Defendants' efforts to turn this Motion into an adjudication on the merits, the Court keeps returning to the true issue of this motion: did the Defendants perpetuate a fraud against the Court by making knowing factual misrepresentations to the Court?

## III.   DISCUSSION

Monsanto argues that Defendants have perpetrated a fraud against the Court through five misrepresentations:

> 1) Defendants always had the right to commercialize (or sell) RR/ OGAT stacked seeds;
>
> 2) Defendants always had the right to stack RR and OGAT traits (glyphosate-tolerant traits);
>
> 3) Defendants believe that Section 2.09 of the license agreements, the "Licensed Field" definition, has no relation to stacking;
>
> 4) Defendants did not discover the meaning of the "Licensed Field" definition and its limitation on stacking until 2008; and,
>
> 5) Defendants believe that Section 3.01(a) does not contain any type of field of use limitation.

Monsanto asserts that Defendants have made these statements even though they knew the statements were "directly contradicted by the truth."  Monsanto states that documents from Defendants' last discovery production show by clear and convincing evidence that Defendants made false misrepresentations to the Court.

Defendants generally respond that the pending motion takes Defendants' statements out of context in an effort to "short circuit" the truth by innuendo, (Sanctions Hr'g Tr., Nov. 30, 2011, at 38), and represents "Monsanto's latest attempt to prevent a trial on the meaning of the Soybean and Corn Licenses." [ECF No. 893]. They assert that when read in context, the alleged misrepresentations show that Defendants genuinely believed that they negotiated the right to stack and commercialize glyphosate-tolerant traits such as RR and OGAT.[3] They contend that each alleged misrepresentation is in fact a plausible interpretation of the license agreement terms and is a plausible statement rooted in facts.

The issues involved in determining whether a party has committed sanctionable behavior involve "fact-intensive, close calls." *Cooter & Gell*, 496 U.S. at 404. Thus, each of these serious allegations of factual misrepresentation to the Court will be addressed in turn.

### A.   Defendants' assertion that Monsanto and Pioneer agreed that Pioneer could sell RR/OGAT stacked seeds

Monsanto contends that Defendants have lied to the Court by stating that after intense contract negotiations, Monsanto agreed that Pioneer could sell RR/OGAT stacked seeds. Monsanto cites to two of Defendants' statements from their pleadings filed in the fall of 2009 that are unequivocal assertions that the terms of license agreements give Defendants the right to sell a RR/OGAT stacked seed:

- "[T]he RR Licenses authorize Pioneer to sell stacked OGAT/RR seed." [ECF No. 66 at 17].

---

[3] In Monsanto's motion, it mentions "Pioneer's established track record of fraud before this Court" and cites to the Court's unpublished order in *Pioneer Hi-Bred Int'l, Inc. v. Monsanto Co.*, No. 4:97CV01609, 2001 WL 170410 (E.D. Mo. Jan. 2, 2001). Monsanto's citation to this case can only be construed as an effort to inflame the Court's passion and to bias the Court against Defendants. The Court rejects outright all comparisons of this case to the *Pioneer Hi-Bred* case. The Court rules on the pending Motion without any reliance on or reference to the January 2, 2001 Order.

- "Instead, the relevant terms *authorize* Pioneer to breed OGAT seeds with Roundup Ready® seeds and sell a product with those traits stacked." [ECF No. 76 at 4] (emphasis in original).

Monsanto states that the January 19, 2008 email [Pls.' Exh. E, ECF No. 866-5] between -----, DuPont's then-vice president of research & development, agriculture and nutrition, and -----, DuPont's then-executive vice president of agriculture and nutrition, flatly contradicts the above statements represented to the Court that Defendants believed that they had the right to sell stacked RR/OGAT seeds.  The relevant portion of the January 19, 2008 email states:

> ----- to -----: Begs two questions.  Do we feel we have stacking rights with RR today or not, I am not clear on this, and will Mon[santo] restrict access to their traits only to those varieties containing the output traits."

> ----- to -----: Check with ----- but I am sure we do have have [sic] stacking rights[4]

> ----- to -----: Just did we don't have commercial rights

[Pls.' Exh. E, ECF No. 866-5].

Monsanto also asserts that an email dated September 20, 2007, [Pls.' Exh. P, ECF No. 917-2] between two of Pioneer's in-house attorneys,  ----- and -----, unambiguously refutes Defendants' assertion that they believed they had the right to sell stacked RR/OGAT seeds:

> ----- to -----: What is our current advice to R&D on stacking RR and OptimunGAT in [soy]beans, based on the foregoing [section 3.01(i) of the license agreement]?

> ----- to -----: Current: they can stack but no commercial rights.

> ----- to -----: Because of the field of use limitation in 3.01(a)?[5]

---

[4]  ----- was Pioneer's in-house counsel and a negotiator of the 2002 License Agreements.

[5]  Section 3.01(a) states:
Subject to the terms of this Agreement, Monsanto hereby grants to Licensee, and Licensee, hereby accepts, a non-exclusive license within the Licensed Field in the Territory under Monsanto Patent Rights, Biological Materials and Licensed Patent Rights to develop, use, produce, have produced, offer to sell, sell and import Licensed Commercial Seed [Licensed Corn Products] and to develop, produce,

----- to -----: Yes.

[Pls.' Exh. P, ECF No. 917-2].

Defendants respond that these emails are taken out of context.  They assert that this email, and other January 2008 emails, are representative of in-house counsel -----'s conservative legal advice to research and development executives regarding his most conservative interpretation of the license agreements –"the reading most likely to avoid a fight with litigious Monsanto." [ECF No. 893 at 21].

Defendants cite two emails in support of this explanation.  In the July 7, 2007 email, ----- states to -----, a Pioneer executive, "As for a bright line, I am of the opinion that you are free to create test crosses with R (40-3-2) [RR soybeans] and [O]GAT and could start that immediately." [Pls.' Exh. L, ECF No. 866-12].  In the January 28, 2008 email from ----- to -----, the subject line is "Pioneer possesses right to stack GAT with RR and commercialize" [Pls.' Exh. M, ECF No. 866-13].   In that email, ----- summarizes arguments Monsanto is likely to make regarding the license agreements' grant of authority to stack RR and OGAT traits and commercialize these traits.  He states: "A conservative reading says we can stack but may not be able to commercialize, a potentially useless right.  However, a better argument might be that Pioneer is able to commercialize the stack even if that product [is] commercialized outside of the Licensed Field limitation."  [Pls.' Exh. M, ECF No. 866-13].

---

have produced, import, but not sell license or otherwise convey rights to Soybean [Corn inbred or] parent lines required for development and production of Licensed Commercial Seed [Licensed Corn Products], except to Licensee's Affiliates.

(bracketed material indicates the language for the RR Corn License Agreement).

The Court finds that the January 18, 2008 and the September 20, 2007 emails directly contradict Defendants' two assertions that they believed they had the right to sell RR/OGAT stacked seeds.  The Court does not find Defendants' explanation for the misrepresentation plausible.  Read together and in total, the emails demonstrate that as of September 20, 2007, Defendants did not believe that they had commercial rights. By repeatedly stating that they believed they had right to sell stacked RR/OGAT seeds, Defendants have deceived the Court.  They have intentionally made statements to the Court that are directly contradicted by facts.   In doing so, Defendants have perpetrated a fraud against the Court.  These misrepresentations to the Court have prolonged these already-protracted  proceedings and caused unnecessary expense to Monsanto and needless effort by the Court.  Such conduct abuses the judicial process and warrants sanctions.

### B.    Defendants' assertion that they always believed they could make RR/ OGAT Stacks under the license agreement

Monsanto asserts that Defendants directed their attorneys to file pleadings and motions stating that *at all times*, they subjectively believed they had this stacking right even though Defendants always knew that they lacked the right to stack glyphosate-tolerant traits.  Monsanto alleges that statements from Defendants Second Amended Answer and Counterclaims (SAAC) are false misrepresentations about their subjective belief regarding their stacking rights that are directly contradicted by recently produced emails:

317.  Any conclusion by the Court that the Soybean and Corn License Agreements prohibit Pioneer from stacking OGAT in Licensed Commercial Seed, or Licensed Corn Product, constitutes a material deviation from the parties' specific understanding that these agreements would not prohibit Pioneer in this manner.

318. A Letter of Intent ("LOI") executed by the parties, the negotiation history of the Soybean and Corn License Agreements, prior agreements and the parties' course of dealings, all evince that Monsanto and Pioneer agreed specifically that Pioneer would not be prohibited from stacking other traits or genes, including traits or genes for glyphosate tolerance, in soybean products containing Event 40-3-2 or corn hybrids containing Event NK603, but rather be permitted to add such traits.  Further,

8

Monsanto was at all times aware that Pioneer and DuPont interpreted the Soybean and Corn License Agreements in that manner during the drafting and execution of the Agreements, while DuPont and Pioneer were never aware that Monsanto had a countervailing interpretation.

335. Pioneer and DuPont thought that the final draft of the Soybean and Corn License Agreements conformed with . . . the LOI because the executed Agreements contained no express prohibition on stacking and contained the language suggested by Pioneer of March 28, 2002 at section 3.01(I). Further, Pioneer and DuPont understood that the [Soybean and Corn License] Agreements expressly authorized Pioneer to introduce any gene and/or trait into the Licensed Commercial Seed and Licensed Corn Products subject only to any Monsanto applicable patent rights that could be asserted against those introduced traits. See 3.01(e). Therefore, on April 1, 2002, Pioneer and Monsanto executed the Soybean and Corn License Agreements.

344. The negotiation history . . . demonstrated that the Licensed Field term was never intended to be – and Pioneer and DuPont had no reason to interpret it as – a stacking restriction. Rather, the parties drafted the Licensed Field term to identify that the license applied "solely" to the trait licensed by Monsanto, limiting Monsanto's non-assert.

573. At all times during the drafting and execution of the Soybean and Corn License Agreements, Pioneer and DuPont thought that these Agreements did not prohibit Pioneer from stacking other traits of genes, including traits or genes form glyphosate-tolerance, in soybean products containing Event 40-3-2 or corn hybrids containing Event NK603. [Averment under Count Thirteen: reformation due to mutual mistake].

574. Should the Court determine that any term of the Soybean and Corn License Agreements legally operate to prohibit Pioneer from stacking OGAT, this constitutes a direct conflict with the parties' understanding and agreement.

575. Pioneer and DuPont were mistaken of that fact during the drafting and execution of the Agreements.

581. At all times during the drafting and execution of the Soybean and Corn License Agreements, Pioneer and DuPont thought that these Agreements did not prohibit Pioneer from stacking other traits of genes, including traits or genes form glyphosate-tolerance, in soybean products containing Event 40-3-2 or corn hybrids containing Event NK603. [Averment under Count Fourteen: reformation due to Pioneer's unilateral mistake and Monsanto's knowing silence].

[SAAC, ECF No. 316].

Monsanto contends that emails between ----- and ----- illustrate Defendants' true subjective belief about their rights under the license agreements during negotiations and at the execution of the

agreement — that is, Defendants did not "always" believe they had full stacking rights.  In an email

dated March 27, 2002, ----- stated the following to ----- and -----:

> As you know, the deadline for making a deal with Monsanto expires on March 31 (Sunday).  ----- has said that ----- wants a deal completed by tomorrow (Thursday).  I wanted to make sure you understood where we are on the outstanding issues. . . . [T]here are also several big picture issues that we need to review and decide whether they are deal-breakers, at least from our perspective.
> . . .
> 2.  Stacking restriction with their traits (*currently we would agree not to stack like traits with theirs--e.g., no Ffybes/RR stack*).  This is a walk-away, to the extent that it prohibits us from using selectable markers for our entire trait pipeline.    We probably could agree not to stack competitive traits on Monsanto's *but we have to be able to use LL, GATT*, and maybe others someday, as selectable markers. . .*The ideal language would be what was in the 1992 RR Soybean agreement*, which we've already proposed, I think.  The acceptable compromise would be that we get a clear right to use herbicide tolerant genes as selectable markers in all cases, without additional royalty or restrictions so long as we don't impair the performance of their traits.

[Pls.' Exh. G, ECF No. 866-7] (emphasis added).[6]  Later in the day, ----- wrote: "It's fair to say that

the biggest issues for us are the stacking restrictions, as discussed below, and the germplasm

restrictions."  Then, ----- responded:

> 2.  Stacking restrictions trying for: We can (1) MON810 + another LEP trait, (2) RR corn with any other gene that confers non-gly[phosate] herbicide resistance except glufosinate as a selectable marker, and (3) RR corn with any other gene that confers non-gly[phosate] herbicide resistance.

[Pls.' Exh. G, ECF No. 866-7].  This email thread makes clear that Defendants knew that the license

agreements did not give them unlimited stacking rights.  This email thread also reveals what

Defendants did not do before they executed the 2002 license agreements:  Defendants did not suggest

contract language on the topic of stacking glyphosate-tolerant traits.  Defendants, however, did

---

[6] Ffybes is "a technology that created glyphosate-tolerant plants."  [ECF No. 893 at 15 n.12]. Ffybes utilizes an EPSPS trait.  *Id.*  According to Defendants, OGAT does not use an EPSPS trait to exhibit glyphosate tolerance. *Id.*

"LL" is LibertyLink, which is another product created by Defendants that is not associated with this litigation.

suggest language that addressed the fact that Pioneer could attempt to commercialize a stack that increased *non-glyphosate* tolerance if Pioneer could present scientific evidence that the non-glyphosate tolerant stack does not compromise glyphosate tolerance as memorialized in section 3.01(i). *See* Pls.' Exh. G, ECF No. 866-7 and Defs.' Exh. A, ECF No. 893-1.

Defendants respond that the recently produced documents and other evidence show that Defendants have been honestly representing to the Court their subjective belief regarding the right to stack RR traits with OGAT traits in soybeans and corn. First, Defendants cite to an email that memorializes their successful negotiation for the inclusion of section 3.01(i) as evidence that Monsanto included favorable stacking language from the 1992 license agreement. [Defs.' Exh. A, ECF No. 893-1]. The March 29, 2002 email between ----- and -----, the Pioneer vice president who signed the 2002 RR soybean and corn license agreements, (hereinafter -----) states: "They have agreed to use the language out of the '92 soybean agreement regarding stacking nearly word for word. We still have to show with credible scientific evidence that there is no decrease in the gly[phosate] tolerance." "That's on RR corn and soybean by the way. Hope that helps." This argument completely misses the point because it is referencing section 3.01(i), which grants permission to stack *non-glyphosate* tolerant traits that do not compromise glyphosate tolerance. In this case, Defendants have represented that they *always* believed that they have the right to stack

OGAT, a glyphosate-tolerant trait, with RR.[7]  This statement is not true, and it is clearly a false misrepresentation to the Court.

Secondly, Defendants cite to the July 10, 2007 email from ----- that analyzes Monsanto's potential arguments against stacking rights under the license agreements to show Defendants' subjective beliefs. [Pls.' Exh. L, ECF No. 866-12].  ----- writes: "We are not without arguments to allow the stack you are requesting, however.  For example, section 3.01 of the license also provides . . . Therefore, there would appear to be the recognition and agreement that Pioneer can take any gene (including a gly[phosate] tolerance gene) and introduce it into the Licensed Commercial Seed."  Again, this email does not erase the knowledge that at other times, Defendants believed that the language of the license agreements limited their stacking rights regarding glyphosate-tolerant traits.

Defendants also state that deposition testimony corroborates that they believed during the license agreement negotiations in 2002 that they could stack glyphosate-resistant traits such as RR and OGAT.  -----, deputy chief IP counsel of DuPont Legal, testified that

> A. The [legal] team was – understood that any agreement that would be negotiated would provide to Pioneer full stacking rights.
> Q. And was there ever a moment during the negotiations in March of 2002 that Monsanto indicated that was not correct? Or, did you always have the impression that you and Monsanto understood Pioneer would have full stacking rights?
> A. That was my understanding. And I don't know what Monsanto's understanding was, but that's what ----- communicated to me they agreed to.

---

[7]  Section 3.01(i) states:
Licensee agrees not to commercialize a variety of Licensed Commercial Seed which carries a gene or genes not supplied by Monsanto and which results in increased tolerance to *a non-glyphosate herbicide* without prior written consent of Monsanto which consent shall not be withheld if Licensee reasonably demonstrates with credible scientific evidence that the introduction of such *non-glyphosate herbicide tolerance gene(s)* does not increase the injury (if any) from glyphosate application to the crop produced by such modified Licensed Commercial Seed.
(emphasis added).

12

> Q. Did there ever come a point in time that Monsanto pushed back and said no, there are going to be some stacking restrictions? Or was it always your understanding that Monsanto believed, as you did, that Pioneer would have full stacking rights in the March 2002 time frame?
>
> A. Yes, there were times when, during the negotiations, Monsanto pushed back.

[Defs.' Exh. T, ECF No. 893-20]. This contradictory statement is not persuasive.  -----'s deposition testimony undermines Defendants' position because it shows that Defendants were aware that during negotiations, Monsanto was "pushing back" and wanted stacking restrictions.

Defendants also state that the January 17, 2011 deposition testimony of  ----- supports their assertion that Defendants have always believed that the 2002 license agreements allowed for stacking of glyphosate-tolerant stacks.  The relevant portions of -----'s deposition state the following:

> Q. (By Mr. Gutzler) Did you have any discussions with Monsanto prior to the letter of intent regarding stacking rights?
>
> A. I personally don't recall discussions between myself and Monsanto. I recall discussions as part of a negotiating team about the need for us to get the full stacking rights that we got in the 2002 agreement.[8]
>
> Q. Okay. You just said you got those rights in the agreement?
>
> A. Yes. As I interpreted the agreement, we were not under stacking restrictions with the exception of the -- and I don't -- can't point to the specific paragraph that said we -- whatever gene we stacked would not decrease the efficacy of the herbicide tolerance.
>
> Q. Okay.  So you interrupted [sic] the agreement, and you interpreted it with respect to stacking rights; correct?  That's what you just said.
> . . .
> A. I, at the execution of the agreement, knew that we had gotten the stacking rights that I as the research person felt we needed.
>
> Q. (By Mr. Gutzler) Okay. So when the agreement was signed, the agreement encapsulated exactly what you bargained for when it came to stacking rights; correct?
>
> A. When the agreement was signed, I felt confident that I could lead a research team that could stack what [we] needed to be stacked to bring about the products desired by customers.
>
> Q. Okay. And so when you interpreted the agreement when you signed it, you understood it to encapsulate the stacking rights that you had bargained for with Monsanto; correct?

---

[8]  The Court believes that ----- misspoke here and meant to say the "1992 agreement."

. . .

A. If you are defining the "you" in that question as Pioneer or DuPont, I would say, Yes.

\*\*\*

Q. What do you understand that provision to mean as a lay person? I'm not asking for a legal understanding. I'm asking for your understanding as the person who signed the agreement.

. . .

A. I understood at that time that to mean that this license did not cover other glyphosate herbicide tolerant traits developed by Monsanto, that we were only getting a license to those tracing to 40-3-2 from Monsanto, that this wasn't an evergreen so we got access to anything Monsanto ever developed.

\*\*\*

Q. Okay. Would you agree with me that putting -- stacking a glyphosate-tolerant trait with 40-3-2 would be outside the licensed field?

MR. FLEMING: Objection. Calls for a legal conclusion.

Q. (By Mr. Gutzler) Well, you just told me you understand the provision, so I'm asking your understanding.

MR. FLEMING: Objection. Calls for a legal conclusion.

A. My understanding at the time of signing the agreement was that we could stack any other trait we wanted to as long as we demonstrated that it met the conditions of the appendix spelling out glyphosate tolerance.

[Defs.' Exh. J, ECF No. 893-10]. Defendants assert that -----'s deposition shows that at the time of contracting, he understood that Defendants could stack any trait.

Monsanto responds that Defendants' construction of -----'s deposition testimony is contradicted by a March 26-27, 2002 email thread between ----- and -----. The relevant portion of the email, authored by -----, is excerpted below:

By the way, I just found out section 2.09 may be a problem. The definition of Licensed Field *limits us* to genetically-engineered protection against Glyphosate herbicide *solely due to the presence of the Glyphosate-Tolerant Soybean Event: 40-3-2. That will be problematic for us if we use a Glyphosate resistance gen (i.e. GAT) as a selectable marker in soybean transformation.* Our 1992 agreement is not so restrictive and permits us to commercialize stacks so long as they still meet the Commercial Tolerance definition. We need to get back to the language so we are not limited in what we can do from a transformation standpoint.[9]

---

[9]  Section 2.09 of the RR Soybean License Agreement states: "The term 'Licensed Field' means Licensed Commerical Seed which exhibit genetically-engineered protection against Glyphosate herbicide solely due to the presence of the Glyphosate-Tolerant Soybean Event: 10-3-

[Pls.' Exh. O, ECF No. 917-1] (emphasis added).  This email thread clearly shows that -----, the Pioneer vice president and signator of the 2002 RR license agreements, knew days before the execution of the agreements that section 2.09, the definition of Licensed Field, restricts Pioneer's use of the 40-3-2 soybean event and does not allow stacking RR with their OGAT trait.  The language of section 2.09 did not change to reflect -----'s desire "to get back to the language" of the 1992 agreement.  Moreover, in -----'s deposition he states that he "interpreted the agreement," which necessitates reading the agreement.  The 2002 executed license agreements contain section 2.09, which ----- states in this email he was concerned that that provision was a stacking restriction.

The Court finds that this email, Monsanto's exhibit O [ECF No. 917-1], conclusively shows that Defendants have perpetrated a fraud against the Court by stating to the Court, repeatedly, that they *always* believed that under the license agreements, they always had the right to stack RR traits with OGAT traits.  *See* SAAC, ¶ 317, 318, 335, 344, 573, 574, 575, 581 [ECF No. 316].  Defendants have perpetuated a fraud upon the Court by knowingly making false factual statements to the Court in order to further their argument for contract reformation.  This conduct constitutes an abuse of the judicial process and is sanctionable.

### C.    Defendants' assertion that the definition of "licensed field" in Section 2.09 of the license agreement has no relation to stacking

---

2."  The Court ruled on January 15, 2010 and again on July 30, 2010,  that section 2.09, the field of use restriction, "limit[s] Defendants' use of the licensed RR traits to 'Licensed Commercial Seed which exhibit genetically-engineered protection against Glyphosate herbicide solely due to the presence of the [RR soybean or corn trait],' cannot plausibly be read to permit the stacking of glyphosate-tolerant traits." [July 30, 2010 Order, ECF No. 283].  This email shows that Defendants recognized that section 2.09 was a field of use restriction despite their arguments to the contrary.

Monsanto contends that Defendants' repeated statements to the Court that Section 2.09, the definition of "Licensed Field," has no relation to stacking are patently false.  Defendants have averred in the SAAC that:

344.  The negotiation history of the MON810, 2001 license demonstrates that the Licensed Field term was never intended to be – and Pioneer and DuPont had no reason to interpret it as – a stacking restriction.  Rather, the parties drafted the Licensed Field term to identify that the license applied "solely" to the trait licensed by Monsanto, limiting Monsanto's non-assert.

353. Pioneer and DuPont and Monsanto's agents all understood that the Licensed Field term, including the language "solely due to the presence of," in the MON810, 2001 license and in the Soybean and Corn License Agreements concerned limiting Monsanto's non-assert and has nothing to do with stacking restrictions.

354. Monsanto's agents, including Hoerner who contributed to drafting both the MON810, 2001 license and the Soybean and Corn License Agreements, knew that Pioneer and DuPont did not at any time understand the Licensed Field term to restrict Pioneer from stacking traits or genes that provide similar protection as the licensed trait.

[ECF No. 316].  Defendants have also stated: "while Monsanto misconstrues the 'Licensed Field' provision as a prohibition against stacking, 'Licensed Field' merely defines the limit on Monsanto's promise not to sue Pioneer for patent infringement." [ECF No. 65 at 18].

Monsanto asserts that -----'s March 14, 2002 email regarding a draft of the RR Soybean license agreement illustrates that Defendants knew that the language in the Licensed Field provision created a stacking restriction and was not merely a non-assert provision.  [Pls.' Exh. I, ECF No. 954-1].  The email states:

Attached hereto is a redline version of Monsanto's draft RR Soybean agreement.  *It has been modified to remove the stacking restrictions* and non-promote language [sic] in accordance with the [Letter of Intent].  It has also been modified in several places to remove language appropriate to the MON810 license, but not to this agreement.  Where possible, language from the 1992 agreement has been substituted. . . .

16

[Pls.' Exh. I, ECF No. 954-1] (emphasis added).  The attached redline edit strikes the word "solely" from the from section 2.08,[10] the Licensed Field definition, and in its place, adds the words "in whole or part." [Pls.' Exh. I, ECF No. 954-1].  The email coupled with the redline edit shows that Defendants were aware that as of March 14, 2002, that the Licensed Field definition acted as a stacking restriction.

Monsanto also points to the March 26, 2002 email from ----- to ----- as evidence that Defendants knew well before 2008 that the Licensed Field definition is a stacking restriction.  The relevant portion of the email states:

> By the way, I just found out section 2.09 may be a problem.  The definition of Licensed Field *limits us* to genetically-engineered protection against Glyphosate herbicide *solely due to the presence of the Glyphosate-Tolerant Soybean Event: 40-3-2.*  That will be problematic for us if we use a Glyphosate resistance gene (i.e. GAT) as a selectable marker in soybean transformation.  Our 1992 agreement is not so restrictive and permits us to commercialize stacks so long as they still meet the Commercial Tolerance definition.  We need to get back to the language so we are not limited in what we can do from a transformation standpoint.

[Pls.' Exh. O, ECF No. 917-1] (emphasis added).  As mentioned above, ----- signed the 2002 RR license agreements on behalf of Pioneer.

Monsanto also states that throughout this litigation, Defendants have contended that the YieldGard Agreement, which is not at issue in this case, and the RR soybean and corn license agreements "must be read together as two parts of the same business transaction." [ECF No. 150 at 5].  This contention, Monsanto argues, shows that Defendants have always known that the "Licensed Field" definitions from each agreement, which are virtually identical to each other, operated as stacking restrictions and did not refer only to Monsanto's promise not to sue Defendants for patent infringement.  Monsanto cites to an August 17, 2007 email from ----- to ----- that states: "Some

---

[10]  The language proposed by Monsanto in section 2.08 is identical to the language in section 2.09 of the executed 2002 license agreement.

suggested changes re stacking." [Pls.' Exh. K, ECF No. 866-11].   Attached to the email is a document that redline edits the YieldGard Agreement.  One relevant change reads: "Section 2.07 will be amended to delete the phrase 'solely due to the presence of the B.t. Corn Event-MON810.'"[11] *Id.*

Defendants deny that their repeated contention that the Licensed Field definition is only a non-assert provision amounts to fraud on the Court.  They assert that -----'s suggested revision to the YieldGard License in 2007 is not evidence of fraud, but it is evidence of "his desire to remove a potential argument" from Monsanto's arsenal.  Defendants also state that Monsanto's removal of another provision in the Amended YieldGard License, section 3.01(h), as evidenced in a letter from Monsanto to Pioneer, [Defs.' Exh. U, ECF No. 893-21], shows that "even Monsanto understood that the Licensed Field provision does not implicitly or explicitly prohibit GAT in the Soybean and Corn Licenses."  This argument ignores that the March 14, 2002, March 26, 2002,  and  August 17, 2007 emails show that the Defendants struck language from related contracts which they believed related to stacking and that language was contained in the "Licensed Field" definition.

The Court finds Monsanto's argument persuasive.  Defendants have contended that the their subjective beliefs about the YieldGard Agreement is relevant to their subjective beliefs about the RR license agreements.  The March 14, 2002 email and the August 17, 2007 email show that the edits to the Licensed Field definitions in the respective agreements were changes that *Defendants believed* were related to stacking, which needed to be changed to permit the desired stacking rights.  -----'s word choice demonstrates that Defendants were aware of the stacking restrictions in the definition for "Licensed Field" in the YieldGard Agreement, and by their own insistence that the the RR license

---

[11]  Section 2.07 of the YieldGard license agreement states, "The term 'Licensed Field' shall mean Licensed Corn Products which exhibit genetically-engineered protection against lepidopteran insects solely due to the presence of the B.t. Corn Event- MON810."  The language of section 2.07 in the YieldGard license agreement is virtually identical to section 2.09 in the RR soybean agreement.

agreements must be read and considered in context of the YieldGard agreement,  the RR license agreements.  Thus, as of March 14, 2002, Defendants were aware that the "Licensed Field" definition related to stacking restrictions.  Monsanto has shown by clear and convincing evidence that Defendants intentionally have made misrepresentations to the Court and in doing so, have perpetrated a fraud against the Court.  Such conduct is an abuse of the judicial process and is sanctionable.

### D.    Defendants' assertion that they had no idea that the "licensed field"related to stacking until Monsanto told Defendants it did in 2008

Defendants have repeatedly stated that they were unaware until 2008 that the "Licensed Field" definition related to stacking.  Defendants have stated:

- "Under no circumstances could DuPont be deemed 'fully aware' of the claimed prohibition on stacking until Monsanto first asserted that position. Based on the allegations in the Counterclaims, which the Court is required to accept on a motion to dismiss, this did not occur until 2008." [ECF No. 384 at 28-29];
- "Pioneer and DuPont understood that the Agreements expressly authorized Pioneer to introduce any gene and/or trait into Licensed Commercial Seed and Licensed Corn Products." SAAC ¶ 335 [ECF No. 316].
- "Monsanto's silence as to a contractual prohibition on stacking continued for over six years … until 2008. Only upon learning of Pioneer's intent to add its own proprietary OGAT technology to Roundup Ready® seeds, did Monsanto come forward to claim that the Soybean and Corn License Agreements prohibited stacking." SAAC ¶ 359 [ECF No. 316].

As described in detail in the previous section, Monsanto has shown by clear and convincing evidence that Defendants knew before 2008 that the Licensed Field definition related to stacking restrictions. These statements from Defendants' SAAC and ECF No. 384 are factual misrepresentations,  amount to fraud against the Court, and indicate an abuse of the judicial process.  Defendants' conduct warrants sanctions.

**E.      Defendants' contention that section 3.01(a) does not contain any type of field of use limitation**

Defendants have asserted that Section 3.01(a) of the license agreements does not contain any type of field of use limitation: "Section 3.01(a) affirmatively grants Pioneer the right to sell certain products, but does not create a negative covenant enforceable against Pioneer." [ECF No. 66 at 12]. Monsanto contends that this assertion is misrepresentation and Defendants' actually believe that section 3.01(a) is a field of use limitation.  Monsanto cites the following September 20, 2007, email between ----- and ----- to support its contention:

-----:    Current: they can stack but no commercial rights.

-----:    Because of the field of use limitation in 3.01(a)?

-----:    Yes.

[Pls.' Exh. P, ECF No. 917-2].   Monsanto asserts that this email unequivocally shows that Defendants knew as of 2007 that section 3.01(a) is a limitation on their license rights and still Defendants represented to the Court in 2009 that it did not believe that section 3.01(a) imposed any limitations.  After pouring over Defendants' brief, exhibits, and  the hearing transcript, the Court cannot locate Defendants' counter argument to this claim.

The Court finds that the September 20, 2007 email clearly shows that Defendants knew that they section 3.01(a) is a field of use limitation and, therefore, Defendants' aforementioned statement from ECF No. 66 at 12 is a factual misrepresentation.   By knowingly making this false representation, particularly about an issue so critical to this litigation, Defendants have committed a fraud against the Court.  Defendants' conduct is an abuse of the judicial process and warrants sanctions.

## F.      Defendants' Arguments Against Sanctions

Rather than attack each alleged misrepresentation individually, Defendants make sweeping arguments to justify their conduct and statements that undermine the truth of their statements made to the Court.  Defendants' arguments can be summarized as follows:

- •      Because document production did not start until July 2010, Defendants could not have made any factual misstatements.

- •      Defendants' voluntary production of the incriminating documents shows that they have nothing to hide and that they did not have any intent perpetrate a fraud against the Court

- •      The documents, when read in context, show that Defendants do believe and have always believed that they have a contractual right to stack and commercialize RR and OGAT.

The Court has attempted to place some of Defendants' arguments within the context of each of Monsanto's allegations.  However, the Court now will address the general arguments in turn.

### 1. Because document production did not start until July 2010, Defendants could not have made any factual misstatements.

Defendants contend that they could not have made any intentional factual misstatements because formal discovery did not begin until July 2010:

> There were no documents even collected and produced in this case until July 2010, months and months later.  So when these statement were made, just as a matter to put all this had in context, neither side including DuPont and Pioneer had seen the documents.  So how can a statement intentionally be made that's fraudulent when no one has the facts yet, no one has had the discovery yet, no one has reviewed the documents yet?

(Hr'g Tr. at 44).    Timing is at the heart of this Motion because a party cannot make a misrepresentation to the Court until it knows a statement is factually or legally unsound. Nevertheless, a party has a duty to have a good-faith belief, "formed after an inquiry reasonable under the circumstances," that facts support any allegation or denial.  Fed. R. Civ. Pro. 11(b)(3) & (4).

Defendants' argument is undermined by their previous admissions that they had conducted investigations before formal discovery began.   In Defendants' "Memorandum in Support of Defendants' Motion for Leave to File SAAC," filed February 19, 2010, Defendants state:

> The parties have been engaged in Rule 26 negotiations for six months, and as a result have not yet begun producing formal discovery to each other. Defendants have used the intervening time to conduct additional investigations. These amendments are the product of those ongoing, good faith investigations, which Defendants have undertaken even in the absence of the benefit of formal discovery from Monsanto.

[ECF No. 164 at 2].   Later in that pleading, Defendants state:

> However, out of the abundance of caution and in an effort to expeditiously resolve the issue, Defendants have taken the opportunity presented by delays in the onset of formal discovery to exceed their pleading obligations under Rule 9(b), and provide Monsanto with all of the details it has requested. Defendants continued investigation has also uncovered additional evidence of inequitable conduct set forth in the SAAC.

[ECF No. 164 at 3].  The Court does not believe that Defendants would have avoided questioning the Pioneer attorneys and executives who negotiated the license agreements—the individuals who would have the best personal knowledge of Pioneer's intent during negotiations and at the execution of the license agreements—at the earliest instance to prepare its defense in such a high-stakes case.

Even if Defendants did not question the negotiation team or review their internal documents regarding the negotiation of the license agreements, such behavior would be unreasonable.  Rule 11 requires that an attorney conduct a reasonable inquiry of the factual and legal basis for a claim before filing.  *Coonts v. Potts*, 316 F.3d 745, 753 (8th Cir. 2003); ----- *v. Bittner*, 985 F.2d 935, 939 (8th Cir. 1993).  "To constitute a reasonable inquiry, the prefiling investigation must uncover a factual basis for the [party's] allegations, as well as a legal basis."  -----, 985 F.2d at 939.  The reasonableness of the attorney's inquiry  depends on factors such as "whether counsel had to rely on a client for factual information[.]"  *Id*.  An attorney may rely on a client's factual statements when those statements are objectively reasonable.  *Id*.  However, "merely relying on the word of client as to the factual

22

underpinnings of the case violates Rule 11 given the counsel's experience and access to relevant information." *Id*. (citing *Lloyd v. Schlag*, 884 F.2d 409, 413 (9th Cir. 1989). Ultimately, the Court must determine "whether a reasonable and competent attorney would believe in the merit of an argument." -----, 985 F.2d at 939. (citation omitted); see also *Norsyn, Inc. v. Desai*, 351 F.3d 825, 831 (8th Cir. 2003).

Counsel's Rule 11 obligations do not cease after the filing of the initial pleadings; Rule 11 imposes a limited continuing duty upon the signing attorney to ensure that the factual allegations previously alleged remain rooted in truth. *See* Fed. R. Civ. P. 11, 1993 amendment advisory committee note ("a litigant's obligations with respect to the contents of these papers are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit."). With each new filing, the signing attorney renews his or her attestation to the veracity of the underlying pleading. "Moreover, if evidentiary support is not obtained after a reasonable opportunity for further investigation or discovery, the party has a duty under the rule not to persist with that contention." *Id*. This duty does not require the party to formally amend the pleadings; rather, it requires the party to abandon the factually or legally unsupported claim or defense. *Id*.

The Court is not utilizing Rule 11 to impose sanctions, however, Defendants still have Rule 11 obligations. Under Rule 11, Defendants had a duty to perform a "reasonable inquiry" to uncover factual and legal support for their contentions. *Coonts*, 316 F.3d at 753; -----, 985 F.2d at 939. Moreover, a party "is impressed with a continuing responsibility to review and reevaluate his pleadings and where appropriate modify them to conform to Rule 11." *Merritt v. Int'l Ass'n of Machinists and Aerospace Workers*, 613 F.3d 609, 626 (6th Cir. 2010); *see also* Rule 11 1993

23

amendment.  By the time Defendants had moved for reconsideration of the Court's Rule 12(c) Order on January 29, 2010, a reasonable attorney would have ferreted out this information from key witnesses regarding these essential issues of the case.  The Court also finds it unreasonable that Defendants' attorneys would not have known what high-level executives and in-house counsel during and after the 2002 license agreements would have said and believed about the 2002 license agreements.  The Court does not believe Defendants when they assert that a lack of discovery prevents them from making factual misstatements.

> *2. Defendants' voluntary production of the incriminating documents shows that they have nothing to hide and that they did not have any intent to perpetrate a fraud against the Court.*

Defendants believe that their voluntary production of these documents shows that they have nothing to hide and have not mislead or committed a fraud upon the Court.  However, Defendants chose to waive attorney-client privilege and produce documents rather than abandon their contract reformation claim.[12]  Defendants ask, "how can you have an intent to defraud when you've looked at the document and said we believe they should be produced?" (Hr'g Tr. at 49).

The Court believes that in this case, an intent to defraud does coincide with a voluntary production of self-destructive documents.  The explanation is rather simple: the parties are bitter corporate rivals who for years, have conducted a business relationship based on distrust and litigation. Defendants have adopted a  fight-to-the death mentality, which in this instance, the Court believes has clouded Defendants' judgment.   Defendants' counsel saw the material produced. Notwithstanding the clear and unmistakable content of the documents that clearly and convincingly show Defendants knew of the 2002 license agreements stacking restrictions, they nevertheless

---

[12]  Defendants assert that they have produced  "almost 8 million pages of documents" in this litigation.  (Hr'g Tr.at 41).

persisted and persist to this day, in advancing false claims that they always believed that they had the

right to stack RR and OGAT traits and commercialize this stack.  The claimed excuse is not plausible.

Defendants have knowingly committed a fraud upon the Court.

> *3. The documents, when read in context, show that Defendants do believe and have always believed that they have a contractual right to stack and commercialize RR and OGAT.*

Defendants also insist that the emails between Pioneer's in-house counsel and research and

development executives sent a few days before the parties executed the license agreements show that

Defendants genuinely believed, and continue to believe, that they negotiated for the right to stack and

sell glyphosate-tolerant stacks, RR and OGAT.  They assert that the following emails when read in

their entirety and in chronological order, show that the parties negotiated a right to stack and sell

glyphosate-tolerant stacks.[13]  The content between the bullet points is the Court's commentary on the

emails and not representative of Defendants' position:

• The March 26 - 27, 2002 email chain between ----- and -----, in which  ----- states:
  > By the way, I just found out section 2.09 may be a problem.  The definition of Licensed Field limits us to genetically-engineered protection against Glyphosate herbicide solely due to the presence of the Glyphosate-Tolerant Soybean Event: 40-3-2.  That will be problematic for us if we use a Glyphosate resistance gen (i.e. GAT) as a selectable marker in soybean transformation.  Our 1992 agreement is not so restrictive and permits us to commercialize stacks so long as they still meet the Commercial Tolerance definition.  We need to get back to the language so we are not limited in what we can do from a transformation standpoint.

  [Pls.' Exh. O, ECF No. 917-1].

---

[13]  Many of these emails have been excerpted in this Order.  The Court recites all the emails in the manner suggested by Defendants in order to best illustrate Defendants' argument although there is redundancy.

As already noted, this email clearly shoes that Defendants knew of the Licensed Field restriction in early 2002.  This document also calls into question the integrity of -----'s aforementioned sworn deposition testimony.

- The "Walk-Away Email" dated March 27, 2002, from -----, which states:

    [T]here are also several big picture issues that we need to review and decide whether they are deal-breakers, at least from our perspective.
    . . .
    2. Stacking restriction with their traits (currently we would agree not to stack like traits with theirs--e.g., no Ffybes/RR stack).  *This is a walk-away, to the extent that it prohibits us from using selectable markers for our entire trait pipeline.  We probably could agree not to stack competitive traits on Monsanto's but we have to be able to use LL, GATT, and maybe others someday, as selectable markers. . . The ideal language would be what was in the 1992 RR Soybean agreement,* which we've already proposed, I think.  The acceptable compromise would be that we get a clear right to use herbicide tolerant genes as selectable markers in all cases, without additional royalty or restrictions so long as we don't impair the performance of their traits.

[Pls.' Exh. G, ECF No. 866-7] (emphasis added). This email confirms Defendants' knowledge of stacking restrictions that Defendants needed to eliminate from the 2002 license agreements.

- An email from ----- to ----- and ----- dated March 27, 2002, at 7:24 p.m. ----- states to ----- and -----:

    "Still having a major problem with the RR/[Liberty Link] stack on [soy]beans as a commercial product.  I get the impression this is a high priority for you.  Will try again.  They have OK'ed a gene that confers GLY[phosate] resistance as a marke[r] (i.e. GAT)."  [Defs.' Exh. L, ECF No. 893-12].

This email shows that stacking to commercialize still remains a problem at this point.

- Later in that thread, ----- responds to ----- on March 27, 2002, at 8:06 p.m.: *"Good news about the GAT!*  The [Liberty Link]/ RR stack in soybeans in not a "walk-away" for me.  Its more of a principle of the thing.  We don't have restriction in our 1992 agreement and they didn't raise the issue while ----- and ----- negotiated the [Letter of Intent].  Why are they trying to dump it on us now?" [Defs.' Exh. L, ECF No. 893-12] (emphasis added).

This email shows that Monsanto was still persistent that the license agreements would contain stacking restrictions, and significantly, ----- knew of the restrictions at the time.

•         March 28, 2002, at 8:31 p.m, same email thread, ----- says to -----: "Before you get too excited about GAT. . . They do not know about it specifically, and they will obviously have other issues (i.e. patents) regarding it's [sic] use. *However, at least the agreement does not prohibit use of a non-Mon[santo] gene which supplies gly[phosate]-tolerance*." [Defs.' Exh. L, ECF No. 893-12] (emphasis added).

Defendants' counsel continues to raise the stacking prohibition, and ----- is *not advised* that stacking RR with GAT is permitted.

•         March 28, 2002, at 8:31-8:45 a.m., between -----, -----, and -----:

>         -----: Understood -----.  The old provision read:
> Pioneer agrees not to commercialize a variety of Licensed Commercial Seed which carries a gene of genes not supplied by Monsanto and which result in increased tolerance to a non-glyphosate herbicide without the prior written consent of Monsanto which consent shall not be withheld if Pioneer reasonably demonstrates with credible scientific evidence that the introduction of such non-glyphosate herbicide tolerance gene(s) does not increase the injury (if any) from glyphosate application to the crop produced by such modified Licensed Commercial Seed;
> I assume something that broad would be perfect, and I can take it from there.

>         -----: Question.  This speaks to the issue of non-glyphosate herbicides but is silent on other glyphosate resistance genes.  I assume we would not be blocked against using another glyphostate [sic] resistance gene as a selectable marker.  We need to make sure that agreement doesn't include language elsewhere that takes this opportunity away.

>         -----: Your assumption is right, but of course it does not necessarily mean we have an FTO on another Gly[phosate]-tolerant gene.  I'll take care of this.

[Defs.' Exh X, from Defs.' hr'g presentation]. Here, ----- only recognizes that Pioneer will get the

right to stack *non-glyphosate* herbicide resistant traits, and he wants to get the freedom to stack

glyphosate on glyphosate-tolerant traits.  At this point, clearly, Pioneer, did not have this right and

----- and ----- were aware of that fact.

•         March 28, 2002, at 9:25 a.m., between ----- and ----- at Monsanto: "On another topic, it was pointed out to me by [-----] ----- that the [Letter of Intent] had provision in it stating that Pioneer shall not be prohibited by the licenses from combining or stacking other traits or genes.  Therefore, I would propose in both RR corn and soy agreements we should discuss the inclusion of language similar to the earlier license, section 3.5(a), which provided:

[stacking and commercialization restrictions identical to section 3.01(i)]" [Pls.' Exh. H, ECF No.866-8]

It is clear at this point, in 2002, Defendants understood that they had not achieved the desired stacking rights. The conversation regarding stacking rights resumes five years later:

- July 10, 2007 email between ----- and -----: "Monsanto would likely argue that the stack of GAT and 40-3-2 is not allowed under the terms of the license agreement. . . ." [Defs. Exh. O; ECF No. 893-15]

Defendants express no surprise at an expected claim by Monsanto that the 2002 license agreements contain stacking restrictions.

- "We are not without arguments to allow the stack you are requesting." July 10, 2007, email between ----- and -----. [Defs. Exh. O; ECF No. 893-15]

- July 10, 2007 email between ----- and -----. "As a bright line, I am of the opinion that you are free to create test crosses with R(40-3-2) and GAT and could start that immediately." [Defs. Exh. O; ECF No. 893-15]

Defendants continue at this point to believe that "test crosses" would be permissible, but there is nothing to suggest that they have the right to commercialize.

- January 28, 2008 email between ----- and -----:
  Summary of Argument MON will likely make
      [text of section 3.01(a)]
  The key limitation is the Licensed Field. That term is defined as:
      [text of section 2.09]

  This seems to limit the ability to stack GAT plus RR. However, the license also allows that stacking of "any gene" later in the license grant:
      [text of section 3.01(e)]

  . . . A conservative reading says we can stack but may not be able to commercialize, a potentially useless right.

  However, a better argument might be that Pioneer is able to commercialize the stack even if that product commercialized outside of the Licensed Field limitation. Section 3.01(a) has two levels of "commercialization": the first dealing with "Licensed Commercial Seed" and the second with "Soybean parent lines". The limits on commercialization in 3.01(a) are therefore the distinction between parent seed and commercial seed {the green highlight}, and those do not included the Licensed Field limitation.

[Pls.' Exh. M, ECF No. 866-13].  As of January 28, 2008, Defendants' top in-house attorneys

recognize the Licensed Field limitation.

• January 30, 2008 email from ----- to -----:
  ----- there is no question but that the soy license permits us to make breeding stack
  with RR soy and another gene/trait.  Breeding stacks were OK but not molecular
  stacks.  This was clearly understood when we negotiated the licenses.  The only
  exception is crossing with a non-glyphosate herbicide trait, and even then Monsanto
  cannot unreasonably withhold consent if we can demonstrate with credible evidence
  that this other non-glyphosate herbicide trait does not harm the crop when
  glyphosate is applied. . . .

  . . . During the negotiation, Monsanto really pressed back on stacking two lep traits
  BUT not herbicide traits.  We told them that we were developing alternatives to RR
  and would use STS or other SU resistant traits.  We would never accept a flat out
  restriction to this.  They said OK, but just wanted us to show that it did not harm
  glyphosate tolerance from RR.

[Defs.' Exh. S, ECF No. 893-19].  ----- clearly understands that molecular stacking is prohibited.  He

further understands that  stacking with a non-glyphosate resistant trait is permissible provided the

Defendants show no harm to glyphosate resistance.  He was well aware that Monsanto was "pushing

back" as previously discussed.

Defendants contend that these emails show that on March 27, 2002, Monsanto confirmed

with ----- that stacking glyphosate-tolerant traits was authorized by the license agreements: "These

documents show that Pioneer did believe and does believe and has contemporaneous evidence that

trier of fact could look at and it's not just plausible, it's in black and white, that shows they

understood through conversations with Monsanto and documents that they had the right to stack

glyphosate on glyphosate [- resistant traits]." (Hr'g Tr. at 61).  Defendants also contend that the 2007-

2008 emails exemplify the distrust between the parties and in-house counsel's attempt to anticipate

all of Monsanto's potential litigious conduct.   Defendants assert that Monsanto's piecemeal

presentation of the emails does not accurately represent the negotiations evidenced by these emails,

nor does Monsanto's presentation show the truth—Defendants have always believed that under the

license agreement, they have the right to stack RR and OGAT.  This argument is merely advocacy that invites the Court to look away from what the plain language says to what counsel impressively says the words mean.  These emails advanced Monsanto's position rather than Defendants.  They are conclusive that Defendants never were granted glyphosate on glyphosate stacking rights.

The Court finds that these emails show that Defendants, at different times between 2002 - 2008, knew that the 2002 license agreements prohibited them from stacking and commercializing glyphosate-tolerant traits.  Defendants knew that they lacked these rights, and yet, they stated throughout two years of litigation that they negotiated for this rights and *always believed* that they had these rights.  For example, on March 26, 2002, -----, the executor of the 2002 license agreements states, "By the way, I just found out section 2.09 may be a problem" because that language will be "problematic" if they want to stack "GAT" onto RR traits.  [Pls.' Exh. O, ECF No. 917-1].  He then states that Defendants need to get back to the language of the 1992 agreements that did not prohibit stacking.  The negotiations never resulted in an adoption of all of the 1992 language.  Then, six years later, -----, a negotiator of the 2002 license agreements, details at length all of the anti-stacking arguments that Monsanto could possibly use against Defendants.   [Pls.' Exh. M, ECF No. 866-13].  That email transcribes three sections of the 2002 license agreements that appear to create some type of stacking restriction.  At least in 2002 and 2008, Defendants did not *always* believe that they had full stacking rights.  The moment Defendants realized that they lacked the right to stack and commercialize glyphosate-tolerant traits, they could not represent to the Court that they always believed they had these rights without making false representations to the Court, committing a fraud upon the Court.

Defendants also cite to Monsanto's "Global Agreement Summary," dated May 2002, as evidence that Defendants' subjective beliefs about stacking rights (that they have the right to stack

and commercialize RR and OGAT traits) comports with Monsanto's belief about Defendants' stacking rights. [Defs.' Exh. N, ECF No. 893-14].  That exhibit, which is an internal document prepared by a Monsanto employee, states that under the Pioneer RR Corn & Soybean  License Agreements, "Pioneer can stack with other events.  Pioneer agrees not to commercialize herbicide tolerant stack until it is reasonably demonstrated with credible scientific evidence that product does not increase crop injury from glyphosate application."  The language of this exhibit seems to be referring to section 3.01(i) of the 2002 license agreements that pertains to stacking *non-glyphosate* tolerant herbicide traits onto RR traits.

The Court does not find this argument compelling because it shifts the focus from Defendants sanctionable conduct to adjudicating the merits of the reformation claim. The language in the "Global Agreement Summary" does not address what Defendants believed about the right to stack and commercialize stacks.  It does not change the statements contained in numerous emails that show that Defendants knew that the license agreement did not grant them the right to stack or commercialize RR/OGAT stacks.  Nor does this exhibit change the fact that Defendants continuously stated to the Court that they always believed that they had stacking rights when clearly they did not believe that the license agreement gave them full stacking rights.

## IV.    REMEDY

Defendants have knowingly and in bad faith made false misrepresentations to the Court that are clearly refuted by internal documents  produced by Defendants to Monsanto.  Monsanto seeks, in the alternative, the following remedies: 1)  strike Defendants' pleadings on the breach of contract claims and counterclaims and award Monsanto attorneys' fees; or 2) preclude Defendants from putting forth evidence relating to their contract defenses.  In addition, Monsanto requests that the Court allow Monsanto to re-depose certain witnesses.

31

## A.     Striking Portions of the Pleadings

A court has wide discretion to fashion a sanction that deters future misconduct by the party. *Chrysler Corp. v. Carey*, 186 F.3d 1016, 1022 (8th Cir. 1999).  Public policy favors adjudicating issues on the merits as opposed to depriving a party of its day in court.  *Id.* at 1020.  Nevertheless, a party's egregious misconduct may force a court to impose the severest of sanctions – dismissing a lawsuit of striking pleading.  *See id.* at 1020-22.  Defendants' recently produced documents show that they have been making false representations to the Court for over a year about issues critical to their breach of contract defenses and counterclaims.  Defendants show no remorse for their wrongdoing but to compound the seriousness of their behavior, insist on maintaining their bogus arguments, despite the overwhelming evidence that those arguments are directly contradicted by the facts. It is pointless to impose a monetary sanction against Defendants for this misconduct and then allow them to continue these misrepresentations in order to proceed with their contrived reformation defense.

The Court finds that striking portions of Defendants' SAAC is the only means to deter this misconduct and preclude Defendants from continuing this behavior that is an abuse of the judicial process.  The Court strikes the following portions from Defendants' SAAC [ECF No. 316]: Ninth Defense - Reformation; Count Thirteen, Reformation due to Mutual Mistake, (¶¶ 571-578); Count Fourteen, Reformation due to Pioneer's Unilateral Mistake and Monsanto's Knowing Silence, (¶¶ 579 -596); and Count Fifteen, Reformation due to Monsanto's Fraudulent Misrepresentation as to the Legal Effect of the Soybean and Corn License Agreements, (¶¶ 597-607).

## B.     Accessing Attorney's Fees To Be Paid By Defendants

Defendants have repeatedly and systematically made and continue to make false representations to the Court about their subjective beliefs regarding stacking rights and restrictions. Defendants had an opportunity to abandon their reformation defense and counterclaims as well as all

32

of the unsupported statements regarding those claims, but Defendants chose not to abandon the claim. This choice shows willful conduct on the part of Defendants.  These intentional misrepresentations have delayed the case and caused Monsanto to defend itself against bogus, factually unsupported allegations.

"[T]he award of attorney's fees for bad faith . . . vindicate[s] the District Court's authority over a recalcitrant litigant." *Chambers*, 501 U.S. at 53 (internal citation omitted) (alterations in original).  "Like other sanctions, attorney's fees certainly should not be assessed lightly or without fair notice and an opportunity for a hearing on the record." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980).

To award attorneys' fees under the Court's inherent power, the Court must find the party acted "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers*, 501 U.S. at 46; *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-59 (1975); *Willhite*, 459 F.3d at 870; *Harlan v. Harlan*, 982 F.2d 1255, 1260 (8th Cir. 1993). "This bad faith conduct must have practiced a fraud upon the court or defiled 'the temple of justice,' and cannot be based solely on the pre[-]litigation conduct that led to the substantive claim of the case." *Stevenson*,  354 F.3d at 751. (internal citations omitted).  Finding that a party acted with an improper purpose and intent amounts to a finding of subjective bad faith.  *Clark*, 460 F.3d at 1011.  "A  party demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." *Leon v. IDX Systems Corp.*, 464 F.3d 951, 961 (9th Cir. 2006).  Findings regarding a party's or attorney's state of mind "must necessarily be based on circumstantial evidence and inferences drawn therefrom." *Clark*, 460 F.3d at 1011.

Defendants have made a mockery of this proceeding and delayed this litigation by their insistence  that  they  believed  they  had  the  right  to  stack  and  commercialize  RR  and  OGAT.

Defendants have repeatedly made false representations to the Court and these misrepresentations have compromised the integrity of the case and abused the judicial process.  Defendants' obstinate refusal to abandon these false statements or to be deterred from proceeding on their reformation claims amounts to vexatious conduct.  The Court  finds that Defendants have acted in bad faith and their misrepresentations have caused substantial expense to Monsanto.  Therefore, Monsanto is entitled to attorney's fees incurred from defending the reformation counterclaim and filing this Motion.

An award of attorney's fees should be "no greater than sufficient to deter future misconduct by the party."  *Willhite*, 459 F.3d at 869 (8th Cir. 2006).  Moreover, the Court's award of attorney's fees should not exceed the expenses and fees directly and unavoidably caused by the sanctionable conduct. *See Landscape Props., Inc. v. Whisenhunt*, 127 F.3d 678, 684-85 (8th Cir. 1997).  In the context of a complex, multi-claim lawsuit, the party receiving attorney's fees must demonstrate to the Court that the fees sought actually represent the amount of time spent defending that claim.  Within thirty (30) days of this order, Monsanto shall submit an itemized list of its accrued fees beginning with the date of the filing of Defendants' motion for reconsideration, January 29, 2010.  No fees will be awarded that can be traced to the antitrust claims or any unrelated contract defense or counterclaim.

### C.      The Request to Re-Depose Certain Witnesses

Monsanto requests to re-depose certain witnesses in light of the information revealed by Defendants' latest document production.  Monsanto seeks this opportunity to probe DuPont and Pioneer in-house counsel and executives about the newly discovery information regarding Defendants' subjective beliefs about their stacking rights and the limitations imposed by the license agreements.  Because striking portions of Defendants' SAAC renders Defendants' reformation claim

moot and likewise renders moot questions about Defendants' subjective beliefs about stacking rights and restrictions, the Court denies Monsanto's request to re-depose certain witnesses on the topic.

## IV.    CONCLUSION

Candor toward the Court, whether it is through a party's pleadings or other representations, is fundamental to the swift administration of justice.  Defendants and their attorneys have perpetrated a fraud against the Court. They have unreasonably and unnecessarily protracted this litigation to the prejudice of Monsanto.  Their behavior is so egregious that only the most severe sanctions will deter future misconduct.

Accordingly,

**IT IS HEREBY ORDERED** that Monsanto's Motion for Sanctions [ECF No. 864] is **GRANTED**.

**IT IS FURTHER ORDERED** that the aforementioned portions of Defendants' Second Amended Answer and Counterclaims [ECF No. 316] are struck.

**IT IS FURTHER ORDERED** that within thirty (30) days of this Order, Monsanto shall submit to the Court itemized reports detailing attorney's fees accrued as described above.

Dated this  21st  day of December, 2011.

E. RICHARD WEBBER
SENIOR UNITED STATES DISTRICT JUDGE

35